**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 1:25-cv-04458-APM** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendants (collectively, the District) move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint [5-1] for failure to state a claim. A memorandum of points and authorities as well as a proposed order are attached. Because this Motion is dispositive, the District did not seek Plaintiff's consent. *See* LCvR 7(m).

Date: March 18, 2026.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
Civil Litigation Division

400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendants*

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 1:25-cv-04458-APM** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    I.    The District's Assault Weapons Laws ................................................................ 2

    II.    Second Amendment Jurisprudence ...................................................................... 3

    III.    34 U.S.C. § 12601 ............................................................................................. 5

        A.    Text and Enactment History ................................................................... 5

        B.    Past Practice ............................................................................................ 8

    IV.    This Case .......................................................................................................... 11

LEGAL STANDARD ....................................................................................................... 12

ARGUMENT .................................................................................................................... 13

    I.    The United States' Challenge to the District's Assault Weapons Laws Is
        Not Cognizable Under Section 12601 ............................................................... 13

        A.    Section 12601 Does Not Authorize the United States to Challenge
            Substantive Criminal Prohibitions ........................................................ 14

            1.    The Text of Section 12601 Does Not Authorize Challenges
                to State and Local Criminal Statutes ............................................. 14

            2.    History and Context Make Clear That Section 12601
                Should Not Be Construed to Authorize Challenges to
                Substantive Criminal Statutes ....................................................... 19

                a.    Congress Enacted Section 12601 Against the
                        Backdrop of Other Pattern-or-Practice Laws, Which
                        Do Not Contain Similar Constraints ................................. 19

                b.    Legislative History Also Evidences Section 12601's
                        Narrow Focus on Eliminating Police Misconduct ............ 22

                c.    Since Its Enactment 30 Years Ago, Section 12601
                        Has Never Been Used to Challenge a Substantive
                        Criminal Prohibition ....................................................... 24

3.     Construing Section 12601 to Authorize Challenges to Criminal Prohibitions Is Contrary to Federalism and Common Sense .................................................................................. 26

B.     The Complaint Brings a Facial Challenge to Substantive Criminal Laws That Section 12601 Does Not Permit.............................................. 28

II.     The Complaint Fails to Plausibly Allege Facts Supporting a Pattern or Practice of Conduct by Law Enforcement That Deprives Persons of Constitutional Rights .............................................................................. 31

A.     The Complaint Fails to Plausibly Allege a Deprivation of Constitutional Rights .............................................................................. 31

B.     The Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement Officers ..................................................... 38

CONCLUSION.................................................................................................................... 40

**INTRODUCTION**

This lawsuit is the first of its kind—and it should be the last.  The United States brings a facial challenge to longstanding District laws that prohibit the possession of assault weapons, statutorily defined to include a list of certain makes and models, as well as firearms with certain combat-functional features.  It does so under the guise of a federal statute, 34 U.S.C. § 12601, which allows the United States to sue state and local governments to eliminate "a pattern or practice of conduct by law enforcement officers" that "deprives persons of [constitutional] rights."  But Section 12601 historically has not been used by the federal government to facially challenge criminal laws democratically enacted by state or local legislatures.

This Court should reject the United States' novel claim for either of two reasons.  First, Section 12601 does not authorize a facial challenge to state or local criminal prohibitions.  It creates a targeted cause of action to seek injunctive or declaratory relief to eliminate "a pattern or practice of conduct by law enforcement officers."  But substantive criminal prohibitions—like the challenged assault weapons laws—are not directed at "conduct by" law enforcement officers. To the contrary, they proscribe private conduct.  The United States' efforts to shoehorn its challenge into Section 12601 violate the statute's plain text, ignore telling legislative history, and run afoul of basic canons of construction—plus common sense.  Second, even if the United States' claim is cognizable under Section 12601, the Complaint fails to plausibly allege facts showing that the District's laws are unconstitutional or that police officers have a pattern or practice of enforcing those laws.  For either of these reasons, the Court should dismiss the Complaint for failure to state a claim.

**BACKGROUND**

This case involves the interplay between local, federal, and constitutional law: the District's assault weapons laws, the Second Amendment, and 34 U.S.C. § 12601. An overview of each is helpful before turning to the case at hand.

## I.    The District's Assault Weapons Laws

Seventeen years ago, the District enacted a series of statutory provisions prohibiting assault weapons in the District. Firearms Control Amendment Act of 2008, D.C. Law 17-372, 56 D.C. Reg. 1365 (Feb. 13, 2009) (eff. Mar. 31, 2009). District law generally provides that no person in the District may "possess or control" a firearm without a "valid registration certificate." D.C. Code § 7-2502.01(a). Possession of an unregistered firearm is a misdemeanor. *See id.* § 7-2507.06(a). But an "assault weapon" cannot be registered. *Id.* § 7-2502.02(a)(6).

District law enumerates various "assault weapons" across dozens of severable subsections. *See id.* §§ 7-2501.01(3A), 7-2507.10. First, District law prohibits a list of specified makes and models of rifles, pistols, and shotguns. *Id.* § 7-2501.01(3A)(A)(i)(I)–(III). Relevant here, on that list is the AR-15. *See id.* § 7-2501.01(3A)(A)(i)(I)(ee) (defining all guns in the "Colt AR-15 series" to be assault weapons). Other firearms specifically proscribed by District law include, for example, the Striker 12 shotgun. *Id.* § 7-2501.01(3A)(A)(i)(III)(bb).

Second, District law prohibits semiautomatic rifles, pistols, and shotguns with statutorily proscribed features, *id.* § 7-2501.01(3A)(A)(i)(IV)–(VI), such as a "grenade launcher" or "barrel shroud," *id.* § 7-2501.01(3A)(A)(i)(IV)(dd), (V)(cc).

Third, District law prohibits "other models within a series that are variations, with minor differences, of those models" listed in subparagraph (A) of the statute, *id.* § 7-2501.01(3A)(A)(i)(VIII), as well as a "semiautomatic shotgun that has the ability to accept a

2

detachable magazine," *id.* § 7-2501.01(3A)(A)(i)(VII), and "[a]ny shotgun with a revolving

cylinder" with an express exception, *id.* § 7-2501.01(3A)(A)(ii).

Fourth, District law prohibits weapons that are determined by MPD through rulemaking

to "pose the same or similar danger to the health, safety, and security of the residents of the

District as those weapons enumerated" by the District's assault weapons laws.  *Id.*

§ 7-2501.01(3A)(A)(iii).

## II.    <u>Second Amendment Jurisprudence</u>

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized

that the Second Amendment protects an individual right to possess handguns in the home for

self-defense.  But, the Court cautioned, "the right secured by the Second Amendment is not

unlimited" and is "not a right to keep and carry any weapon whatsoever."  *Id.* at 626.  "[T]he

Second Amendment does not protect those weapons not typically possessed by law-abiding

citizens for lawful purposes."  *Id.* at 625.

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), and *United

States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court articulated a two-step test for Second

Amendment challenges.  At the first step, the challenger bears the burden to show that the

challenged law infringes conduct that falls within "the Second Amendment's plain text," as

originally understood and interpreted by precedent.  *Hanson v. District of Columbia*, 120 F.4th

223, 231–32 (D.C. Cir. 2024) (per curiam) (quoting *Bruen*, 597 U.S. at 17), *cert. denied*, 145 S.

Ct. 2778 (2025).  If so, the Court proceeds to the second step, and the law nonetheless must be

upheld if it "is consistent with the principles that underpin our regulatory tradition."  *Rahimi*, 602

U.S. at 692.

The D.C. Circuit applied this framework in *Hanson* to affirm the denial of a preliminary

injunction in a challenge to the District's prohibition on extra-large-capacity magazines

(ELCMs), that is, ammunition magazines containing 12 to 17 bullets.  120 F.4th at 230; *see id.* at 231 n.2.  The D.C. Circuit explained that *Bruen*'s step one "encompasses two more precise questions:  Do ELCMs constitute bearable arms, and, if so, are ELCMs in common use for a lawful purpose, such as self-defense?"  *Id.* at 232 (citation modified).[1]  The "answer" to the second question "is not to be found solely by looking to the number of a certain weapon in private hands."  *Hanson*, 120 F.4th at 232–33.  The court cited approvingly the Fourth Circuit's observation that "the [Supreme Court's] choice of the phrase common *use* instead of common *possession* suggests that only instances of 'active employment' of the weapons should count."  *Id.* at 233 (quoting *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) (en banc), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025)).  Thus, "common use for self-defense" at step one also turns on both an arm's actual use and suitability for self-defense.  In light of disputed facts in the record in *Hanson* "about the role of ELCMs for self-defense," the court "presume[d]" that ELCMs "can be used for self-defense" and proceeded to *Bruen*'s step two.  *Id.*  At step two, the court identified historical principles that governments have long had the power to restrict "particularly dangerous weapons" and "the related category of weapons particularly capable of unprecedented lethality."  *Id.* at 237.  The court held that the ELCM restriction comported with those principles because it "counter[s] the growing use of ELCMs to facilitate crime and, specifically, to perpetrate mass shootings."  *Id.* (citation modified).

