**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 1:25-cv-04458-APM** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

**<u>REPLY BRIEF IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 1

I.    The United States' Challenge to the District's Assault Weapons Laws Is
Not Cognizable Under Section 12601. ...................................................................... 1

      A.    Substantive Criminal Prohibitions May Not Be Challenged Under
Section 12601. ............................................................................................... 2

          1.    The United States Has No Meaningful Response to the
District's Plain-Text Reading of Section 12601. ........................... 2

          2.    History and Context Reinforce That Section 12601 Does
Not Authorize Challenges to Substantive Criminal Statutes. ......... 9

              a.    The United States Cannot Explain the Striking
Differences Between Section 12601 and Other
Pattern-or-Practice Laws. ...................................................... 9

              b.    This Court Should Decline the United States'
Invitation to Ignore Legislative History That
Reinforces Section 12601's Text. ...................................... 10

              c.    The Novelty of the United States' Claim Should
Trigger Close Scrutiny by This Court. .............................. 12

          3.    Basic Canons of Federalism and Common Sense Caution
Against Reading Section 12601 to Authorize the United
States' Challenge. ....................................................................... 14

      B.    The United States' Claim Falls Outside Section 12601. ........................... 17

II.    The Complaint Fails to Plausibly Allege Facts Supporting a Pattern or
Practice of Conduct by Law Enforcement That Deprives Persons of
Constitutional Rights. ............................................................................................. 19

CONCLUSION ..................................................................................................................... 25

**INTRODUCTION**

The United States raises and battles an army of strawmen rather than engage Defendants (collectively, the District) on key fronts.  *See* Pl.'s Opp'n [23].  To argue that its unprecedented claim is cognizable under 34 U.S.C. § 12601, the United States simply contends that the statute's language is broad and contains no exemption for Second Amendment claims.  But the District never argued for a Second Amendment exemption.  Rather, the District explained that text, context, history, and canons of interpretation all show that Section 12601 has real limits and does not authorize challenges to substantive criminal prohibitions.  The United States' response overlooks the meaning of the statutory terms, ignores key context, brushes off history, and violates canons of construction.

Even if the United States' claim were cognizable, it is insufficiently pleaded because the Complaint relies on conclusory legal assertions that the challenged assault weapons laws are unconstitutional and that the Metropolitan Police Department (MPD) has a pattern or practice of enforcing them all.  In response, the United States says little about its pleading deficiencies and instead applies pleading standards that depart from the correct standards.  The Court should apply those correct standards and dismiss the Complaint.

**ARGUMENT**

I.    **The United States' Challenge to the District's Assault Weapons Laws Is Not Cognizable Under Section 12601.**

The District moved to dismiss the Complaint based on a simple frontline thesis: Challenges to substantive criminal prohibitions are not cognizable under Section 12601, and, accordingly, the United States' challenge to the District's assault weapons laws fails as a matter of law.  Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss Pl.'s Compl. (Defs.' Mot.) [16] at 13–31.  This baseline premise follows from Section 12601's text, history, and context, as well as

canons of construction.  Rather than engage with this premise or explain its own understanding of Section 12601's limits, the United States posits that its claim survives dismissal because the statute is "extraordinarily broad" and "could hardly be broader."  Pl.'s Opp'n at 6, 12.  The United States' say so cannot override the text and other indicia of Congress's more limited intent.

A. **<u>Substantive Criminal Prohibitions May Not Be Challenged Under Section 12601.</u>**

Section 12601's text along with its context, its history, and basic canons of construction make clear that the statute does not authorize facial challenges to state and local criminal laws. Instead of mounting a response to that assertion, the United States spends the lion's share of its brief attacking strawmen.

1. **The United States Has No Meaningful Response to the District's Plain-Text Reading of Section 12601.**

As the District explained, Section 12601's plain text sets forth three limiting principles: The statute provides a cause of action (1) targeted at specific actors ("law enforcement officers"), (2) when "a pattern or practice of conduct by" those actors, *i.e.*, the way in which they perform their duties, (3) causes the deprivation of constitutional rights.  *See* Defs.' Mot. at 14–19.  These limitations inhere in the words Congress used to define the scope of the cause of action created by Section 12601.  *See id.* (detailing the ordinary meaning of Section 12601's terms).  A challenge to a substantive criminal statute runs afoul of each of these limitations.  It targets a legislative act: a criminal statute enacted by the legislature.  And the legislative act in question does not speak to the way in which law enforcement officers conduct their duties; instead, it restricts the rights of private individuals.  Moreover, the source of the claimed harm is the legislature's proscription of private conduct, not any "conduct by" law enforcement officers.

The United States does not engage with these arguments at all.  Instead, it calls the District's text-based arguments "pointless" and suggests that its preferred reading is "inescapable."  Pl.'s Opp'n at 6.  But the United States does not touch any definitions of Section 12601's terms, nor does the United States try to understand the terms' meanings together and in context.  In other words, the United States does not engage in statutory interpretation, which usually proceeds, as the District did, by determining the meaning of terms and then understanding those terms in context and with the use of interpretive tools.  *See Inst. S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 766–67 (D.C. Cir. 2025).

Instead, the United States oscillates between either restating the statutory text without elaboration, Pl.'s Opp'n at 6, 7, or else proffering an unexplained (and unexplainable) atextual interpretation, *id*. at 6.  Specifically, the United States contends that "[t]he plain text makes it unlawful for any covered entity or person to deprive a citizen of *any* 'right[ ], privilege[ ], or immunit[y] secured or protected by the Constitution or laws of the United States."  *Id.*  That recounting omits a key part of the statutory text: that the alleged deprivation of rights must be caused by a pattern or practice of "conduct by law enforcement officers."  34 U.S.C. § 12601(a).  Therein lies the rub.  The United States does not, and cannot, respond to the District's contention that the Complaint's claim is not cognizable under Section 12601 because the harms alleged do not flow from "conduct by" law enforcement officers.

