**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

THE DISTRICT OF COLUMBIA, ACTING
CHIEF OF POLICE JEFFREY CARROLL, in
his official capacity as Chief of the Metropolitan
Police Department of the District of Columbia,
and THE METROPOLITAN POLICE
DEPARTMENT OF THE DISTRICT OF
COLUMBIA,

      Defendants.

Case No.  1:25-cv-04458-APM

## FIRST AMENDED COMPLAINT

Defendants' have given their written consent to this amended pleading.  Pursuant to Fed. R. Civ. P. 15(a)(2), the United States of America respectfully submits the following First Amended Complaint.

## INTRODUCTION

1.      The Second Amendment protects the pre-existing right[1] to keep and bear arms.  In *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010), the Supreme Court held that this right is among those fundamental rights necessary to our system of ordered liberty and incorporated it under the Fourteenth Amendment, thereby making it applicable to the states.  *Id.* at 778.  The Second Amendment protects the right of law-abiding Americans to possess and use weapons that are in common use for lawful purposes.  *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022); *District of Columbia v. Heller*, 554 U.S. 570, 625-27 (2008).

---

[1] *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008) ("[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right.") (emphasis in original).

2.        Unfortunately, the District of Columbia has enacted ordinances that contravene the Second Amendment in at least two respects.  First, D.C. Code §§ 7-2502.01 and 7-2502.02 combine to ban the possession of AR–15 platform rifles.  But "Americans today possess an estimated 20 to 30 million AR–15s." *Snope v. Brown*, 145 S. Ct. 1534 (2025) (Kavanaugh, J., statement respecting denial of certiorari).  Indeed, as Justice Kagan recently noted, "[t]he AR–15 is the most popular rifle in the country." *Smith & Wesson Brands, InC. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025).  *See* also *Garland v. Cargill*, 602 U.S. 406, 429-30 (2024) (Sotomayor, J., dissenting) (AR-15s are "commonly available, semiautomatic rifles").  Just last term, Justice Kavanaugh stated the following regarding a Maryland law that bans AR-15s: "Given that millions of Americans own AR–15s and that a significant majority of the States allow possession of those rifles, petitioners have a strong argument that AR–15s are in 'common use' by law-abiding citizens and therefore are protected by the Second Amendment under *Heller*.  *Snope*, *supra*, (Kavanaugh, J., statement respecting denial of certiorari).

3.        Supreme Court justices have recently expressly contemplated challenges to bans on so-called "assault-style" firearms such as the AR–15, noting that "[a]dditional petitions for certiorari will likely be before th[e] Court shortly and . . . th[e] Court should and presumably will address the AR–15 issue soon, in the next Term or two." *Snope*, *supra* (Kavanaugh, J., statement respecting denial of certiorari).  The lawful possession of "the most popular rifle in America" is of "critical importance to tens of millions of law-abiding" citizens "throughout the country." *See Snope*, 145 S. Ct. 1535, 1538 (Thomas, J., dissenting from denial of certiorari).

4.        Secondly, D.C. Code § 22–4514(a) bans firearm suppressors (which it calls "appliance[s] for causing the firing of any firearm to be silent or intended to lessen or muffle the

noise of the firing of any firearms").  But suppressors are also in common use by law-abiding Americans and categorically banning them violates the Second Amendment.

5.        In summary, the District's laws contravene the Second Amendment in at least these two respects, and the United States brings this action to enjoin the District's law enforcement officers from enforcing those unconstitutional law.

## PARTIES

6.        Plaintiff is the United States of America.

7.        The District is a "governmental entity" as that term is used in 34 U.S.C. § 12601(a).

8.        Defendant The Metropolitan Police Department of the District of Columbia ("MPD") is a law enforcement agency that enforces the laws within the District.  *See* D.C. Code § 5–105.05.  Police officers within MPD are "law enforcement officers" as that term is used in 34 U.S.C. § 12601(a).  MPD serves as the registration and licensing office for all applicants for firearms-related licenses in the District.  *See* D.C. Mun. Regs. Tit. 24, § 2305.  Additionally, MPD polices officers have and exercise the authority to arrest individuals committing a violation of the laws referenced in this Complaint.  *See* D.C. Code § 23-581.  Members of the MPD are required to "familiarize themselves with the statutes, laws, and regulations in force in the District of Columbia." D.C. Mun. Regs. tit. 6-A, § 200.13.  And they are required to "take action respecting violations of those statutes, laws, and regulations coming to their attention or about which they have knowledge." *Id*.  When such police officers perform their duty pursuant to these regulations, they are engaging in "conduct by law enforcement officers" as that phrase is used in 34 U.S.C. § 12601(a).