---

[1]    The *Hanson* Court "assume[d], without deciding," that the "common-use" issue belongs at step one, reasoning that "the *Bruen* Court determined that handguns are in common use before conducting its historical analysis."  120 F.4th at 232 n.3.  Unless and until the D.C. Circuit revisits the placement of the common-use issue, this Court should follow *Hanson*.  *Cf. Ellis v. District of Columbia*, 84 F.3d 1413, 1418 (D.C. Cir. 1996) (a district court follows an "on point" case until the appellate court "instructs . . . otherwise").

III.    **34 U.S.C. § 12601**

A.    **Text and Enactment History**

This case arises under 34 U.S.C. § 12601.  Section 12601, originally codified at 42 U.S.C. § 14141, is part of Title XXI, § 210401, 108 Stat. 2071, of the Violent Crime Control and Law Enforcement Act of 1994 (the "1994 Crime Bill").  It reads as follows:

> (a) Unlawful conduct
>
> It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.
>
> (b) Civil action by Attorney General
>
> Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1)[2] has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

Section 12601 was a direct response to the 1991 beating of Rodney King by officers from the Los Angeles Police Department (LAPD).  *See* Defs.' Ex. 1, Civ. Rts. Div., U.S. Dep't of Just., *Roundtable on State and Local Law Enforcement Police Pattern or Practice Program 42 USC § 14141* at 1–2 (June 3, 2010) (*Roundtable* Rep.) (summarizing history).[3]  Following that

---

[2]    The reference to "paragraph (1)" is a scrivener's error, which should be read as "paragraph (a)."  *United States v. Lauderdale Cnty.*, 914 F.3d 960, 962 n.2 (5th Cir. 2019).

[3]    With this motion, the District provides as exhibits relevant materials from the Justice Department regarding Section 12601.  As federal agency documents, they are subject to judicial notice and properly considered at this stage, especially because they either provide background or are extrinsic sources relevant to interpreting Section 12601.  *See Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (on a motion to dismiss, a court may consider "public records

5

tragedy and the national outrage it sparked, the Police Accountability Act of 1991—the precursor to Section 12601—was introduced in Congress and incorporated into H.R. 3371, the Omnibus Crime Control Act of 1991 (the "1991 Crime Bill").  H.R. Rep. No. 102-1085, at 63, 65 (1992); H.R. Rep. No. 102-242, at 135–39 (1991).  The Police Accountability Act passed the House of Representatives, but the Senate "failed to achieve cloture on the Conference Report."  H.R. Rep. No. 102-1085, at 65, 67, 189–90.  A modified version of the Police Accountability Act was, however, incorporated into the 1994 Crime Bill.  *See* Pub. L. No. 103-322, tit. XXI, 108 Stat. 2071 (1994); *Roundtable* Rep. at 1–2.  This modified version, which became law, was identical in substance to its predecessor, except that it omitted a private cause of action and expanded the scope of the provision so that it referenced "conduct" not only by "law enforcement officers," but also by "officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles."  *Compare* 34 U.S.C. § 12601, *with* H.R. Rep. No. 102-242, at 24.

Because Section 12601 has no direct legislative history, courts and the Justice Department have looked to the legislative history of the Police Accountability Act to interpret the statute's scope.  *See, e.g.*, *United States v. City of Columbus*, No. 99-cv-1097, 2000 WL 1133166, at *3 (S.D. Ohio Aug. 3, 2000).  The committee report makes clear that the Act was designed to address a specific problem: "the problem of excessive force," which "is a serious one."  H.R. Rep. No. 102-242, at 136.  The report detailed the brutalization of King by the LAPD and noted that it was "not an aberration," but rather part of a "culture" of "excessive force" in the LAPD.  *Id.* at 135.  The committee underscored that this "problem is not limited to Los

---

subject to judicial notice").  Ordinarily, they are publicly available online, but the District attaches them as exhibits because some have recently been removed from the Justice Department's website.

Angeles"—"[p]olice use of excessive force is a significant problem in this country." *Id.* The report described other examples of "police brutality" and "police misconduct" in police departments, many of which evidenced "pattern[s] of misconduct," including "unconstitutional, harassing stops and searches of minority individuals," arrests of bystanders who "complain about police actions," a special unit using a racial slur in its name, and officers' use of "an illegal kung-fu device . . . to inflict pain on passive demonstrators." *Id.* at 136.

The committee found that the Justice Department "lack[ed] the authority to address systemic patterns or practices of police misconduct." *Id.* at 137. Specifically, the committee noted that "the Federal Government's criminal authority to prosecute police brutality is not adequate to address patterns or practices such as the lack of training or the routine use of deadly techniques like chokeholds, or the absence of a monitoring and disciplinary system." *Id.* at 138. And the committee further explained that after the Supreme Court's decision in *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), individual litigants could not seek injunctive relief to address police abuses "absent a showing of likely future harm." *Id.* at 137. This created a "gap in the law" where neither individual litigants "nor anyone else" could eliminate systemic constitutional violations caused by "police brutality." *Id.* at 137–38.

Congress sought to "close this gap in the law, [by] authorizing the Attorney General . . . to sue for injunctive relief against abusive police practices." *Id.* at 138. The committee report cited two cases as illustrative of "the need for this authority and how it will work"; both involved excessive force. *Id.* at 138–39 (detailing how residents in Washington State were "beaten by police officers following traffic stops" and a "young black man" in North Carolina was "strangled to death by city police officers"). Nonetheless, the report stressed that "[t]he Act does not increase the responsibilities of police departments or impose any new

7

standards of conduct on police officers" because "[t]he standards of conduct under the Act are the same as those under the Constitution." *Id.* at 138; *see id.* at 136 (stating that "[p]olice brutality is a violation of the U.S. Constitution").

### B.    Past Practice

Following Section 12601's enactment, the Justice Department developed standard procedures and practices for Section 12601 cases. Defs.' Ex. 2, Civ. Rts. Div., U.S. Dep't of Just., *The Civil Rights Division's Pattern and Practice Police Reform Work: 1994-Present* at 1–2 (2017) (2017 Rep.). Section 12601 cases have historically been handled by the Special Litigation Section in the Civil Rights Division, which "consists of career professional attorneys with many decades of collective experience working on police reform cases." *Id.* at 3. A Section 12601 case begins with a preliminary, internal inquiry of whether to open an investigation into a police department's conduct. *Id.* at 5. After that preliminary inquiry, if the Special Litigation Section recommends opening an investigation and the Assistant Attorney General agrees, the Civil Rights Division notifies the jurisdiction's chief executive officer and chief legal officer. *Id.* at 8. The Division then "makes the existence of the open investigation public." *Id.*

Investigations of police conduct are comprehensive, often take over a year, and include extensive review of evidence, data, and documents along with direct observation of police officers. *Id.* at 9–10, 14. "As part of its investigations, the Division emphasizes outreach to all levels of a law enforcement agency" because, "[i]n the Division's experience, engaged and committed police leadership makes investigations more effective and efficient." *Id.* at 10–12. One of the first steps in an investigation is meeting with law enforcement leadership. *Id.* at 10. Then, during the investigation, "[t]he Division engages officers . . . at roll-calls [and] during ride-alongs," as well as "in face-to-face meetings." *Id.* at 12. The Division also engages the

community and "almost always conducts a series of community or town hall meetings in different locations designed to create a forum for members of the community to speak to their experiences and insights." *Id.* at 13. These extensive investigation efforts are necessary because "the thoroughness of the Division's investigations underpins the credibility and effectiveness of its reform efforts." *Id.* at 15.

At the end of an investigation, if the Division determines that there is insufficient evidence of a Section 12601 "pattern or practice of conduct by law enforcement officers" that violates constitutional or statutory rights, it notifies the jurisdiction of the finding and closes the investigation. *Id.* at 15. If, however, the Division determines that there is reasonable cause to believe that such a Section 12601 pattern or practice exists, the Division sends a letter or report notifying the jurisdiction of the Division's determination and setting forth the specific conclusions underlying that determination. *Id.* That "announcement of findings is typically accompanied by a day of meetings with police leadership and command staff, police unions, and community stakeholders" to discuss the findings and next steps. *Id.* at 15–16.