Rather than respond to that contention, the United States spends an outsized share of its brief attacking arguments that the District never made or else making arguments that lack merit.

First, the United States argues that Section 12601 is "not limited to remedying excessive force" and can be invoked to protect the "right to bear arms," along with "other types of constitutional violations."  Pl.'s Opp'n at 7–9, 12–13; *see id.* at 22 (arguing that Section 12601 is

not limited to "addressing police brutality").  The District never suggested otherwise.  *See* Defs.' Mot. at 20 ("Section 12601 has no express subject-matter constraint").  The District advanced no arguments about limits to the "rights, privileges, or immunities" that may be vindicated through a Section 12601 claim.  Instead, the District explained that the universe of cognizable Section 12601 claims is cabined by the *source* of the harm alleged, not the right affected.  Specifically, to invoke Section 12601, the harms alleged must be caused by a "pattern or practice of conduct by law enforcement officers"—regardless of whether that conduct ultimately infringes upon rights protected by the First, Second, or Fourth Amendments, or rights otherwise protected by federal law.  To put a fine point on it, to be cognizable under Section 12601, the harms alleged must be caused by "conduct by" law enforcement officers, *i.e.*, the way in which officers conduct their duties.  But in a challenge to a criminal prohibition, the source of the alleged constitutional harm is a criminal statute, passed by the legislature and signed by the executive.  That is what sets this case apart from other cases where the United States has invoked Section 12601 to challenge *how* officers enforce firearm laws, *e.g.*, "unreasonable delays" in implementation of those laws.  *Id.* at 25.  Section 12601 is concerned with *how* law enforcement officers perform their duties not *what* substantive criminal prohibitions they enforce.

Second, the United States emphasizes that Section 12601 applies not only to acts by individual "rogue" law enforcement officers, but also to conduct by officers "acting pursuant to an official policy."  Pl.'s Opp'n at 13.  The District does not dispute this unremarkable proposition.  Section 12601 may be used to challenge "conduct by" law enforcement officers, taken pursuant to official policy, that causes violations of rights "protected by the Constitution or laws of the United States."  That proposition does nothing to discredit the District's baseline

4

thesis that Section 12601 cannot be used to challenge substantive criminal prohibitions, which are not directed at "conduct by" law enforcement officers.

The very cases the United States cites in support of its "official policy" argument show why this is so. For starters, none of them addresses whether Section 12601 can be used to challenge a substantive criminal prohibition. Instead, each case analyzed *who* can be sued under Section 12601 for standard-fare patterns and practices of law enforcement conduct. *See, e.g.*, *United States v. Cnty. of Maricopa*, 889 F.3d 648, 651–53 (9th Cir. 2018) (analyzing whether Maricopa County could be sued under Section 12601); *United States v. Town of Colorado City*, 935 F.3d 804, 807–11 (9th Cir. 2019) (concluding that Section 12601 allows for respondeat superior liability); *United States v. Lauderdale Cnty.*, 914 F.3d 960, 964–68 (5th Cir. 2019) (holding that judges of a county youth court are not "officials or employees of any governmental agency with responsibility for the administration of juvenile justice"). That question is not presented here, so the United States' citations are inapposite.

If anything, the United States' cases only reinforce that its interpretation is anomalous and atextual. As the United States notes, *County of Maricopa* held Maricopa County "liable for violations of . . . [Section] 12601 stemming from its own official policies." 889 F.3d at 653. But the "official policies" in question were not substantive criminal prohibitions that governed private conduct. To the contrary, there was an alleged "culture of disregard . . . for Latinos" in the County's Sheriff's Office that led to (1) the failure to "adopt basic policy, training and oversight practices," (2) the unlawful "stop[ping], det[ention], and arrest[ ]" of Latinos "on the basis of race, color, or national origin," and (3) retaliation against critics of these unlawful practices. Compl. [1] ¶¶ 1, 4, 79–80, 138–51, 165–70, 186–88, *United States v. Cnty. of Maricopa*, No. 12-cv-981 (D. Ariz. May 10, 2012). In other words, the crux of the United

5

States' claim was that Maricopa County had "significantly departed from standard law enforcement practices that protect against discriminatory policing," *id.* ¶¶ 79–100—not that Maricopa County had enacted an allegedly unconstitutional criminal law.

Next, the United States cites *Colorado City*, 935 F.3d 804, for the proposition that it "may prosecute municipalities when police departments violate constitutional rights, . . . whether or not those violations resulted from implementation of an official policy."  Pl.'s Opp'n at 13–14. There, too, the harms alleged did not flow from substantive criminal prohibitions.  Instead, the defendants allegedly "allowed the [Fundamentalist Church of Jesus Christ of Latter-day Saints (FLDS)] to direct or unlawfully influence their actions regarding policing services," including by "fail[ing] to provide policing services to non-FLDS individuals," "selectively enforc[ing] laws and regulations," and "arrest[ing] non-FLDS individuals without probable cause."  Compl. [1] ¶¶ 15–17, 31, *United States v. Town of Colorado City*, No. 12-cv-8123 (D. Ariz. June 21, 2012). Those are bread-and-butter Section 12601 claims.