9.        Defendant Jeffrey Carroll is the interim Chief of Police for the MPD.  In that capacity, Chief Carroll "shall take any measures that will insure prompt and vigorous enforcement

of all criminal statutes, laws, regulations, and ordinances . . ..” D.C. Mun. Regs. tit. 6-A, § 800.02. Additionally, Chief Carroll or his designee promulgates and enforces the regulations that implement the District's unconstitutional gun registration system. *See* D.C. Mun. Regs. tit. 24, § 2305.1.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

11.    The Court has authority to grant the remedies Plaintiff seeks pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 34 U.S.C. § 12601 (“Section 12601”).  The United States is authorized to initiate this action against the Defendants under Section 12601.

12.    The declaratory and injunctive relief that the United States seeks is authorized by 34 U.S.C. § 12601(b) and 28 U.S.C. §§ 2201 and 2202.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred therein.

## GENERAL ALLEGATIONS

### A.    The District' Ban of So-Called “Assault Weapons” is Unconstitutional

#### 1.    The Text of the Ordinance

14.    D.C. Code § 7–2501.01(3A) defines the term “assault weapon”[2] to include several specific firearm models, including the AR-15.  The statutory definition also includes other models of firearms that are variations of the listed models regardless of manufacturer. Thus, D.C. Code § 7–2501.01(3A) defines “assault weapon” to include all AR-15 platform rifles.

---

[2] This definition uses politically charged rhetoric.  The term “assault weapon” is not a technical term used in the firearms industry.  Rather, as Justice Thomas has aptly noted, “assault weapon” is a tendentious political term developed by anti-gun publicists. *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting).

15.     Unlike some jurisdictions that ban so-called "assault weapons," the District does not have a straightforward ban.  Instead, it accomplishes the same result by making it illegal to possess a firearm unless it is registered with the police and then prohibiting the registration of "assault weapons."

16.     Specifically, D.C. Code § 7-2502.01(a) states that ". . . no person or organization in the District shall possess or control any firearm, unless the person or organization holds a valid registration certificate for the firearm."  And D.C. Code § 7-2502.02(a)(6) states: "A registration certificate shall not be issued for . . . An assault weapon."

17.     The combined effect of the statutes described in the preceding three paragraphs is to ban the possession of AR-15-style semiautomatic rifles in the District.

18.     Any person convicted of violating the "assault weapon" ban may be fined $2,500 and imprisoned for up to one year. D.C. Code §§ 7-2507.06; 22-3571.01.

**2.     Tens of Millions of Law-Abiding Americans Own AR-15 Style Rifles for Lawful Purposes**

19.     The AR-15 is the "paradigmatic example" of the sort of weapon the possession of which is banned by the District's law.  *See Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1183 (7th Cir. 2023); *Bianchi v. Brown*, 111 F.4th 438, 453 (4th Cir. 2024).  Accordingly, in this action, Plaintiff seeks an injunction prohibiting the District's law enforcement officers from engaging in a pattern or practice of conduct pursuant to which they enforce the District's prohibition on the possession of AR-15 style rifles.

20.     As of 2021, there were at least twenty-eight million AR-style semiautomatic rifles in circulation.  *NSSF Releases Most Recent Firearm Production Figures*, Nat'l Shooting Sports Found.  (Jan.  11, 2024) (available at https://perma.cc/C533-T8TV).[3]

---

[3] The statistics in this section are drawn from *Bianchi*, 111 F.4th 518–19 (Richardson, J., dissenting).

21.    Roughly 2.8 million AR-style semiautomatic rifles entered the market in 2020 alone, making up around 20% of all firearms sold that year.  Cong.  Rsch.  Serv., House-Passed Assault Weapons Ban of 2022 (H.R.  1808), 2 (Aug.  4, 2022); Nat'l Shooting Sports Found., Firearms Retailer Survey Report, 9 (2021) (available at https://perma.cc/ZQC3-WNHH).