The focus then shifts to cooperatively finding solutions to eliminate the pattern or practice. *Id.* at 17. "The Division's goal in every case is to avoid contentious litigation and begin the process of reform as quickly as possible." *Id.* at 18. The Division engages the police department in negotiations to reach a reform agreement and consent decree, with input from a variety of stakeholders. *Id.* at 17–18, 20. Reform agreements and consent decrees provide for termination once their terms have been implemented, which usually occurs after two years. *Id.* at 35. Only if a reform agreement cannot be reached does the Division bring a lawsuit. *Id.* at 2, 18. At the time of the Division's 2017 report on the history of Section 12601, "of the many dozens

9

of cases in which the Division has found a pattern or practice of police misconduct, all but six have resulted in a reform agreement without the need for civil litigation." *Id.* at 18.

The Division's Section 12601 cases have "focus[ed] on systemic police misconduct." *Id.* at 1. Accordingly, "[m]any of the Division's investigations focus on core issues in police reform common to many law enforcement agencies—such as patterns of unlawful use of force; unlawful stops, searches and arrests; and racial discrimination." *Id.* at 6. Indeed, "[a]ddressing systemic excessive force is one of the core functions of the Division's pattern-or-practice cases." *Id.* at 27. Consistent with the Division's focus on police misconduct, until late last year, the Justice Department had never, to the District's knowledge, used a Section 12601 case to bring a facial challenge to a state or local statute duly enacted by the legislature, let alone to the legislature's regulation of individual criminal conduct. *See id.* at 41–48 (summarizing past Section 12601 cases); *Roundtable* Rep. at 8–9 (cataloguing Section 12601 cases and tagging the allegation type).

In fact, between 2017 and 2021, the Justice Department brought only one Section 12601 investigation and even declined to open an investigation into the Minneapolis Police Department following the murder of George Floyd. Christy E. Lopez, *DOJ Police Pattern-or-Practice Investigations*, 37-SPG Crim. Just. 34, 35–36 (2022). The lack of investigations was consistent with that administration's pronouncement that it "is not the responsibility of the federal government to manage non-federal law enforcement agencies." Defs.' Ex. 3, Memo. From Jefferson B. Sessions III, Atty. Gen., to Heads of Dep't Components & U.S. Attys. at 1 (Mar. 31, 2017). Indeed, the federal government significantly curtailed the use of consent decrees because, in its view, "federal court decrees that impose wide-ranging and long-term obligations on, or require ongoing judicial supervision o[f], state or local governments are extraordinary remedies

10

that 'raise sensitive federalism concerns.'" Defs.' Ex. 4, Memo. From Jefferson B. Sessions III, Atty. Gen., to Heads of Civ. Litigating Components & U.S. Attys. at 2 (Nov. 7, 2018) (quoting *Horne v. Flores*, 557 U.S. 433, 448 (2009)). In the United States' view at the time, "[t]his supervision can deprive the elected representatives of the people of the affected jurisdiction of control of their government." *Id.*

## IV.    **This Case**

This case breaks with both longstanding Section 12601 procedures, as well as the federal government's more recent, limited view of Section 12601. There was no public investigation, engagement with MPD, or attempted negotiations. Instead, this case began with a Complaint filed in December 2025, Compl. [1], by the Justice Department's "newly established Second Amendment Section," Press Release, Off. of Pub. Affs., U.S. Dep't of Just., *Justice Department Sues the District of Columbia for the Unconstitutional Ban of Semi-Automatic Firearms* (Dec. 22, 2025), tinyurl.com/yu82pzdn; *see* David Hood-Nuño & Sarah N. Lynch, *US Justice Department Plans Gun Rights Office Within Civil Rights Unit*, Reuters (Nov. 25, 2025), tinyurl.com/yfyw2kec (noting establishment of the Second Amendment Section just one month prior, in November 2025).

The Complaint, as corrected, brings a single claim under Section 12601. Compl. [5-1] ¶¶ 27–42. The Complaint alleges that MPD has a pattern or practice of denying firearm registration certificates for assault weapons or arresting individuals for possession of assault weapons. *Id.* ¶¶ 39–42. The Complaint further alleges that assault weapons are protected by the Second Amendment and that prohibiting their possession violates individuals' Second Amendment rights. *Id.* As relief, the Complaint seeks (1) a declaration that the District's pattern and practice of prohibiting registration of "the AR-15" and "all other firearms without an automatic firing mechanism and otherwise protected under the Second Amendment" violates the

11

Second Amendment, (2) a permanent injunction preventing the District from arresting and levying fines for possession of "the AR-15 and all other firearms protected by the Second Amendment and being possessed or used for lawful purposes," and (3) a permanent injunction requiring the District "to enable and allow the registration of firearms protected under the Second Amendment." *Id.* ¶ 43.[4]

## LEGAL STANDARD

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court need not accept as true conclusory "assertions devoid of further factual enhancement," *id.* (citation modified), or "legal conclusions," *Pueschel v. Chao*, 955 F.3d 163, 166 (D.C. Cir. 2020). The court "take[s] note of the elements" of a plaintiff's claim and "then determines whether the plaintiff has pleaded those elements with adequate factual support to state a claim to relief that is plausible." *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (citation modified). A dismissal for failure to state a claim is appropriate when a plaintiff's claims are premised on mistakes of law, including mistakes about the scope of constitutional rights. *See Neitzke v. Williams*, 490 U.S. 319, 326 (1989) ("Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law."); *Medina v. Whitaker*, 913 F.3d 152, 154 (D.C. Cir. 2019) (affirming Rule 12(b)(6)

---

[4]    The United States designated this case as "related" to another Second Amendment challenge to the District's assault weapons laws pending before this Court, *Yzaguirre v. District of Columbia*, No. 1:24-cv-01828-APM. Not. of Related Case [2]. *Yzaguirre* is brought by private plaintiffs under 42 U.S.C. § 1983.

dismissal of challenge to the federal felon-in-possession ban because the Second Amendment does not extend to felons).

**ARGUMENT**

**I.      The United States' Challenge to the District's Assault Weapons Laws Is Not Cognizable Under Section 12601.**

Following the brutal beating of Rodney King and startling reports of police misconduct across the country, Congress enacted Section 12601 to authorize the Attorney General to bring civil suits to eliminate systemic constitutional and statutory violations caused by law enforcement officers.  In so doing, Congress did not fundamentally reorder the federal government's relationship with states and localities.  Instead, Congress crafted a powerful but targeted cause of action and remedial scheme with important limitations.  The statute's text, history, and context—plus common sense—make clear that Section 12601 may only be invoked to challenge a "pattern or practice of conduct by law enforcement officers" that "deprives" individuals of protected rights.  That reading respects states' and localities' historic exercise of police powers while accomplishing Congress's stated goal of empowering the Attorney General to redress a particular category of harm—systemic police misconduct—which is not easily redressed by individual litigants.  Since its enactment 30 years ago, this is precisely how the United States has interpreted Section 12601.

Today, however, the United States asks the Court to adopt a reading of Section 12601 that is atextual and out of step with history, past practice, and basic principles of prudence.  The United States seeks to use Section 12601 to bring a facial challenge to the District's prohibition on the possession of assault weapons.  But Section 12601's text does not support such a reading because substantive criminal prohibitions, like the challenged laws, proscribe *individual* conduct; they are not directed at "conduct by" law enforcement officers.  And facial challenges to criminal

13

prohibitions are far afield from the types of harms that Congress sought to remedy when it enacted Section 12601, *i.e.*, harms caused by police misconduct. The United States' novel interpretation also dramatically expands the federal government's ability to superintend state and local affairs at the expense of state and local sovereignty. For these and all the reasons that follow, this Court should hold that the United States' suit based on its newly minted interpretation of Section 12601 is not cognizable.

A.    **Section 12601 Does Not Authorize the United States to Challenge Substantive Criminal Prohibitions.**

Section 12601's text, especially when interpreted in light of its context, its history, and canons of interpretation, reveals that the statute does not authorize facial constitutional challenges to state and local criminal laws.

1.    **The Text of Section 12601 Does Not Authorize Challenges to State and Local Criminal Statutes.**

To resolve a question of statutory interpretation, the Court "begin[s] with the text," which "must be read in the context of the entire statute." *Noble v. Nat'l Ass'n. of Letter Carriers*, 103 F.4th 45, 50 (D.C. Cir. 2024). In construing statutory text, "words generally should be 'interpreted as taking their ordinary . . . meaning . . . at the time Congress enacted the statute.'" *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (quoting *Wis. Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018)). Here, the text of Section 12601 makes three limiting principles clear: the statute provides a cause of action (1) targeted at specific actors (as relevant here, "law enforcement officers"), (2) when "a pattern or practice of conduct by" those actors, *i.e.*, the way in which they perform their duties, (3) causes the deprivation of constitutional rights. The import of these limitations is that Section 12601 does not authorize the United States to challenge substantive criminal prohibitions, such as the District's assault weapons laws.