Finally, the United States plucks language from *Lauderdale County*, 914 F.3d 960, for the proposition that Section 12601 authorizes suits against "counties."  Pl.'s Opp'n at 14.  But the issue there was "whether the phrase 'officials or employees of any governmental agency with responsibility for the administration of juvenile justice,' as it is used in 34 U.S.C. § 12601(a), includes the judges of a county youth court."  914 F.3d at 961.  More specifically, the court's analysis focused on the term "agency."  *Id.* at 964.  In the part of the opinion that the United States selectively quotes from, the court explained that its conclusion that judges were not part of an "agency" would not vitiate the statute because "the government can presumably still bring Section 12601 lawsuits against many other entities in the juvenile justice system without stretching the ordinary meaning of any words—including counties."  *Id.* at 968.  Nothing about

6

*Lauderdale County*'s issue presented, holding, or analysis supports the United States here because this case is about different terms in the statute: "engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of [constitutional] rights."  And this case is about whether those terms encompass criminal prohibitions—while *Lauderdale County* did not involve a challenge to criminal prohibitions at all.  To the contrary, the alleged harms there were caused by the defendants' misconduct, *i.e.*, a "pattern or practice of prolonged and procedurally flawed incarceration of children pending adjudication."  Compl. [1] ¶¶ 5, 7, *United States v. Lauderdale Cnty.*, No. 13-cv-978 (D. Miss. Oct. 24, 2012).  Those allegations are different in kind from the United States' claim here.

The only notable thing revealed by the United States' cases is that some courts have interpreted Section 12601 to allow for respondeat superior liability.  *See* Pl.'s Opp'n at 13–14 (citing *Colorado City*, 935 F.3d at 810).  That issue is untested in this Circuit and not teed up in this case; but if Section 12601 does allow for respondeat superior liability, it authorizes the United States to litigate any number of instances of police misconduct.  That takes the wind out of any argument by the United States that the District's reading of the statutory text results in a narrow cause of action.  It also suggests that the actor-based limitations that counterbalance this breadth should not be casually swept aside.  The cause of action designed by Congress "reflect[s] a balance of multiple competing interests," and the very purpose of statutory interpretation is to "respect the formula that Congress prescribed"—not "to rewrite" it.  *Advoc. Christ Med. Ctr. v. Kennedy*, 145 S. Ct. 1262, 1274 (2025).

Third, the United States contends that there is "no exception to Section 12601 liability for acts taken pursuant to law."  Pl.'s Opp'n at 25 (capitalization altered).  The District never argued there was.  If a law actually speaks to police conduct—*e.g.*, it authorizes chokeholds—it would

fall within Section 12601's purview. Such a law would establish a pattern or practice of "conduct by" law enforcement officers that "deprives" individuals of protected rights. No such law is at issue here. The Complaint brings a challenge to District criminal law's substantive definition of "assault weapon," which does not speak to the way in which law enforcement officers conduct their duties.

Fourth, the United States argues that the District's reading of Section 12601 "leads to absurd results" because it forecloses a challenge to a hypothetical unconstitutional "firearms ban," such as a law "banning the possession of handguns." Pl.'s Opp'n at 22–23. "[A]bsurdity is a high bar" and requires "an outcome so bizarre, illogical, or glaringly unjust that Congress could not plausibly have intended that outcome." *Stovic v. R.R. Ret. Bd.*, 826 F.3d 500, 505 (D.C. Cir. 2016) (citation modified); *see United States v. Long*, 997 F.3d 342, 356 (D.C. Cir. 2021) ("the absurdity and injustice" must "be so monstrous that all mankind would, without hesitation, unite in rejecting the application" (citation modified)).

The United States' hypotheticals do not come close to the high bar of absurdity. The text and history of Section 12601 make plain that Congress did not intend to authorize the United States to challenge any and every unconstitutional law through Section 12601. Rather, Congress demarcated the specific type of suits that the United States could bring: those seeking to eliminate a pattern or practice of conduct by law enforcement that deprives individuals of constitutional rights. The United States' authority is bounded by the plain text of the cause of action Congress enacted, and what the United States calls an absurd result is the status quo, as no court has ever recognized a suit like this one. *Cf. Alexander v. Sandoval*, 32 U.S. 275, 286–87 (2001) (explaining that courts may not recognize a cause of action when Congress has not). This reading would leave no remedial gap—certainly not an absurd one—because "flagrantly

8

unconstitutional" criminal prohibitions can be and frequently are challenged in myriad ways besides lawsuits brought by the Attorney General under Section 12601. Pl.'s Opp'n at 23. For example, individuals can bring suits under 42 U.S.C. § 1983, and criminal defendants can challenge firearms charges—just as they already are doing in the District and across the country. *See, e.g.*, Compl. [1], *Yzaguirre v. District of Columbia*, 1:24-cv-01828-APM (D.D.C. June 25, 2024); *People v. Crenshaw*, 339 Cal. Rptr. 3d 888, 893 (Ct. App. 2025). Far from absurd, that outcome comports with the time-honored principle that facial challenges are disfavored, while "as-applied challenges are the basic building blocks of constitutional adjudication." *Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) (citation modified).

### 2. History and Context Reinforce That Section 12601 Does Not Authorize Challenges to Substantive Criminal Statutes.

Section 12601's context and history confirm the plain meaning of its text: The statute can be used only to target unlawful "conduct by" law enforcement officers that is the cause of deprivations of federal rights.

### a. The United States Cannot Explain the Striking Differences Between Section 12601 and Other Pattern-or-Practice Laws.

A straightforward comparison of Section 12601 to other pattern-or-practice laws underscores Section 12601's limitations. *See Merck & Co. v. HHS*, 385 F. Supp. 3d 81, 95 (D.D.C. 2019) (Mehta, J.) ("Other statutes may bear on Congress's intent."), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020). As the District explained, unlike other pattern-or-practice laws, Section 12601 has actor-based constraints rather than subject-matter constraints. Defs.' Mot. at 19–22. Those differences indicate that Congress did not intend Section 12601 to operate in lockstep with other pattern-or-practice laws. Instead, it designed a specific, targeted remedy for a specific problem: police misconduct.