22.    Various studies estimate that at least 16 million, but possibly up to 24.6 million, Americans own or have owned AR-style rifles.  *See* Emily Guskin, Aadit Tambe & Jon Gerberg, *Why Do Americans Own AR-15s?*, Wash.  Post (Mar.  27, 2023), (estimating that about 16 million Americans—approximately 20% of gun owners—own AR-15-style rifles); William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 33 (May 13, 2022) (available at https://perma.cc/9L8W-Y3HT) (estimating that 24.6 million Americans— approximately 30% of gun owners—have owned an AR-15 or similarly styled rifle); *see also* Nat'l Shooting Sports Found., *Sport Shooting Participation in the U.S. in 2020*, pg. iii (2020), (available at https://perma.cc/G353-9XME) (reporting that over 20 million American adults participated in target shooting with AR-15-style rifles).

23.    These rifles are widely owned for many lawful purposes.  One survey from 2021 found that the most commonly reported reasons for owning AR-style rifles are recreational target shooting (66% of respondents), home defense (61.9%), hunting (50.5%), defense outside the home (34.6%), and competitive sports shooting (32.1%).  English, *supra*, at 33–34.  Another survey conducted in 2022 found that respondents reported self-defense (65%), target shooting (60%), the potential breakdown of law and order (42%), and hunting (18%) as major reasons for owning AR-15s.  Guskin, Tambe & Gerberg, *supra*.

24.    Semiautomatic rifles like the AR-15 are common for lawful purposes.  *Bianchi*, 111 F.4th at 519 (Richardson, J., dissenting).  Indeed, for many years now, this question has been

6

"beyond debate." *Id.* (quoting *Kolbe v. Hogan*, 849 F.3d 114, 156 (4th Cir. 2017) (Traxler, J., dissenting)).   In *Staples v. United States*, 511 U.S. 600 (1994), the Supreme Court contrasted semiautomatic rifles like AR-15s with "machineguns, sawed-off shotguns, and artillery pieces," finding that the former are "commonplace," "generally available," and "widely accepted as lawful possessions." *Id.* at 603, 610–12.  *See* also *Heller v. D.C.* ("*Heller II*") 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . .  are indeed in 'common use . . ..'"); *N.Y.  State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . .  at issue are 'in common use' as that term was used in *Heller*.");[4] *Friedman v. City of Highland Park*, 577 U.S. 1039 (2015) (mem.) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) (explaining that semiautomatic rifles like the AR-15 are commonly owned for lawful purposes); *see* also *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) ("Semi-automatic rifles have not traditionally been banned and are in common use today, and are thus protected under *Heller*.").  Justice Kagan recently noted that "[t]he AR–15 is the most popular rifle in the country." *Smith & Wesson Brands, InC. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025).  *See* also *Garland v. Cargill*, 602 U.S. 406, 429-30 (2024) (Sotomayor, J., dissenting) (AR-15s are "commonly available, semiautomatic rifles").  In 2022, the Bureau of Alcohol, Tobacco, Firearms and Explosives described AR-15 style rifles as "one of the most popular firearms in the United States," including for "civilian use." *Bianchi*, 111 F.4th at 520 (quoting *Definition of 'Frame or Receiver' and Identification of Firearms*, 87 Fed.  Reg.  24652, 24652, 24655 (Apr.  26, 2022)).

---

[4] The Second Circuit's holding in this respect was not disturbed by the more recent *Nat'l Ass'n for Gun Rts.  v. Lamont*, 153 F.4th 213 (2d Cir. 2025).

25.     AR-15 type rifles are not commonly used by criminals. According to the FBI, in 2019 only 364 homicides were known to have been committed with *rifles of any type*, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects.  *See* Expanded Homicide Table 8, Crime in the United States (2019), https://bit.ly/3HdolNd.

26.     There cannot be the slightest question that millions of Americans have chosen to equip themselves with AR-15 style rifles for various lawful purposes, including but not limited to self-defense.

### 3.     The *Bruen* Framework

27.     In *Bruen* the Court summarized the standard for applying the Second Amendment with the following two-step analysis: "[1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"  *Id.*, 597 U.S. at 17.

### 4.     Plaintiff Has Carried Its Burden at Step One

28.     The United States has carried its burden at *Bruen* step one.  The District's law makes it a crime to keep (i.e., possess) or bear a firearm, to wit AR-15 style rifles even for self-defense.  Keeping and bearing arms is the quintessential type of conduct covered by the plain text of the Second Amendment.