14

First, Section 12601 provides an avenue for redressing harms caused by specific actors: "law enforcement officers" and "officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles." The statute's focus on specific actors is evidenced not only by the text itself, but also by the title and subtitle heading under which Congress enacted Section 12601, "State and Local Law Enforcement," and "Police Pattern or Practice," respectively. *See* Pub. L. No. 103-322, 108 Stat. 2061, 2071 (1994). "[T]he title of a statute and the heading of a section" can help determine a statute's "meaning." *Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)). Here, the statute's title and heading "point to a narrow[ ] reading" that is "centered around" police officers. *Id.* at 120; *see United States v. Lauderdale Cnty.*, 914 F.3d 960, 966 (5th Cir. 2019) (referring to title and subtitle in interpreting Section 12601).

Second, Section 12601's phrase "engage in a pattern or practice of conduct by" law enforcement officers shows that the statute governs *how* officers perform their duties. As used here, "engage in" means "[t]o involve oneself or become occupied" or to "participate." *Engage*, The American Heritage College Dictionary (3d ed. 1993). "Pattern" means "[a] characteristic form, style, or method." *Pattern*, The American Heritage College Dictionary (3d ed. 1993); *see Pattern*, Webster's New World Dictionary (3d ed. 1988) ("a regular, mainly unvarying way of acting or doing"). "Practice" means "[a] habitual or customary action or way of doing something." *Practice*, The American Heritage College Dictionary (3d ed. 1993); *see Practice*, Webster's New World Dictionary (3d ed. 1988) ("a frequent or usual action; habit; usage . . . a usual method or custom"). "Conduct" means "the way that one acts; behavior; deportment." *Conduct*, Webster's New World Dictionary (3d ed. 1988); *see Conduct*, Black's Law Dictionary

15

(6th ed. 1990) ("[p]ersonal behavior; deportment; mode of action"); *Conduct*, The Compact Oxford English Dictionary (2d ed. 1989) ("Manner of conducting oneself or one's life; behaviour; usually with more or less reference to its moral quality (good or bad)). "Conduct" is distinct from an "act," for example, which means simply "a thing done," stripped of any normative gloss as to how that act is performed. *Act*, Webster's New World Dictionary (3d ed. 1988). And "[c]onduct" is coupled in Section 12601 with "by," which connotes agency and means "[t]hrough the means, act, agency or instrumentality of." *By*, Black's Law Dictionary (6th ed. 1990); *see By*, Webster's II New Riverside University Dictionary (1984) ("[t]hrough the agency or action of"). "By" is used to "[i]ntroduc[e] the principal agent." *By*, The Compact Oxford English Dictionary (2d ed. 1989); *see Bank of Am. Corp. v. United States*, 148 F.4th 171, 177–78 (4th Cir. 2025) (relying on the definition of "by" to interpret "interest is payable . . . on equivalent underpayments and overpayments by the same taxpayer" to mean the "taxpayer *made* the 'equivalent underpayments and overpayments'").

Putting these terms together along with "law enforcement officers," "engage in a pattern or practice of conduct by law enforcement officers" refers to repeated or habitual modes of action by law enforcement officers. The statutory language is focused on officers' own conduct, not the conduct of others. "Engage in" reinforces that this provision is focused on something law enforcement officers are actually doing. And the statute's references of "pattern," "practice," and "conduct" are limited to *how* officers act, as evidenced by past actions targeting police misconduct, *i.e.*, police actions that deviated from a jurisdiction's duly enacted laws. "By" indicates that the law enforcement officer is responsible for the pattern or practice of relevant "conduct." Accordingly, the phrase "conduct by" limits Section 12601's scope so that it creates

16

a cause of action to remedy abuses of authority by law enforcement officers.  It does not grant the United States a roving license to seek redress for *any* alleged harm.

Third, the "pattern or practice of conduct by" law enforcement officers must cause the alleged deprivation of rights.  The clause "that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States" is a restrictive relative clause that limits the preceding text and meaning of "pattern or practice of conduct by law enforcement officers" such that this pattern of conduct must be the source of the deprivation. *See* H.W. Fowler, *The New Fowler's Modern English Usage* 672 (R.W. Burchfield rev. 3d ed. 1996) (explaining how restrictive relative clauses limit phrases); *United States v. Nishiie*, 996 F.3d 1013, 1021–22 (9th Cir. 2021) (explaining that "[r]estrictive relative clauses are usually introduced by *that* . . . and are never set off by commas from the rest of the sentence" and "provide[ ] information that is essential to understanding the intended meaning of the rest of the sentence" (emphasis in original) (citation omitted)).  If a different act causes the alleged deprivation—for instance, an underlying statute that restricts conduct by private individuals—then there is no police "pattern or practice" that falls within the scope of Section 12601.

Altogether, these text-based limitations mean that Section 12601 cannot be used to challenge substantive criminal prohibitions.  A criminal statute enacted by the legislature and signed by the executive is not "conduct by" law enforcement officers.  Rather, criminal prohibitions are legislative acts.  Nor do substantive criminal prohibitions establish or regulate a "pattern or practice of conduct by law enforcement."  To the contrary, they impose restrictions and concomitant penalties on private individuals.  As such, criminal prohibitions, like the District's assault weapons laws, do not speak to the way in which "law enforcement officers" conduct their duties.  This means that challenges to criminal prohibitions are, in essence, facial

17

challenges to legislative acts—they are not challenges to harms allegedly caused by a pattern or practice of police conduct. And, when a criminal statute is challenged as unconstitutional, it is the legislature's proscription of individual conduct that causes any alleged deprivation of rights—not any act by law enforcement officers. In short, Section 12601 is an avenue for the correction of systemic police misconduct, *i.e.*, repeated abuses of authority by officers. It does not give the federal government carte blanche to challenge any state or local law that it opposes.

Section 12601's remedial scheme confirms that the statute cannot be used to challenge substantive criminal prohibitions. While subsection (a) of Section 12601 proscribes "a pattern or practice of law enforcement conduct" that deprives individuals of constitutional rights, subsection (b) authorizes a limited remedy, and the two must be construed together. *See City & Cnty. of S.F. v. EPA*, 604 U.S. 334, 347 (2025) ("[O]ur interpretation of the meaning of the term 'limitation' in § 1311(b)(1)(C) must take into account the way in which the term is used in the two preceding statutory subsections."); *United States v. Wilson*, 290 F.3d 347, 355 (D.C. Cir. 2002) ("It is the 'classic judicial task' of construing related statutory provisions 'to make sense in combination.'" (quoting *United States v. Fausto*, 484 U.S. 439, 453 (1988))). Subsection (b) provides that courts may grant only "appropriate equitable and declaratory relief to eliminate the pattern or practice," *i.e.*, the "pattern or practice of conduct by law enforcement officers . . . that deprives persons" of rights guaranteed by the Constitution or federal law. In the case of a challenge to police conduct, that equitable and declaratory relief would "eliminate" the constitutional harm—the abusive police conduct could be declared unlawful or enjoined. For example, a police department could enter into a consent decree agreeing to stop using a particular method of force and thus "eliminate" the constitutional harm of excessive force.

18

But when the United States challenges a substantive criminal prohibition, the only relief the statute allows—equitable and declaratory relief to eliminate the "pattern or practice of conduct by" law enforcement officers—would not actually eliminate the source of the alleged harms. At most, a federal court could enjoin the police from enforcing a criminal prohibition, but that would not redress the alleged constitutional violation caused by the prohibition itself. The offending law would still remain on the books, and individuals would remain subject to enforcement in any other way and prosecution and punishment for violating it. Accordingly, any redress granted by this Court would not remedy the harms alleged by the United States. That is a nonsensical outcome when Congress expressly designed Section 12601 to *eliminate* constitutional harms.

### 2.    History and Context Make Clear That Section 12601 Should Not Be Construed to Authorize Challenges to Substantive Criminal Statutes.

In addition to the statute's plain text, its context and history (both pre- and post-enactment) indicate that Section 12601 can be used only to target "conduct by" law enforcement officers, not to bring facial challenges to substantive criminal statutes.

### a.    Congress Enacted Section 12601 Against the Backdrop of Other Pattern-or-Practice Laws, Which Do Not Contain Similar Constraints.

Comparing Section 12601 to Congress's other, broader "pattern or practice" laws further evinces that Congress crafted a narrower statute here. Before Section 12601 was enacted, "pattern or practice" laws existed in a range of areas, including employment, housing, and public accommodations. Differences between Section 12601 and these predecessor laws are meaningful because "Congress legislates against the backdrop of existing law." *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013); *see also Orton Motor, Inc. v. HHS*, 884 F.3d 1205, 1214 (D.C. Cir. 2018).