The United States does not try to explain those differences away.  It makes no reference to other pattern-or-practice laws whatsoever.  *See* Pl.'s Opp'n at 14–15.  The United States thus concedes the District's point about other pattern-or-practice laws.  *See Texas v. United States*, 798 F.3d 1108, 1114–16 (D.C. Cir. 2015) (describing the well-established rule in this circuit that a party concedes points raised in a motion when an opposition brief fails to address them); *Hillware v. Snyder*, 151 F. Supp. 3d 154, 158 (D.D.C. 2015) (Mehta, J.) (applying rule).

Even as to Section 1983, the United States does not grapple with the differences in the language of Section 1983 and Section 12601.  Section 1983 expressly contemplates challenges to statutes irrespective of the actor by providing a cause of action against "*[e]very person* who under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia" deprives individuals of federal rights.  42 U.S.C. § 1983 (emphasis added); *see* Defs.' Mot. at 21–22.  Section 12601, by contrast, is limited to "conduct by law enforcement officers"—a distinction the United States disregards.

          **b.**       **This Court Should Decline the United States' Invitation to Ignore Legislative History That Reinforces Section 12601's Text.**

The District explained that legislative history confirms Section 12601's scope.  Defs.' Mot. at 22–24.  The United States' frontline retort is that "[l]egislative history is not the law." Pl.'s Opp'n 17.  But the D.C. Circuit has made clear that "though 'legislative history is not the law,' it can be helpful in confirming or reinforcing what the text shows."  *Sec'y of Labor v. KC Transport, Inc.*, --- F.4th ----, ----, No. 22-1071, 2026 WL 1042075, at \*14 n.10 (D.C. Cir. Apr. 17, 2026) (first citing *Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019), then citing *Delaware v. Pennsylvania*, 598 U.S. 115, 138–39 (2023)); *see Inst. S'holder Servs. Inc. v. SEC*, 718 F. Supp. 3d 7, 27 (D.D.C. 2024) (Mehta, J.) (consulting legislative history, after the text, to decide which party's interpretation "better reflects the purposes and history" of the statute), *aff'd*,

142 F.4th 757 (D.C. Cir. 2025).  Legislative history does just that here by reiterating that the statute was designed to remedy systemic patterns of "[p]olice brutality" and "police misconduct"—not to grant the United States a roving license to challenge any state or local criminal law.  Defs.' Mot. at 22–24.

Next, the United States takes issue with the District's reliance on the legislative history of Section 12601's predecessor statute.  *See* Pl.'s Opp'n at 16.  But the United States relies on that same legislative history in this case, *id.* at 17, and has previously affirmed that while "[t]here is no separate legislative history for" Section 12601, "the legislative history of the predecessor bill is relevant because the language of that bill was identical, in pertinent part," Mem. of L. in Supp. of Joint Mot. for Entry of Consent Decree [2] at 3 n.2, *United States v. City of Steubenville*, No. 97-cv-966 (S.D. Ohio Aug. 28, 1997).  Courts agree.  *See, e.g.*, *United States v. City of Columbus*, No. 99-cv-1097, 2000 WL 1133166, at *3 (S.D. Ohio Aug. 3, 2000); *City of Seattle v. Seattle Police Officers' Guild*, 484 P.3d 485, 496 n.7 (Wash. Ct. App. 2021).

As to the content of the legislative history in question, the United States has next to nothing to say.  It contends that the relevant legislative history demonstrates that "the standards of conduct prescribed under Section 12601 are coterminous with the standards of conduct prescribed by the Constitution."  Pl.'s Opp'n at 16–17.  Again, no one argued otherwise.  Section 12601 allows for the vindication of "rights, privileges, or immunities secured or protected by the Constitution or laws of the United States"—but only when those rights are infringed by "conduct by" law enforcement officers, *i.e.*, the way in which officers perform their duties.  As Amici put it, the United States has a viable cause of action when rights are infringed upon by "*institutional shortcomings*" within police departments, not when they are allegedly infringed upon by substantive criminal prohibitions as written.  Amicus Br. [25] at 2, 4–9.

11

**c.**      **The Novelty of the United States' Claim Should Trigger Close Scrutiny by This Court.**

As the District explained, past practice "can inform a court's determination of what the law is."  Defs.' Mot. at 24 (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024)). It is another tool in this Court's interpretive toolkit, which is, at minimum, "noteworthy."  *Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994) (en banc). Here, past practice reveals an unbroken tradition of Section 12601 actions aimed at "conduct by" law enforcement officers that deviates from the law—not facial challenges to substantive criminal prohibitions.  Amici, including former leaders of the Justice Department's Civil Rights Division as well as career supervisors from the Division's Special Litigation Section, know Section 12601 better than anyone and confirm that this suit is "the first of its kind" and a "stark[ ] depart[ure]" from past practice.  Amicus Br. at 2, 3.  Nevertheless, with three arguments, the United States seeks to blind the Court to the United States' own past positions and practices, including from the first Trump Administration; but those arguments lack merit.

First, the United States urges this Court to not consider the United States' own past practices because "the alleged facts on which Defendants rely" do not "appear in the four corners of the Complaint."  Pl.'s Opp'n at 5 n.3, 18–19 (citing Fed. R. Evid. 201(b)).  The District cited Justice Department reports and memoranda by former Attorney General Sessions.  *See* Defs.' Exs. 1–4 [16-1, 16-2, 16-3, 16-4].  The Court may take judicial notice of each of these publicly available government documents on a motion to dismiss.  *See* Defs.' Mot. at 5 n.3; *United States v. Windsor*, 570 U.S. 744, 766 (2013) (taking judicial notice of information from a government website); *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (same).  The United States provides no reason to believe that these documents are subject to "reasonable dispute."  Fed. R. Evid. 201(b).  At most, the United States claims that the District's "assertions"

12

based on these documents are "false." Pl.'s Opp'n at 19. But the United States offers no explanation or any authority for this drive-by critique. The United States also claims that the documents' "source is unknown"—but these documents come from *the Justice Department*. *Id.* at 5 n.3. Lastly, the District offered these documents for the purposes of statutory interpretation, so they are also properly considered as legislative facts. *See* Fed. R. Evid. 201 advisory comm. notes (1972) (explaining that legislative facts need not follow Rule 201's judicial notice requirements); *United States v. Bello*, 194 F.3d 18, 22 (1st Cir. 1999) (explaining that legislative facts are used when a court is "interpreting a statute").