29.     In summary, the Second Amendment's plain text covers the conduct of those law-abiding the District's citizens who desire to keep and bear arms in common use for self-

defense. Therefore, the Constitution presumptively protects that conduct. Another way of saying that is the District's law that bans such conduct is presumptively unconstitutional.

**5.    The District Must Necessarily Fail to Carry Its Step Two Burden**

30.    The District cannot rebut the presumption of unconstitutionality. There is no historical tradition analogous to a ban on a weapon in common use. *See Heller*, 554 U.S. at 629. A plaintiff is not required to prove common use as part of their step one showing, but if they do prove common use, they necessarily preclude the government from prevailing under step two. *See Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1209 (7th Cir. 2023) (Brennan, J., dissenting) (Proving common use is a "sufficient condition" for finding an arm is protected under the history and tradition test).

**B.    The District' Suppressor Ban Is Unconstitutional**

31.    The National Firearms Act regulates firearm suppressors (which it refers to as "silencers"). *See* 26 U.S.C.A. § 5845(a)(7). In order to obtain a suppressor, a person must:

- Select and purchase the suppressor from a licensed dealer (it will be held by the dealer until approval)
- Submit a Form 4
- Provide personal information
- Submit fingerprints
- Provide passport-style photos
- Pay any applicable dealer fees
- Submit to ATF background check

Only after completing this arduous process may a citizen obtain possession of the suppressor he or she has purchased.

32.    Unlike the NFA, the District does not merely regulate suppressors, it categorically bans them. *See* D.C. Code § 22–4514(a) (banning suppressors, which it calls "appliance[s] for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms"). Categorically banning an arm is different in kind and not merely in degree from

9

regulating it.    The District may enact a wide variety of firearm regulations, but the Second Amendment "takes certain policy choices"—including a categorical ban of an arm in common use—"off the table." *Heller*, 554 U.S. at 636.

33.    The idea that suppressors are in any way widely associated with criminal activity is a myth.    According to the American Suppressor Association, as if April 2026, there are approximately six million registered suppressors in the United States.    Yet, according to acting former ATF Deputy Director Ronald B. Turk, they are rarely used in criminal shootings and should not be viewed as a threat to public safety.[5]    Indeed, in 2017, the ATF reported that it had recommended prosecutions in only *44* suppressor-related cases on average per year.

34.    Applying the *Bruen* framework to the District's ban of suppressors, at the plain text step, "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Bruen*, 577 U.S. at 28. This includes all "modern instruments that facilitate armed self-defense." *Id*.    Suppressors fall within this category.    Therefore, suppressors are presumptively protected.    Again, the District cannot rebut the presumption of unconstitutionality, because there is no historical tradition analogous to a ban on an arm in common use. *See Heller*, 554 U.S. at 629.

### C.    The District Routinely Enforces the Challenged Regulations

35.    The District routinely enforces the firearm regulations the enforcement of which is challenged in this Complaint, as evidenced by the fact that hundreds of people have been convicted for violating them.

---

[5] Ronald B. Turk, *White Paper: Options to Reduce or Modify Firearms Regulations* at 6–7, ATF (Jan. 20, 2017), https://perma.cc/JXF5-CULT.

10

**D.      The District is in Violation of Section 12601**

**1.      Introduction**

36.      As pertinent to this action, Section 12601 states:

It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

37.      Thus, to state a cause of action under Section 12601, the United States must allege three elements: (1) a "governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority;" (2) "engage[d] in a pattern or practice of conduct by law enforcement officers;" and (3) that conduct operated to "deprive[] persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." All three elements are present here.

**2.      Government Authority**

38.      The District is a governmental authority, as that term is used in Section 12601(a). The MPD is an agency of that governmental authority.  And the MPD's police officers, including but not limted to Chief Carroll, act on behalf of the governmental authority in the course of their law enforcement activities.  Thus, pursuant to the laws identified in paragraphs 8 and 9, the law enforcement officers of the MPD, including but not limited to Chief Carroll, are agents of (and are otherwise acting on behalf of) the District for purposes of enforcing its laws.

**3.      Pattern or Practice of conduct**

39.      As set forth in above, the District law enforcement officers routinely enforce the statutes the enforcement of which Plaintiff seeks to enjoin.