Other "pattern or practice" laws allow for the vindication of only a specific subset of rights in a particular field. *See, e.g.*, 42 U.S.C § 2000a-5(a) (public accommodations "rights secured by this subchapter"); *id.* § 2000e-6(a) (employment "rights secured by this subchapter"); *id.* § 3614(a) (housing "rights granted by this title"). By contrast, Section 12601 has no express subject-matter constraint. It allows for the vindication of "rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." 34 U.S.C. § 12601(a). That breadth, however, is counterbalanced by clear actor-based constraints. As discussed, Section 12601 allows for the vindication of only those harms caused by "law enforcement officers" and other specified actors not relevant here. *Id.* By contrast, other "pattern or practice" laws allow the Attorney General to sue "any person or group of persons" "engaged in a pattern or practice of resistance" to protected rights, *e.g.*, 42 U.S.C §§ 2000a-5(a), 2000e-6(a), 3614(a), or any "State government or unit of local government" that "has engaged in or is engaging in a pattern or practice in violation" of specified rights, 34 U.S.C. § 10228(c)(3), without any actor constraints.

Congress's decision to exclude subject-matter constraints and, instead, include actor constraints in Section 12601 is a marked and deliberate choice. It underscores Congress's laser focus on only one type of harm: harm caused by "conduct by" law enforcement officers. This is especially true because the 1994 Crime Bill, within which Section 12601 was enacted, contained another "pattern or practice" law that again was limited by subject matter but not by actor. *See* 31 U.S.C. § 6715 (authorizing the Attorney General to sue "a unit of general local government that the Attorney General has reason to believe has engaged or is engaging in a pattern or

20

practice in violation of section 6711 (a) or (b)").[5]  "[B]ecause Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another," the presence of actor-based constraints in Section 12601 but not in 31 U.S.C. § 6715, carries particular weight.  *DHS v. Maclean*, 574 U.S. 383, 391 (2015); *see Orton Motor*, 884 F.3d at 1214 (similar); A. Scalia & B. Garner, *Reading Law* 170 (2012) ("[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.").

In fact, it strains common sense to conclude that regardless of Section 12601's clear actor-based constraints, Congress nonetheless sought to authorize broader challenges to substantive criminal prohibitions.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[The Court] must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency.").  Congress knows how to authorize or refer to challenges to statutes.  *See, e.g.*, 42 U.S.C. § 1983 (providing a cause of action against "[e]very person who, under color of any *statute*, *ordinance*, *regulation*, custom, or usage, of any State or Territory or the District of Columbia" deprives a plaintiff of constitutional or statutory rights (emphases added)); 28 U.S.C. § 2284(a) ("A district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.").  In Section 12601, however, Congress

---

[5]    Section 6711(a) states that "[n]o person in the United States shall be excluded from participating in, be denied the benefits of, or be subject to discrimination under, a program or activity of a unit of general local government because of race, color, national origin, or sex if the government receives a payment under this chapter," and Section 6711(b) applies further prohibitions to governments that "receive[ ] a payment under this chapter," *i.e.*, age-based discrimination, "discrimination against an otherwise qualified handicapped individual," and "discrimination because of religion."

did not refer to state or local "criminal statutes" or "actions challenging the constitutionality" thereof.  Instead, Congress used "pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights."  The United States thus asks this Court to endorse "the doubtful proposition that Congress sought to accomplish in a surpassingly strange manner what it could have accomplished in a much more straightforward way."  *Azar v. Allina Health Servs.*, 587 U.S. 566, 577 (2019) (citation modified).  At base, Section 12601 is undoubtedly a powerful tool—but it is a targeted tool, aimed at remedying a particular kind of harm caused by specific actors.  To avoid warping the statutory text, Section 12601's textual constraints should be respected by limiting Section 12601 to suits alleging misconduct by law enforcement, not unconstitutional lawmaking.

### b.    Legislative History Also Evidences Section 12601's Narrow Focus on Eliminating Police Misconduct.

As explained, Section 12601 was designed to address a specific problem: police misconduct.  Background § III.A, *supra*; *see Rawat v. C.I.R.*, 108 F.4th 891, 896–97 (D.C. Cir. 2024) (relying on legislative history to confirm Congress's intent).  The committee report for the Police Accountability Act makes clear that the Act was a direct reaction to the brutalization of Rodney King and to police misconduct across the country.  The harm to be remedied was expressly and repeatedly identified as "pattern[s] of abuse," *i.e.*, patterns of "[p]olice brutality," "police misconduct," and "abuse[s]" of "the authority granted" to officers.  H.R. Rep. No. 102-242, at 136, 138.  And Congress called out specific examples of these unacceptable "abusive police practices," including "the lack of training or the routine use of deadly techniques like chokeholds, or the absence of a monitoring and disciplinary system."  *Id.* at 138.

Not once in the thorough committee report did Congress express any concern with state and local criminal laws.  To the contrary, Congress indicated that the problem it sought to correct

22

was not flawed legislative acts, but rather police departments "ignor[ing]" state statutes that mandated proper "police training standards," *id.* at 139, among other troubling instances of police misconduct, *id.* at 138. Facial challenges to substantive criminal prohibitions are fundamentally different from the sorts of suits that Congress plainly had in mind. Authorizing such challenges would be a major and consequential undertaking. If Congress had sought to authorize them, surely Congress would have at least mentioned that somewhere in the legislative history. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 380 (1988) (Scalia, J.) ("[I]t is most improbable that [a major change] would have been made without even any mention in the legislative history.").

Indeed, Congress was clear that it did *not* intend to greatly upset the federal and state balance. Congress evidenced a clear intent to "create[ ] an enforceable right to be free of patterns of police brutality" by empowering the Attorney General to hold police "department[s] . . . responsible" by "su[ing] for injunctive relief against abusive police practices." H.R. Rep. No. 102-242, at 138. But in so doing, Congress also acknowledged competing federalism concerns and reiterated that it did not intend to upset the balance of power between the federal government and states and localities. Specifically, Congress acknowledged, when considering the 1991 Crime Bill that incorporated the Police Accountability Act, that, "[h]istorically, day-to-day responsibility for operation of the Nation's criminal justice system has rested with those units of government that are closest to the people." *Id.* at 88. In Congress's own words: the 1991 Crime Bill "reflects that historical relationship while giving impetus to certain initiatives and policy decisions that must start at the Federal level i[f] the fight against crime is to be waged efficiently and vigorously." *Id.*

23

Further, Section 12601 was enacted against the backdrop of *Lyons*, 461 U.S. 95, which limited the ability of private litigants to seek systemic fixes for police misconduct, and existing limits on the United States' authority to criminally prosecute police misconduct.  *See* H.R. Rep. No. 102-242, at 137–39.  Congress expressed concern that prior to Section 12601's passage, "courts were powerless to correct" systemic police abuses and "had no authority to order remedies for the glaring deficiencies" described in reports of police abuse across the nation.  *Id.* at 139.  Section 12601 was meant to fix that shortfall.  Yet, that sort of remedial gap simply does not exist when it comes to substantive criminal prohibitions.  Criminal defendants can always challenge those laws via a motion to dismiss the indictment, among other mechanisms, and individual litigants can bring (and are bringing) affirmative facial challenges to these laws under 42 U.S.C. § 1983 and other statutes.  At base, nothing in the relevant legislative history suggests that Congress designed Section 12601 to authorize challenges to state or local criminal statutes and make Section 12601 the Justice Department's own Section 1983.

> c.      **Since Its Enactment 30 Years Ago, Section 12601 Has Never Been Used to Challenge a Substantive Criminal Prohibition.**

Tellingly, this suit is entirely anomalous and out of step with past practice.  As Justice Frankfurter explained for the Supreme Court, "just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred."  *FTC v. Bunte Bros, Inc.*, 312 U.S. 349, 352 (1941); *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is." (citation modified)).  The United States invokes Section 12601 in this case to challenge a substantive criminal prohibition on individual conduct.  Historically, Section 12601 has only

24

been used to target law enforcement officer conduct deviating from the law. *See* 2017 Rep. at 41–48 (summarizing the United States' pattern-of-practice cases through 2017). Examples of past suits include challenges to patterns or practices of "unlawful stops, searches and arrests," "discriminatory policing," "excessive force, including deadly force," "theft by officers," "unlawful retaliation against people who make complaints or criticize [the police department]," and "violations of the First Amendment right to observe and record police activity." *Id.* Although the new Second Amendment Section has recently brought a handful of Section 12601 suits, even its recent invocation against the Los Angeles Sheriff's Department is markedly different from this case because it targets discretionary officer conduct—*i.e.*, a "deliberate pattern of unconscionable delay" of the approval of firearm licenses. Compl. [1] ¶ 1, *United States v. Los Angeles County*, No. 25-cv-9323 (C.D. Cal. Sept. 30, 2025). The same holds true for the United States' recent suit against the Virgin Islands. Compl. [1] ¶¶ 44–48, *United States v. Gov't of the V.I.*, No. 25-cv-50 (D.V.I. Dec. 16, 2025) (alleging "unreasonable delays" in the issuance of firearm licenses).

Further, when the United States has previously sought to challenge state or local laws, it has not, to the District's knowledge, done so by invoking Section 12601. Rather, it has either attempted to proceed directly under the Supremacy Clause (and established standing to do so), *see, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012) (challenging Arizona's law as preempted by federal immigration law); *United States v. California*, 921 F.3d 865 (9th Cir. 2019) (challenging California immigration laws); *United States v. Texas*, 586 F. Supp. 3d 574 (W.D. Tex. 2022) (challenging an executive order issued by state governor), or else relied on different statutory authority, *see, e.g.*, *United States v. Skrmetti*, 605 U.S. 495 (2025) (invoking 42 U.S.C. § 2000h-2 to intervene in a suit challenging Tennessee law banning certain medical care for

25

transgender minors).  If Section 12601 did grant the United States broad authority to challenge state and local laws that it opposes, presumably the United States would have invoked it for that purpose previously, rather than invoking other causes of action and bases for standing.

### 3.    Construing Section 12601 to Authorize Challenges to Criminal Prohibitions Is Contrary to Federalism and Common Sense.

Endorsing an interpretation of Section 12601 that allows for challenges to substantive criminal prohibitions would be a sweeping—and unjustifiable—grant of authority to the United States.  After all, police officers can lawfully arrest individuals for the infraction of "even a very minor criminal offense," *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001), and officers enforce not only criminal laws, but also a range of civil laws by, for example, citing individuals for traffic infractions or noise violations, *see, e.g.*, *United States v. Rodenhauser*, No. 94-5709, 1996 WL 331157, at *2 n.2 (4th Cir. June 18, 1996) (noting that the duties of county police officers included the enforcement of the municipal code and "all other laws and ordinances" (quoting Prince George's County, Md., Code § 18-135(a) (1991))).  If the mere enforcement of state and local criminal prohibitions were enough to ground a Section 12601 suit, the United States could bring constitutional challenges to any number of state and local laws that the administration in power opposes.

Basic canons of federalism and common sense weigh against such a seismic shift in police power.  For starters, it is a "well-established principle that it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014) (citation modified); *see also Vt. Agency of Nat. Res. v. United States*, 529 U.S. 765, 787 (2000) ("[I]f Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intentions to do so unmistakably clear in the language of

26

the statute." (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989))). In the balance of federal and state power, "[f]oremost among" the states' powers is "the power to create and enforce a criminal code." *Heath v. Alabama*, 474 U.S. 82, 93 (1985). Accordingly, federal courts have long "disfavored" facial challenges to state and local laws because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008). In a similar vein, states and localities are responsible for local law enforcement, and the Supreme Court has thus long recognized that the "proper balance between state and federal authority counsels restraint" when federal courts are called upon to enjoin local law enforcement. *Lyons*, 461 U.S. at 112.

Authorizing federal-court challenges by the federal executive to state and local criminal laws and enjoining police officers from enforcing them would thus upset this balance. These would not be just any constitutional challenges, but challenges brought by "the world's largest law firm," the Justice Department, with all its resources and powers—which far outmatch that of municipalities' and states' law departments. *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 471 (1983) (Burger, J., dissenting). Yet, nothing in Section 12601's text or history indicates—let alone *clearly* indicates—that this was Congress's desired outcome.

Even if that were not clear from a plain-text review, it is underlined by Congress's express acknowledgment that the lion's share of police powers has historically rested with "those units of government that are closest to the people." H.R. Rep. No. 102-242, at 88. In defining the contours of Section 12601's predecessor statute, Congress underscored that it was crafted to "reflect[ ] that historical relationship." *Id.* That statement only reinforces the commonsense intuition that had Congress desired to dramatically expand the United States' ability to

27

superintend state and local affairs, it would have made its intention clear.  Indeed, Congress legislated against the backdrop of decades of case law that cautioned that "[w]here . . . the exercise of authority by states officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law."  *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (citation modified); *see United States v. City of Phila.*, 644 F.2d 187, 200–03 (3d Cir. 1980) (rejecting pattern-or-practice suit against police department absent clear congressional authorization and stressing that such a suit creates serious federalism concerns).  Had Congress desired to cast these longstanding federalism concerns aside and grant the United States a newly minted license to challenge state and local law as preempted or unconstitutional, it would have said so.

## B.  The Complaint Brings a Facial Challenge to Substantive Criminal Laws That Section 12601 Does Not Permit.

Applying the correct understanding of Section 12601 outlined above, the Complaint fails to state a claim because it is an effort to facially invalidate substantive criminal prohibitions enacted by the D.C. Council.  Such a suit is not cognizable under Section 12601.  The source of the alleged constitutional harm is an "unconstitutional law" that proscribes the possession of "semi-automatic firearms, such as the Colt AR-15 series rifle . . . and a variety of other semi-automatic rifles and pistols."  Compl. ¶¶ 4, 40 (citing D.C. Code § 7-2501.01).  By the Complaint's telling, the *D.C. Council* has engaged in "efforts to infringe the Second Amendment-protected 'right of the people to keep and bear arms' through limiting law-abiding citizens' ability to register commonly used firearms and criminalizing the possession of firearms that it refuses to register."  *Id.* ¶ 3; *see id.* ¶ 17 (similar).

The United States fundamentally challenges prohibitions on private conduct passed by the D.C. Council, signed by the Mayor, and approved by Congress, which subject individuals to

28

criminal penalties—not an unconstitutional pattern or practice of conduct that law enforcement officers are engaged in.  Specifically, D.C. Code § 7-2502.01 mandates that "no person . . . shall possess or control any firearm, unless the person . . . holds a valid registration certificate for the firearm."  D.C. Code § 7-2502.02 carves out categories of firearms for which "[a] registration certificate shall not be issued," including an "assault weapon."  And it is D.C. Code § 7-2501.01 that separately defines "assault weapon," while D.C. Code § 2507.06 imposes criminal penalties for violations of these provisions, and D.C. Code § 22-3571.01(b)(5) further authorizes the imposition of concomitant administrative fines.

The Complaint is drafted throughout as a challenge, at its core, to the substantive definition of "assault weapon."  *See, e.g.*, Compl. ¶¶ 17–21.  The United States repeatedly acknowledges, for example, that Defendants are acting as the "District of Columbia's law mandates."  *Id.* ¶ 24; *see id.* ¶ 22 (seeking to hold Defendants liable for execution of "their duties as prescribed by law"); *id.* ¶ 40 (alleging that Defendants are "obligate[d]" to enforce the District's laws).  That is quite different from a situation where law enforcement makes an independent judgment about the amount of force to use in executing a law or making an arrest, for example.  And consistent with that framing, the United States seeks broad relief, including "[a] permanent injunction requiring all DC Defendants within a reasonable period of time to enable and allow the registration of firearms protected under the Second Amendment by law-abiding citizens."  *Id.* ¶ 43.  That requested relief is striking.  In effect, the United States asks this Court to enlist MPD in nullifying laws enacted by the people's representatives.  That incongruity between the source of the harm alleged (legislative enactments) and the relief available under Section 12601 (proscription of law enforcement conduct) evidences the fundamental problem

29

with the Complaint. It is not directed at the type of harm that Section 12601 is designed to redress, and accordingly, it does not state a claim that is cognizable under Section 12601.

Nonetheless, the Complaint tries to shoehorn its facial challenge into Section 12601 by alleging two ways that MPD enforces the challenged laws. The Complaint alleges that (1) MPD refuses to register firearms that are proscribed by the laws, and (2) MPD has the authority to make arrests when individuals violate the laws. Neither role suffices to state a viable claim under Section 12601.[6]

First, these roles are nothing more than the ordinary ways that police enforce criminal prohibitions across the country. If these roles were sufficient to allow the United States to bring a facial challenge to state or local law under Section 12601, the United States could use this statute to challenge any criminal law it opposed, along with a slew of civil laws. For all the reasons given above, it is wrong to conclude that Section 12601 grants the United States such sweeping authority.

Second, neither of MPD's roles triggers Section 12601 because they do not effect the alleged "depriv[ation]" of constitutional rights. As explained, Section 12601 proscribes only patterns or practices of "conduct by" law enforcement officers "that deprives persons" of constitutional or statutory rights. That is simply not the case here. Rather, the alleged deprivation the United States challenges is caused by the underlying criminal laws enacted by the District's democratic branches. It is the challenged laws that limit individual rights that the United States alleges are protected by the Second Amendment—for instance, by proscribing the possession of "firearms without an automatic firing mechanism," like the AR-15. Compl. ¶ 43.

---

[6]    Even if these theories are cognizable under Section 12601, the United States has not adequately alleged facts showing that MPD actually *has* a pattern or practice of enforcing the laws in the ways it describes, as explained below. Argument § II.B, *infra*.

The Complaint makes these points itself as it expressly alleges that it is *the Council* that "infringed" the Second Amendment by enacting the challenged laws, *id.* ¶ 3, and MPD merely follows what District law "mandates," *id.* ¶ 24. MPD is simply not responsible for the constitutional harm alleged and should not be subject to liability for it under Section 12601.

## II.    The Complaint Fails to Plausibly Allege Facts Supporting a Pattern or Practice of Conduct by Law Enforcement That Deprives Persons of Constitutional Rights.

Even if the United States' claim is cognizable under Section 12601, the Complaint fails to allege sufficient facts to support it. The Complaint fails to plausibly allege either (1) that the challenged laws deprive persons of constitutional rights or (2) that MPD officers are in fact engaging in a pattern or practice of enforcing those laws in a manner that effects any such deprivation.

### A.    The Complaint Fails to Plausibly Allege a Deprivation of Constitutional Rights.

If the United States can use Section 12601 to facially challenge the District's laws, then the United States must plausibly allege facts showing that those laws "deprive[ ] persons of [constitutional] rights." 34 U.S.C. § 12601(a). To determine what the United States must plausibly allege to show a deprivation of constitutional rights, the Court asks what the United States must prove at trial. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 332 (2020); *see Sanchez*, 45 F.4th at 395 (a complaint must allege "adequate factual support" for the "elements" of claim). In a Second Amendment challenge to a regulation of the possession of "arms," the plaintiff must prove, among other things, that the arm is "in common use" or "sufficiently wide circulation" for a lawful purpose, such as self-defense. *Hanson*, 120 F.4th at 232–33 (citation modified). And to be in common use for self-defense, the arm also must be actually used in and useful for self-defense. *Id.* at 233; *see* Background § II, *supra*. Thus, to survive a motion to dismiss, the United States must allege facts plausibly showing that

31

assault weapons are in wide circulation for a lawful purpose, used in self-defense, and useful for self-defense.

The United States' burden is greater still because the Complaint, as discussed, challenges the District's assault-weapon prohibition in its entirety, as a facial matter.  The complained of "pattern or practice" is simply the allegedly "unconstitutional law and official policy," *i.e.*, the challenged assault weapons laws.  Compl. ¶ 40.  To the extent such a challenge is cognizable at all, it should be considered a facial challenge.  "[S]uch challenges are quite difficult to make out."  *Newman v. Moore*, 151 F.4th 472, 483 (D.C. Cir. 2025).  The United States must "establish that no set of circumstances exists under which the [District's laws] would be valid." *Rahimi*, 602 U.S. at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see Comm. on Ways & Means v. U.S. Dep't of Treasury*, 45 F.4th 324, 329–30, 340 (D.C. Cir. 2022) (affirming Rule 12(b)(6) dismissal for failure to meet the standard for facial challenges).  "If the [District's laws] validly restrict[ ] at least one type of weapon, [the United States] cannot make that no-set-of-circumstances showing."  *Capen v. Campbell*, 134 F.4th 660, 669 (1st Cir. 2025); *see Bianchi*, 111 F.4th at 452–53 (similar); *Ways & Means*, 45 F.4th at 340 ("If the statute is constitutional in 'at least one scenario,' the facial challenge fails." (quoting *Chem. Waste Mgmt. v. EPA*, 56 F.3d 1434, 1437 (D.C. Cir. 1995))).

The United States fails to allege facts plausibly showing that any—let alone every— assault weapon covered by the District's laws is constitutionally protected.  The Complaint is light on facts and contains only a few, wholly conclusory allegations regarding whether the covered weapons are in common use:

- "[T]he District denies law-abiding citizens the ability to register a wide variety of commonly used semi-automatic firearms, such as the Colt AR-15 series rifles, which are

among the most popular of firearms in America, and a variety of other semi-automatic rifles and pistols that are in common use." Compl. ¶ 4.

- "D.C.'s current semi-automatic firearms prohibition . . . bans many commonly used pistols, rifles or shotguns . . . ." *Id.* ¶ 5.

- MPD's "decisions to deny certificates of registration for commonly possessed semiautomatic firearms run afoul of binding Supreme Court precedent and therefore trample the Second Amendment rights of law-abiding citizens." *Id.* ¶ 6.

- "The registration prohibition extends to an array of weapons currently in common use in America, including semi-automatic rifles like the AR-15 and numerous other pistols and shotguns." *Id.* ¶ 19.

- "The AR-15 is a firearm in common use for lawful purposes.  Other semi-automatic rifles that D.C. code [*sic*] bans are also in common use by law-abiding citizens for lawful purposes." *Id.* ¶ 31 (internal footnote omitted).

- "[T]he AR-15 is the most popular rifle in the country[.]" *Id.* ¶ 31 n.2 (quoting *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025)).

- "Handguns 'are the most popular weapon chosen by Americans for self-defense in the home . . . .' *Heller*, 554 U.S. at 629." *Id.* ¶ 32.

- "Shotguns not otherwise barred by Federal law and protected under the Second Amendment are not only commonly used for lawful purposes, but they also provide an important means of self-defense.  *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 857-8 [*sic*] (2010) (Thomas, J., concurring)." *Id.* ¶ 33.

These allegations are insufficient to state a claim because they are classic "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*,

556 U.S. at 678. The allegations just refer to "common use" but are conclusory and completely "devoid of further factual enhancement," including factual allegations showing that the weapons are in fact commonly possessed, let alone used in or useful for self-defense. *Id.* (citation modified); *cf. Trazell v. Wilmers*, 975 F. Supp. 2d 133, 146 (D.D.C. 2013) ("[Q]uoting regulatory language and making conclusory statements that a law is violated, without facts supporting that inference, does not satisfy the pleading requirements."). They do not allege, for example, how many assault weapons are lawfully possessed by law-abiding citizens, whether they are in fact used in self-defense, and how their features make them useful for self-defense, rather than offensive or criminal uses. *See Hanson*, 120 F.4th at 233 (concluding that there were "disputed facts in the record about the role of ELCMs for self-defense" when the District presented evidence that ELCMS "are rarely used to fire more than a couple rounds in self-defense" and the plaintiff "replie[d] that one need not fire every bullet in an ELCM in order to use it"). Those facts are needed because, without them, the Complaint contains only "naked assertions" and "conclusions" that the weapons covered by the challenged laws are constitutionally protected. *Iqbal*, 556 U.S. at 678 (citation modified).

Another problem with the Complaint is that it paints with too broad a brush. When alleging common use, the Complaint relies on categorizations at the highest level of generality by referring to "semiautomatic rifles," *see* Compl. ¶¶ 4, 19, 30, 31; "pistols," *see id.* ¶¶ 4, 5, 19; and "shotguns," *see id.* ¶¶ 5, 19, 33. These broad categories do not comport with the statute. The District does not prohibit all semiautomatic rifles, pistols, and shotguns. And it certainly does not prohibit possession of handguns. *Contra id.* ¶ 32. Rather, the District bans "*specified*" semiautomatic rifles, pistols, and shotguns, D.C. Code § 7-2501.01(3A)(A)(i)(I), (II), (III) (emphasis added), and semiautomatic rifles, pistols, and shotguns with *certain* enumerated

34

features, *id.* § 7-2501.01(3A)(A)(i)(IV), (V), (VI), (VII).  Moreover, whether one weapon is in common use does not *ipso facto* show that another weapon is in common use.  The number of UZI's does not establish the number of AK47's, for example.

The Complaint thus would be defective if it were challenging any part of the District's assault weapons laws, yet it does not allege—even in a conclusory fashion—that *all* weapons covered by the challenged laws are in common use, as necessary to challenge the laws on their face or in their entirety.  Quite the opposite, the Complaint stops noticeably short of making that allegation.  The Complaint alleges that the District prohibits "*many* commonly used pistols, rifles or shotguns."  Compl. ¶ 5 (emphasis added).  "Many" is not "all" or even "most."  And "many" does not notify the District or the Court of *which* firearms covered by the law the United States believes are constitutionally protected.  In the same vein, the Complaint alleges that the AR-15 and "*[o]ther* semi-automatic rifles" covered by the District's laws "are also in common use."  *Id.* ¶ 31 (emphasis added).  But "other" is not "all" either.  And this allegation fails to indicate *which* of those "other" rifles are in common use.

Moreover, not a single allegation speaks to "the role of [any assault weapon] for self-defense," in even a conclusory way.  *Hanson*, 120 F.4th at 233.  Instead, the allegations focus on possession, albeit in a conclusory fashion.  For example, the Complaint alleges that the AR-15 is "popular."  Compl. ¶¶ 31 n.2, 32.  But common use "is not to be found solely by looking to the number of a certain weapon in private hands."  *Hanson*, 120 F.4th at 232–33; *see id.* at 232–34 (requiring plaintiff to demonstrate the actual use and suitability of an arm for self-defense).  Simply alleging that a particular weapon is "popular" does not make that showing.

Nor does the Complaint's allegation that "[s]hotguns" "provide an important means of self-defense" suffice.  Compl. ¶ 33.  This again is a conclusion, not a fact.  It needs factual

35

enhancement, but it instead relies on a citation to a concurring opinion. *Id.* (citing *McDonald*, 561 U.S. at 857–58 (Thomas, J., concurring)). A complaint cannot survive a motion to dismiss by relying on facts contained in a judicial opinion. *See Mehle v. Am. Mgmt. Sys., Inc.*, No. 01-7197, 2002 WL 31778773, at *1 (D.C. Cir. Dec. 4, 2002) (per curiam) (a court may take judicial notice of the "existence" of "documents" filed in another action, but "not the accuracy of any legal or factual arguments made therein"); *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86, 92 n.9 (D.D.C. 2017) (courts cannot take judicial notice of facts contained in a judicial opinion). In any event, the concurring opinion simply cites an article from over a hundred years ago in which the author stated his belief that "pistols and shotguns are the only weapons to stop a mob." *McDonald*, 561 U.S. at 857–58 (Thomas, J., concurring) (quoting Eli Cooper, *Church Burnings Follow Negro Agitator's Lynching*, Chi. Defender, Sept. 6, 1919, *reprinted in* R. Ginzburg, *100 Years of Lynchings* 124 (1988)). That article hardly makes it plausible that the modern shotguns covered by the District's assault weapons laws are useful for or used in self-defense.

What is more, "it is implausible" that all assault weapons covered by the challenged laws are in common use. *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1050 (D.C. Cir. 2012). For one, the Court can use "common sense" alone to conclude that several of the weapons covered by the District's laws are not in common use for self-defense. *Iqbal*, 556 U.S. at 679. For example, the District prohibits semiautomatic rifles with grenade launchers. D.C. Code § 7-2501.01(3A)(A)(i)(IV)(dd). "It is beyond obvious that hand grenades are extremely dangerous explosive devices that are not in common use today, nor have they ever been in common use." *United States v. Ocker-Mullen*, No. 20-cr-313, 2024 WL 2834845, at *4 (M.D. Pa. June 4, 2024); *see Staples v. United States*, 511 U.S. 600, 610 (1994) ("[T]here is a long tradition of widespread lawful gun ownership by private individuals in this country. Such a

36

tradition did not apply to the possession of hand grenades."). In fact, plaintiffs in a related case before this Court conceded that the challenged laws cover some weapons, like rifles with grenade launchers, that lack "self-defense utility." Mem. of P. & A. in Supp. of Pls.' Appl. for a Prelim. Inj. [12-1] at 26 n.13, *Yzaguirre v. District of Columbia*, No. 1:24-cv-01828-APM (D.D.C. July 7, 2024).

For another, the United States' own law and prior agency actions severely limit the availability of some weapons covered by the District's laws at issue here. *See Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (a court may consider "public records subject to judicial notice"); *Majid v. FBI*, 245 F. Supp. 3d 63, 70 (D.D.C. 2017) (Federal Register entries are matters of public record subject to judicial notice). For example, the challenged laws prohibit "Striker 12" and "Streetsweeper type" shotguns. D.C. Code § 7-2501.01(3A)(A)(i)(III)(bb). Pursuant to the National Firearms Act, the federal government has "highly restricted" the possession of Striker 12 and Streetsweeper shotguns "for over three decades." *Bianchi*, 111 F.4th at 453; *see also* ATF Rul. 94-2, tinyurl.com/4wp4w2fp (designating Striker 12 and Streetsweeper shotguns as destructive devices and requiring registration); 66 Fed. Reg. 9748, 9749 (Feb. 9, 2001) (announcing that registration period had ended, only 8,200 devices had been registered, and unregistered possession is unlawful). The Court can only infer that Striker 12 and Streetsweeper shotguns are not commonly possessed, let alone used in or useful for self-defense. The Complaint implicitly concedes as much when it alleges that "[s]hotguns *not otherwise barred by Federal law*" are in common use. Compl. ¶ 33 (emphasis added). The carveout for federally barred shotguns indicates that not all shotguns are commonly used.

For all these reasons, the Complaint lacks the necessary factual predicate required under *Twombly-Iqbal*. The United States cannot "unlock the doors of discovery" and litigation "armed

37

with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.  And the District should not be made to mount a costly defense of its prohibitions on weapons that no one can plausibly contend are in common use.  Indeed, challenges to similar laws have revealed that there apparently are no facts supporting claims that many of the assault weapons here are constitutionally protected. *See, e.g.*, *Capen*, 134 F.4th at 669, 674 n.8 (observing that challengers to an assault weapons ban failed to present evidence or argument about any weapons besides the AR-15); *Bianchi*, 111 F.4th at 453 (similar); *Viramontes v. Cook Cnty.*, No. 24-1437, 2025 WL 1553896, at *1 (7th Cir. June 2, 2025) (observing that challengers to an assault weapons ban failed to build a record in discovery), *pet. for cert. docketed*, No. 25-238 (U.S. Aug. 29, 2025).  "[T]his basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the [C]ourt."  *Twombly*, 550 U.S. at 558 (citation modified).

### B.    The Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement Officers.

For all the reasons explained in Argument § I, the Complaint fails to state a claim that is cognizable under Section 12601.  Even if the Court disagrees, the Complaint has not adequately pleaded a pattern or practice of conduct by law enforcement officers.  The Complaint's theory of a pattern or practice is that MPD officers arrest individuals for possessing "Second Amendment-protected firearms" and deny registration certificates for such firearms.  Compl. ¶ 40.  But the Complaint does not allege any facts to support this theory.  Factual allegations are needed to show that MPD officers are actually engaging in this alleged pattern or practice and—importantly—the extent of that pattern or practice.

To start, the Complaint contains no factual allegations relating to MPD officer arrests for possession of assault weapons.  The allegations are conclusory and simply allege, without factual enhancement, that MPD officers arrest individuals for possessing unregistered firearms that are

38

supposedly protected under the Second Amendment. *See id.* ¶¶ 12, 22, 40. The Court cannot reasonably infer such a pattern or practice merely from the existence of the underlying substantive criminal prohibition. The decision of whether and in what circumstances to arrest individuals for violating a criminal statute involves more considerations than just whether the officer has probable cause to believe a crime was committed. *See, e.g.*, *United States v. Texas*, 599 U.S. 670, 680 (2023) (explaining that "[i]n light of inevitable resource constraints and regularly changing public-safety and public-welfare needs, the Executive Branch must balance many factors when devising arrest and prosecution policies"). It does not follow inexorably from the existence of a statute that police have a regular or established practice of making arrests for any violations. For example, federal law criminalizes marijuana possession, but police do not usually arrest for simple marijuana possession. Further, the Complaint alleges that only a subset of conduct prohibited by the statute—possession of certain prohibited firearms by *otherwise law-abiding individuals*—is constitutionally protected. *See, e.g.*, Compl. ¶¶ 4, 22. It is neither intuitive nor obvious that MPD would focus its limited enforcement resources on regularly arresting this particular subset of the population—as opposed to, for example, persons previously convicted of felonies, including violent felonies—for possessing the firearms at issue, and the Complaint contains no allegations whatsoever to that effect. *See* D.C. Code § 22-4503(a)(1) (prohibiting individuals convicted of a felony from possessing a firearm).

The Complaint is also defective because it does not contain factual allegations about the supposedly protected firearms for which MPD is denying registration certificates. The challenged laws prohibit many weapons and contain myriad severable subparts. The Complaint assumes a pattern or practice relating to every assault weapon as defined under the laws and treats the assault weapons laws as a monolith. But such an approach does not work because, as

39

even the Complaint seems to acknowledge, not all weapons covered by the laws are protected by the Second Amendment. So the Complaint needs facts about which weapons are impermissibly being denied registration certificates.

Yet, the Complaint only alleges in a conclusory fashion that MPD denies registration certificates for assault weapons and cites to the filings in *Yzaguirre*. Compl. ¶¶ 24, 39. But the United States cannot rely on filings in other cases to make factual allegations in this case. *See Capitol Servs. Mgmt., Inc. v. Vesta Corp.*, 933 F.3d 784, 789 (D.C. Cir. 2019) (district courts "may not treat as true" allegations contained in pleadings filed in a different case); A. Benjamin Spencer, 5A *Fed. Prac. & Proc. Civ.* § 1326 (4th ed. 2025) ("allegations in pleadings in another action . . . cannot be incorporated by reference"). And, in any event, *Yzaguirre* involved only one registration denial for an AR-15, so it hardly provides factual support for the sweeping challenge that the United States brings here.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

Date: March 18, 2026.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*

40

ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendants*

41