Second, the United States claims that its "past practice has not been as limited as Defendants suggest" because it has previously brought a Section 12601 suit to vindicate First Amendment violations. *See* Pl.'s Opp'n at 19 (citing *Colorado City*, 935 F.3d 804). But, as the District explained above, *Colorado City* challenged quintessential police misconduct, and it is in no way in tension with interpreting Section 12601 to not cover challenges to substantive criminal prohibitions. Further, in a footnote, the United States contends (without citation to any authority) that it has previously "asserted Section 12601 jurisdiction for claims that law enforcement enforced local ordinances that are allegedly unconstitutional on their face with respect to profanity laws and stop-and-identify ordinances." *Id.* at 13 n.8. But the United States does not cite any support for this statement or identify the cases for which it has "asserted Section 12601 jurisdiction." Nor does the United States explain what it means to "assert[ ] Section 12601 jurisdiction." This Court "need not consider cursory arguments made only in a footnote"—particularly when the United States provides "no citation for this argument." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008); *see also Bush v. District of Columbia*, 595 F.3d 384, 388 (D.C. Cir. 2010). Elsewhere, the United States obliquely refers to

13

past "findings under Section 12601 that law enforcement engaged in misconduct by enforcing laws that the Department alleged were unconstitutional." Pl.'s Opp'n at 25. Again, the United States cites no authority. *See id.*

Third, the United States argues that past practice has "no relevance" whatsoever. *Id*. at 19. But that ignores both the law and common sense. "The fact that powers long have been unexercised well may call for close scrutiny as to whether they exist" at all. *United States v. Morton Salt Co.*, 338 U.S. 632, 647 (1950). Indeed, the D.C. Circuit just recently relied on past executive practice to analyze statutory language and emphasized that the "want of assertion of power . . . [is] significant in determining whether such power was actually conferred." *Refugee & Immigrant Ctr. Educ & Legal Servs. v. Mullin*, --- F.4th ----, ----, No. 25-5243, 2026 WL 1110616, at *11 (D.C. Cir. Apr. 24, 2026) (citation modified). At a minimum, courts may consider past practice as one factor in the mix when interpreting statutory language. *See Ry. Labor*, 29 F.3d at 670; *Monsalvo v. Bondi*, 604 U.S. 712, 726–27 (2025) (relying on the federal government's implementation history to interpret a statute). In fact, cases cited by the United States say as much. *See* Pl.'s Opp'n at 20 (citing *Nat'l Ass'n of Sec. Dealers, Inc. v. SEC*, 431 F.3d 803, 811 (D.C. Cir. 2005) (explaining that "past practices" are "noteworthy")).

### 3. Basic Canons of Federalism and Common Sense Caution Against Reading Section 12601 to Authorize the United States' Challenge.

Embracing the United States' novel reading of Section 12601 would grant the Attorney General sweeping new authority to superintend the affairs of states and localities. This raises real federalism concerns, and it defies common sense and courts' understandings of how Congress usually works to conclude that Congress granted such sweeping powers without clear indication. *See* Defs.' Mot. at 26–28. The United States' arguments to the contrary flout common sense and presumptions of statutory interpretation.

14

First, the United States suggests there are "[n]o such concerns" here because it has "plenary power over the District." Pl.'s Opp'n at 26. But Section 12601 applies to states, localities, and the District alike. The Court must adopt an interpretation that applies to and works for all entities covered by the law because a statute is not "a chameleon," *Clark v. Martinez*, 543 U.S. 371, 382 (2005), and "the meaning of words in a statute cannot change with the statute's application," *United States v. Santos*, 553 U.S. 507, 522 (2008) (plurality). Accordingly, even assuming that federalism concerns were less present with the District, the Court could not allow the United States to pursue a facial challenge here while forbidding facial challenges against states. Thus, because Section 12601 applies to states and localities, the Court must take into account federalism concerns when adopting an interpretation of Section 12601.

Regardless, the United States is wrong to contend that there are no federalism concerns when it comes to the District. Half a century ago, Congress passed the Home Rule Act, which "grant[ed] to the inhabitants of the District of Columbia powers of local self-government" and sought, "to the greatest extent possible, consistent with the constitutional mandate," to "relieve [Congress] of the burden of legislating upon essentially local District matters." District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified at D.C. Code §§ 1-201.01 to 1-207.71). The Home Rule Act created an elected legislative body, the Council of the District of Columbia, and granted it "legislative powers," subject to limited restrictions. D.C. Code § 1-206.02(a). Those powers, the D.C. Circuit held, with support from the United States as amicus, allow the District to enact firearms laws much like any state or locality—including the very assault weapons laws challenged here. *Heller v. District of Columbia*, 670 F.3d 1244, 1251 (D.C. Cir. 2011).

15

Further, the Department of Justice is not Congress, and it may not casually invalidate the constitutionality of laws passed by the D.C. Council, signed by the Mayor, and approved by Congress without a viable cause of action.  More alarming still, there are virtually no limits to the United States' theory.  By its own telling, the "plain text of" Section 12601 "is extraordinarily broad."  Pl.'s Opp'n at 12, 27.  If courts sanction the use of Section 12601 to challenge substantive criminal prohibitions, the United States could bring constitutional challenges to any number of state and local laws that the administration in power dislikes.  Indeed, the United States recently threatened to bring a similar suit against Virginia if it enacts a law proscribing the purchase or sale of AR-15s.  *See* @Harmeet K. Dhillon, X (Apr. 10, 2026), tinyurl.com/mvhf6453.  The United States cannot minimize federalism concerns here when a victory before this Court could open the floodgates to similar challenges to *state* laws—and to state sovereignty.

Second, the United States contends that the District's federalism concerns are overstated because it seeks to merely "hold[ ] governmental authorities accountable" when they "deprive people of their constitutional rights."  Pl.'s Opp'n at 26.  But federalism concerns are implicated notwithstanding the fact that the United States will ultimately have to prove the deprivation of a federal right.  The Supreme Court has made as much clear in discussing Section 1983.  That statute too seeks to remedy the deprivation of federal rights and imposes liability only when such rights have been violated.  Yet, the Supreme Court has underlined that interpreting that statute too broadly could "engage the federal courts in an endless exercise of second-guessing municipal . . . programs"—"an exercise [it] believe[s] the federal courts are ill suited to undertake, as well as one that would implicate serious questions of federalism."  *City of Canton v. Harris*, 489 U.S. 378, 392 (1989) (citation omitted).

16

Third, the United States lambasts the District's reliance on *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980).  Pl.'s Opp'n at 26–27.  The United States misses the point.  That case cogently, and powerfully, detailed the "important principles of federalism and separation of powers" at stake.  644 F.2d at 200–01.  It explained that permitting the "Justice Department to bring a civil suit against any state or local administrative body merely because the Attorney General and his subordinates" opine that their practices are unconstitutional "would be to vest an excessive and dangerous degree of power in the hands of the Attorney General."  *Id.* at 200 (internal quotation marks omitted).  The court went on to explain that "[t]he conceivable variations" on this type of "lawsuit are practically infinite" and would "compel drastic and far-reaching changes in local governments" fundamentally "inconsistent with a proper division of power in a federal system."  *Id.* at 201.  True, those concerns are quieted following the passage of Section 12601 when the United States brings a suit that hews to the statute's text.  But when the United States seeks judicial sanction of an atextual reading of the statute—that stretches the bounds of authority vested in it by Congress—these concerns reemerge with full force.

### B.      The United States' Claim Falls Outside Section 12601.

For all the reasons given by the District, Section 12601 does not provide a cause of action for facial challenges to substantive criminal prohibitions.  The United States' claim is plainly an impermissible attack on a democratically enacted District law that regulates private conduct.  The alleged harm is caused by a purportedly "unconstitutional law," not by a pattern or practice of "conduct by" law enforcement officers.  *See* Defs.' Mot. at 28.  Nowhere does the United States explain, beyond *ipso facto* arguments, how a challenge to the District's criminal prohibition on possession of assault weapons constitutes a challenge to a "pattern or practice of conduct by law enforcement officers."  It is therefore not sufficient to state a Section 12601 claim.  The tangential responses that the United States does offer are lackluster.

17

First, the United States does not meaningfully dispute that the harms alleged in its Complaint are caused by legislative enactments, not law enforcement conduct. In fact, it states that "Defendants apply" and "enforce[ ]" "an unconstitutional law," *i.e.*, "the District's [allegedly] unconstitutional firearms ban." Pl.'s Opp'n at 9, 11. That only underscores that the underlying alleged constitutional harm targeted in the Complaint is a substantive prohibition on private conduct enacted by the elected branches, not "conduct by" law enforcement officers. At bottom, it is District law that limits individuals' ability to possess assault weapons. *See* Compl. [5-1] ¶ 24 (conceding that law enforcement merely follows the laws' "mandates").

Second, the United States critiques the District's characterization of its suit as a "facial" challenge to District laws. Pl.'s Opp'n at 23–25. That protest rings hollow. For all the reasons detailed before and below, the United States frames its Complaint as a wholesale attack on the District's allegedly "unconstitutional law and official policy" of prohibiting assault weapons. Compl. ¶ 40; *see* Defs.' Mot. at 32; Argument § II, *infra*. There is no tractable difference between that framing and a challenge only to the District's "categorical prohibition on AR-15s and other weapons in common use," Pl.'s Opp'n at 8, or proscription of "[c]ertain categories of firearms," Compl. ¶ 18, when the Complaint fails to allege the contours of any such categories of firearms. Indeed, it is hard to envision that the United States seeks anything other than a full-scale rewriting of the challenged laws when its requested relief includes not only a permanent injunction proscribing enforcement of the challenged laws, but also an apparently mandatory injunction "requiring all DC Defendants within a reasonable period of time to enable and allow the registration of firearms protected under the Second Amendment." *Id.* ¶ 43.

18

**II.**     **The Complaint Fails to Plausibly Allege Facts Supporting a Pattern or Practice of Conduct by Law Enforcement That Deprives Persons of Constitutional Rights.**

Even if the United States' challenge to the assault weapons laws is cognizable under Section 12601, the United States still must—but does not—allege sufficient facts to make it plausible that (1) the challenged assault weapons laws are unconstitutional, and (2) MPD has a pattern or practice of enforcing the assault weapons laws—including *all* of the provisions that the United States challenges—in a manner that results in the deprivation of constitutional rights. *See* Defs.' Mot. at 31–40. Rather than respond to the pleading deficiencies identified by the District, the United States repeats a few of its allegations, says they suffice, and accuses the District of requiring that "the Complaint must contain everything the United States must prove at trial." Pl.'s Opp'n at 10–11.

The United States fundamentally misunderstands and misapplies the pleading standards. As precedent ignored by the United States explains, "the essential elements of a claim remain constant through the life of a lawsuit . . . So, to determine what the plaintiff must plausibly allege at the outset of a lawsuit, we usually ask what the plaintiff must prove in the trial at its end." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 332 (2020). The court "take[s] note of the elements" of a plaintiff's claim and "then determines whether the plaintiff has pleaded those elements with adequate factual support to state a claim to relief that is plausible on its face." *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (citation modified). Accordingly, although the Complaint need not "contain everything the United States must prove at trial," Pl.'s Opp'n at 10, it must contain sufficient factual support for the elements of the United States' claim, *see Sanchez*, 45 F.4th at 395.

One of the elements of the United States' claim is that the alleged pattern or practice is unconstitutional. Thus, assuming that the assault weapons laws are a cognizable pattern or

19

practice under Section 12601, *but see* Defs.' Mot. at 13–28, the United States must plausibly allege facts showing that the laws are unconstitutional.  Those facts include, in a Second Amendment challenge to a ban on "arms," that the regulated weapons are not only common but also used in and useful for self-defense.  *See id.* at 3–4, 31–32; *Hanson v. District of Columbia*, 120 F.4th 223, 231–34 (D.C. Cir. 2024) (per curiam), *cert. denied*, 145 S. Ct. 2778 (2025). Notably, the United States does not address *Hanson* at all.  The United States thus concedes that *Hanson*, when applied at the pleadings stage, requires a plaintiff to make these plausible factual allegations about common use for self-defense.  *See Texas*, 798 F.3d at 1114–16; *Hillware*, 151 F. Supp. 3d at 158.

The United States' Complaint does not make plausible factual allegations to satisfy *Hanson* and instead relies on wholly conclusory legal conclusions.  Ducking its deficiencies under *Hanson* and the pleading standards, the United States argues that it satisfies the pleading standards simply because it avers that AR-15s are popular.  Pl.'s Opp'n at 8–9.  Popularity is insufficient; the United States must plausibly allege facts showing the AR-15's role in self-defense.  Defs.' Mot. at 35.  Citing a statement from a single justice, Pl.'s Opp'n at 9, does not make that showing because the United States cannot rely on judicial opinions as a substitute for factual allegations, Defs.' Mot. at 36; the statement was not even cited in the Complaint, *see Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994) (a complaint's sufficiency is determined by its allegations, not statements in briefs); and the statement does not include any citation to facts about the use of AR-15s for self-defense, *see Snope v. Brown*, 145 S. Ct. 1534, 1534 (2025) (Kavanaugh, J., statement respecting the denial of certiorari).

Besides the AR-15, the United States does not try to explain how the Complaint plausibly alleges that other weapons covered by the assault weapons laws satisfy the common-use test—or

are even just commonly possessed.  Instead, the United States "focuses on the AR-15 because it is a 'paradigmatic example' of the sort of weapon banned by statutes banning 'assault weapons.'"  Pl.'s Opp'n at 11 n.7 (quoting *Bevis v. City of Naperville*, 85 F.4th 1175, 1183 (7th Cir. 2023), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024)).  But the Complaint contains no facts plausibly showing that AR-15s are a "paradigmatic example" of assault weapons covered by the District's laws such that applying *Hanson*'s inquiry to AR-15s suffices for every other covered weapon.  Nor does the United States' Opposition explain why they are the "paradigmatic example."  Yet, as the District explained and the United States does not dispute, the number and characteristics of one assault weapon do not establish the number and characteristics of another.  Defs.' Mot. at 35.  In fact, the United States contradicts itself because it concedes, or at least does not dispute, that grenade launchers, Striker 12 shotguns, and Streetsweeper shotguns are not protected by the Second Amendment.  *See id.* at 36–37; Pl.'s Opp'n at 24.  Clearly then, there are differences among the weapons covered by the District's laws that are material to a Second Amendment challenge, so allegations about the AR-15 cannot apply to all covered weapons.  The United States' citation to *Bevis* is of no help because the Seventh Circuit was determining whether a preliminary injunction should issue, and a "preliminary look" at AR-15s was enough to conclude that the plaintiffs were unlikely to succeed on the merits.  85 F.4th at 1197.  *Bevis* does not address what a plaintiff must plausibly allege when challenging multipart, severable assault weapons laws.

The United States' failure, in both its Complaint and its Opposition, to address other weapons covered by the assault weapons laws defeats its claim because the United States has challenged the laws in their entirety.  *See* Defs.' Mot. at 32, 35.  To resist that straightforward conclusion, the United States tries to recast its Complaint, arguing that it does not bring a facial

21

challenge but only a challenge to a "subset" of the assault weapons laws.  Pl.'s Opp'n at 24–25.

Neither the Complaint nor the Opposition identifies any "subset" of the assault weapons laws.

Rather, both are quite clear on the United States' theory: "in enforcing the District's

unconstitutional law, Defendants have engaged in a pattern or practice of conduct that deprives

persons of their constitutional rights."  *Id.* at 24; *see also, e.g.*, Compl. ¶ 40 (identifying the

pattern or practice as the allegedly "unconstitutional law and official policy" of prohibiting

assault weapons); *id.* ¶ 19 (challenging "the registration prohibition" contained in D.C. Code

§ 7-2501.01(3A)(A), which is the subsection defining "assault weapon").  As a result, the United

States must plausibly allege that laws are unconstitutional, yet the only component of the laws

that the United States addresses is the prohibition on AR-15s.

The United States cannot avoid its pleading burden simply because "[n]owhere in its

Complaint does the United States use the term 'facial challenge.'"  Pl.'s Opp'n at 24.  "The label

is not what matters." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).  Rather, if the "claim

and the relief that would follow . . . reach beyond the particular circumstances of [the]

plaintiff[ ]," then the plaintiff must "satisfy [the] standards for a facial challenge to the extent of

that reach." *Id.*; *see Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 88 (D.D.C. 2025)

(determining that plaintiffs brought a facial challenge to executive orders, despite their insistence

otherwise, because their "constitutional claims challenge the executive orders as a whole" and

"writ large," "rather than as to particular applications" (citation modified)).  The Complaint

alleges that it is unconstitutional for the District to prohibit possession of assault weapons

covered by D.C. Code § 7-2501.01(3A)(A). *E.g.*, Compl. ¶¶ 19–24.  Thus, the United States

must plausibly allege that those weapons are constitutionally protected.  But the only arguably

factual matter in the Complaint about any specific weapon is about AR-15s, and even those few

22

allegations do not plausibly show that AR-15s are constitutionally protected because those allegations do not address "the role of [AR-15s] for self-defense." *Hanson*, 120 F.4th at 233.

Although the United States contends that it does not bring a facial challenge, the United States does not contend that it has brought an as-applied challenge instead. Nor could the United States make such a contention because, in an as-applied challenge, "the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to" the plaintiff. *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). The challenged laws, however, cannot be applied to the United States because they apply only to "person[s] or organization[s]." D.C. Code § 7-2502.01(a). And so, "given the posture of the case," with no application to the United States, it "must" raise a "purely facial challenge." *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987).[1]

The United States further argues that it has not challenged the assault weapons laws facially or in their entirety because the Complaint does not challenge prohibitions on "automatic weapons (i.e., machine guns)" or grenade launchers. Pl.'s Opp'n at 24. Machine guns are banned under a different law, so the United States gains nothing by saying that it is not challenging a prohibition on machine guns. *Compare* D.C. Code § 7-2501.01(3A)(A) (defining "assault weapon"), *with id.* § 7-2501.01(10) (defining "machine gun"). And although the United States contends that "nothing in the Complaint can be construed as a challenge to the enforcement" of the grenade launcher prohibition, Pl.'s Opp'n at 24, nothing in the Complaint can be construed as *exempting* the grenade launcher prohibition from the United States' challenge—or, for that matter, prohibitions on the UZI or the Striker 12 or the Streetsweeper or

---

[1] The United States misunderstands a sentence in the District's brief to "admit" that the Complaint does not bring a facial challenge. Pl.'s Opp'n at 24–25. The sentence, however, explained that the United States failed to plausibly allege sufficient facts to support its facial challenge. Defs.' Mot. at 25.

any other assault weapon.  That is the whole problem with the United States' "subset" argument: Nothing in the Complaint identifies a subset of assault weapons subject to challenge.  The pleadings, however, must give "notice of the general nature of the case and the circumstances or events upon which it is based, so the parties can prepare and the court can dispose of the case properly." *Aktieselskabet AF 21. Nov. 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 16 (D.C. Cir. 2008) (citation modified).  Allowing the United States to proceed being the only one that knows what the Complaint is and is not challenging defies the principles of notice pleading.

This is not a "heightened pleading burden."  Pl.'s Opp'n at 10.  This is the normal pleading standard:  The United States' Complaint "must plausibly plead facts supporting the elements of [its] claim[ ], like plaintiffs must do in any case." *Sanchez*, 45 F.4th at 396.  The United States has not plausibly alleged facts showing that any assault weapons covered by the District's laws are constitutionally protected, let alone any "subset."  That a sufficient pleading here would require far more factual allegations than the Complaint makes is simply a function of the sweeping nature of the claim.  *Cf. id.* (rejecting argument that the court was imposing a heightened pleading standard for rational-basis challenges and explaining that the pleading requirements just reflected the difficulty of bringing such a challenge).  Even accepting the United States' reimagining of the Complaint, it is still deficient.  If the "subset" of the assault weapons laws challenged by the Complaint is everything but the prohibition on machine guns and grenade launchers, then the Complaint still fails because it does not allege facts plausibly showing that any of those other weapons are in common use for self-defense.

For all those reasons, the United States has not plausibly alleged a necessary element of its claim: that the assault weapons laws are unconstitutional.  The United States also has not plausibly alleged another element: that MPD has a pattern or practice of enforcing the assault

weapons laws—and enforcing all the prohibitions that the United States challenges—in a manner that results in the deprivation of constitutional rights. The District explained that simply alleging that MPD makes arrests or denies registration certificates is insufficient. *See* Defs.' Mot. at 38–40. In short, the decision to arrest involves more considerations than just enforcing a criminal law. *Id.* at 38–39. And there are no plausible factual allegations indicating that MPD has a pattern or practice of receiving and denying applications for registration certificates for any of the prohibited assault weapons, let alone all. *Id.* at 39–40. In response, the United States says that it states a claim because it "alleges that when the District's law enforcement officers are enforcing the District's unconstitutional firearms ban, they are engaging in a pattern or practice." Pl.'s Opp'n at 11. That conclusory response does not address the insufficiencies in the United States' theory identified by the District. Those insufficiencies, along with the United States' deficiencies in pleading common use, are reason enough to dismiss the Complaint.

The United States cannot save its Complaint by asking for leave to amend. *See id.* at 28. The United States cannot make such a request in an opposition brief but must do so by motion and with a proposed amended pleading. *IMAPizza, LLC v. At Pizza Ltd.*, 965 F.3d 871, 875–76 (D.C. Cir. 2020). Moreover, if the Court finds that the United States' claim is not cognizable under Section 12601, it should dismiss the Complaint with prejudice because no additional facts could make a challenge to the District's assault weapons laws cognizable. *See Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015) ("Dismissal with prejudice is warranted when the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." (citation modified)); *Gray v. Staley*, 310 F.R.D. 32, 39 (D.D.C. 2015) (Mehta, J.) (applying that standard and dismissing a complaint with prejudice).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint.

Date: April 29, 2026.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

/s/ Matthew R. Blecher

MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

/s/ Honey Morton

HONEY MORTON [1019878]
Assistant Chief, Equity Section

/s/ Adam J. Tuetken

ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendants*

26