40.      When the law enforcement officers of the MPD enforce the District statutes that makes it a crime to possess protected arms, they are engaging in a pattern or practice of conduct

11

by law enforcement officers.  On information and belief, the law enforcement officers of the MPD are fulfilling (and will continue to fulfill) their statutory duty to enforce those statutes.

### 4.    Deprivation of Rights

41.    As set forth above, the District laws violate the Second Amendment.  Accordingly, the pattern or practice of conduct by the District law enforcement officers described above deprives persons of rights, privileges, or immunities secured or protected by the Constitution.

42.    The District admits that Section 12601 is violated any time a pattern or practice of law enforcement officers infringes rights protected by the Second Amendment.  *See* Reply in Support of Defendants' Motion to Dismiss Plaintiff's Complaint (ECF 26) ("Reply"), 4.  Indeed, the District concedes that the "standards of conduct prescribed under Section 12601 are conterminous with the standards of conduct prescribed by the Constitution."  Reply, 11.

43.    The District admits that Section 12601 applies to acts by law enforcement officers taken in furtherance of an official policy of the District.  Reply, 4.  The District's legislative acts, including its laws referred to above, are the very epitome of such an official policy.  *See United States v. Cnty. of Maricopa, Arizona*, 889 F.3d 648, 652 (9th Cir. 2018) (acts of legislative body are "official policy" of a municipality).

44.    The District admits that Section 12601 applies to "acts taken pursuant to law." Reply, 7.  The District asserts, however, that enforcement of only certain kinds of laws can be the predicate of a Section 12601 claim. Nothing in the plain text of the statute supports Defendants' efforts to narrow its plain scope.

45.    The District admits that its reading of Section 12601 would leave the United States powerless to enjoin law enforcement officers from enforcing an admittedly unconstitutional statute

because private individuals could try to do so.  Reply, 8-9.  Though the District denies it, its reading of the statute is absurd and defeats its obvious purpose.

## E.    The United States Is Authorized to Bring This Action

46.    Section 12601(b) states:

Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1)[6] has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

47.    The United States brings this action pursuant to the authority set forth in Section 12601(b) to remedy Defendants' violations of Section 12601(a).

## FIRST CLAIM FOR RELIEF
## (Violation of 34 U.S.C. § 12601)

48.    Plaintiff incorporates and realleges all of the allegations set forth in the previous paragraphs.

49.    Defendants have engaged in, and, on information and belief, will continue to engage in a pattern or practice of conduct by law enforcement officers that deprives persons of rights secured and protected by the Constitution in violation of Section 12601(a).

50.    Unless this Court enjoins Defendants and also grants the declaratory relief the United States is seeking, Defendants will continue to engage in the pattern or practice of conduct described above, which pattern or practice of conduct deprives law-abiding individuals of their Second Amendment rights to acquire, keep, and bear arms protected by the Second Amendment.

---

[6] [*sic*] This should state "paragraph (b)."

13

**PRAYER FOR RELIEF**

WHEREFORE, the United States hereby prays that the Court grant the following relief:

A.      Entry of a declaratory judgment pursuant to 28 U.S.C. § 2201(a), declaring that:

    (1)      The District is a "governmental authority" as that term is used in Section 12601(a);

    (2)      The officers of the MPD are "law enforcement officers" as that term is used in Section 12601(a);

    (3)      When the officers of the MPD enforce the District's laws that make it a crime to possess AR-15 styles rifles or suppressors, they are acting as agents of (or otherwise acting on behalf of) The District; and

    (4)      When the officers of the MPD enforce the District's laws that make it a crime to possess AR-15 styles rifles and suppressors, the effect of that conduct is to deprive the citizens of the District of their rights guaranteed by the Second Amendment.

B.      Entry of preliminary and permanent injunctive relief pursuant to Fed. R. Civ P. 65 enjoining Defendants from enforcing the provisions of the District's laws that make it a crime to possess AR-15 style rifles or suppressors.

C.      Such other and additional relief as the interests of justice may require.

DATED: May 14, 2026

Respectfully submitted:

HARMEET K.  DHILLON
Assistant Attorney General
Civil Rights Division

JESUS OSETE
Principal Deputy Assistant Attorney General

R.  JONAS GEISSLER
Deputy Assistant Attorney General

*/s/ Barry K.  Arrington*

_____
BARRY K.  ARRINGTON
Acting Chief
Second Amendment Section

WILLIAM J.  HANRAHAN
ANDREW COFFARELLI
Trial Attorneys
Second Amendment Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA