## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>v.<br><br>**DISTRICT OF COLUMBIA**, *et al.*,<br><br>**Defendants.** | **No. 1:25-cv-04458-APM** |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Defendants (collectively, "the District") move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the Amended Complaint [28] for failure to state a claim. A memorandum of points and authorities as well as a proposed order are attached. Because this motion is dispositive, the District did not seek Plaintiff's consent. *See* LCvR 7(m).

Date: June 25, 2026.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
Civil Litigation Division

400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendants*

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **No. 1:25-cv-04458-APM** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT</u>

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 1

    I.     The Challenged Firearms Laws ...................................................................... 1

    II.    34 U.S.C. § 12601 ......................................................................................... 2

         A.    Text and Enactment History ........................................................... 2

         B.    Past Practice .................................................................................... 5

    III.   This Case........................................................................................................ 7

LEGAL STANDARD........................................................................................................ 9

ARGUMENT..................................................................................................................... 9

    I.     The United States' Challenge to the District's Proscription of AR-15s and
         Silencers Is Not Cognizable Under Section 12601................................................. 9

         A.    Section 12601 Does Not Authorize the United States to Challenge
              Substantive Criminal Prohibitions. ............................................... 10

             1.    The Text of Section 12601 Does Not Authorize Challenges
                   to State and Local Criminal Statutes............................................ 10

             2.    History and Context Make Clear That Section 12601
                   Should Not Be Construed to Authorize Challenges to
                   Substantive Criminal Statutes. ..................................................... 15

                 a.    Congress Enacted Section 12601 Against the
                        Backdrop of Other Pattern-or-Practice Laws, Which
                        Do Not Contain Similar Constraints. ............................... 16

                 b.    Legislative History Also Evidences Section 12601's
                        Narrow Focus on Eliminating Police Misconduct............ 18

                 c.    Since Its Enactment 30 Years Ago, Section 12601
                        Has Never Been Used to Challenge a Substantive
                        Criminal Prohibition. ....................................................... 21

3.      Construing Section 12601 to Authorize Challenges to Criminal Prohibitions Is Contrary to Federalism and Common Sense. .............................................................................. 23

B.      The Amended Complaint Brings a Facial Challenge to Substantive Criminal Laws That Section 12601 Does Not Permit. ............................ 28

II.     The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement That Deprives Persons of Constitutional Rights. ..................................................................................................... 30

A.      The Amended Complaint Fails to Plausibly Allege a Deprivation of Constitutional Rights. ........................................................... 31

1.      The United States Must Plausibly Allege That Silencers and AR-15s Are Protected by the Second Amendment. ............... 31

2.      The Amended Complaint Fails to Plausibly Allege That Silencers Are Protected by the Second Amendment. ................... 35

3.      The Amended Complaint Fails to Plausibly Allege That AR-15s Are Protected by the Second Amendment. ...................... 39

B.      The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement Officers. ................................ 43

CONCLUSION ................................................................................................................ 45

**INTRODUCTION**

This lawsuit is the first of its kind—and it should be the last.  The United States brings a facial challenge to District laws criminalizing the possession of AR-15 rifles and firearm silencers.  It does so under the guise of 34 U.S.C. § 12601, which allows the United States to sue state and local governments to eliminate "a pattern or practice of conduct by law enforcement officers" that "deprives persons of [federal] rights."  But, historically, Section 12601 has not been used to facially challenge criminal laws democratically enacted by the legislature.

This Court should reject the United States' novel claim for either of two reasons.  First, Section 12601 does not authorize a facial challenge to state or local criminal prohibitions.  It creates a targeted cause of action to seek injunctive or declaratory relief to eliminate "a pattern or practice of conduct by law enforcement officers."  But substantive criminal prohibitions, like the laws challenged here, are not directed at "conduct by" law enforcement officers.  To the contrary, they proscribe private conduct.  The United States' efforts to shoehorn its challenge into Section 12601 violate the statute's plain text, ignore telling pre- and post-enactment history, and run afoul of basic canons of construction.  Second, even if the United States' claim is cognizable under Section 12601, the Amended Complaint fails to plausibly allege facts showing that the District's laws are unconstitutional or that police officers have a pattern or practice of enforcing those laws in ways that deprive constitutional rights.  For either of these reasons, the Court should dismiss the Amended Complaint for failure to state a claim.

**BACKGROUND**

**I.    The Challenged Firearms Laws**

Both the D.C. Council and Congress can legislate firearms laws for the District.  *See Heller v. District of Columbia*, 670 F.3d 1244, 1250 (D.C. Cir. 2011).  This case concerns two District firearms laws, one passed by the Council and the other by Congress.

Almost two decades ago, the D.C. Council passed, the Mayor signed, and Congress passively approved statutory provisions that together prohibit possession of AR-15s in the District. *See* Firearms Control Amendment Act of 2008, D.C. Law 17-372, 56 D.C. Reg. 1365 (Feb. 13, 2009) (eff. Mar. 31, 2009). District law generally provides that no person in the District may "possess or control" a firearm without a "valid registration certificate." D.C. Code § 7-2502.01(a). But "assault weapon[s]" cannot be registered. *Id.* § 7-2502.02(a)(6). Included in the category of assault weapons are AR-15s. *See id.* § 7-2501.01(3A)(A)(i)(I)(ee). Possession of an AR-15 (*i.e.*, an unregistered firearm) is a misdemeanor. *See id.* § 7-2507.06(a).

Almost a century ago, Congress passed and the President signed a District law prohibiting "any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms." Act of July 8, 1932, ch. 465, Pub. L. No. 72-275, § 14, 47 Stat. 650, 654 (codified at D.C. Code § 22-4514(a)).[1] These devices are commonly known as "silencers." *United States v. Woodfolk*, 656 A.2d 1145, 1147 n.3 (D.C. 1995). Possession of a silencer is a misdemeanor. D.C. Code § 22-4515.

**II.    34 U.S.C. § 12601**

   **A.    Text and Enactment History**

This case arises under 34 U.S.C. § 12601. Section 12601, originally codified at 42 U.S.C. § 14141, is part of Title XXI, § 210401, 108 Stat. 2071, of the Violent Crime Control and Law Enforcement Act of 1994 (the 1994 Crime Bill). It reads as follows:

> (a) Unlawful conduct
>
> It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement

---

[1]    The Amended Complaint mistakenly alleges that the District—not Congress—enacted what is now D.C. Code § 22-4514(a). *See* Am. Compl. ¶¶ 2, 32.

officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

(b) Civil action by Attorney General

Whenever the Attorney General has reasonable cause to believe that a violation of paragraph (1)[2] has occurred, the Attorney General, for or in the name of the United States, may in a civil action obtain appropriate equitable and declaratory relief to eliminate the pattern or practice.

Section 12601 was a direct response to the 1991 beating of Rodney King by Los Angeles Police Department officers.  *See* Defs.' Ex. 1, Civ. Rts. Div., U.S. Dep't of Just., *Roundtable on State and Local Law Enforcement Police Pattern or Practice Program 42 USC § 14141* at 1–2 (June 3, 2010) (*Roundtable* Rep.) (summarizing history).[3]  Following that tragedy and national outrage, the Police Accountability Act of 1991—the precursor to Section 12601—was introduced in Congress and incorporated into H.R. 3371, the Omnibus Crime Control Act of 1991 (the 1991 Crime Bill).  H.R. Rep. No. 102-1085, at 63, 65 (1992); H.R. Rep. No. 102-242, at 135–39 (1991).  The Police Accountability Act was passed by the House of Representatives, but the Senate "failed to achieve cloture on the Conference Report."  H.R. Rep. No. 102-1085, at 65, 67, 189–90.  A modified version was, however, incorporated into the 1994 Crime Bill.  *See* Pub. L. No. 103-322, tit. XXI, 108 Stat. 2071 (1994); *Roundtable* Rep. at 1–2.  This modified version, which became law, was identical in substance to its predecessor, except that it omitted a

---

[2]    The reference to "paragraph (1)" is a scrivener's error, which should be read as "paragraph (a)."  *United States v. Lauderdale Cnty.*, 914 F.3d 960, 962 n.2 (5th Cir. 2019).

[3]    With this motion, the District provides as exhibits relevant materials from the Justice Department regarding Section 12601.  As publicly available government documents, they are properly considered at this stage, especially because they provide background and are sources relevant to interpreting Section 12601.  *See Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (on a motion to dismiss, a court may consider "public records subject to judicial notice").

3

private cause of action and expanded the scope of the provision so that it referenced "conduct" not only by "law enforcement officers," but also by "officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles." *Compare* 34 U.S.C. § 12601, *with* H.R. Rep. No. 102-242, at 24.

Because Section 12601 has no direct legislative history, courts and the Justice Department look to the legislative history of the Police Accountability Act. *See, e.g.*, *United States v. City of Columbus*, No. 99-cv-1097, 2000 WL 1133166, at *3 (S.D. Ohio Aug. 3, 2000). The committee report makes clear that the Act was designed to address a specific problem: "the problem of excessive force," which "is a serious one." H.R. Rep. No. 102-242, at 136. The report detailed the brutalization of King and found that it was "not an aberration," but rather part of a "culture" of "excessive force" by police that is "a significant problem in this country." *Id.* at 135. The report described examples of "police brutality" and "police misconduct," including "unconstitutional, harassing stops and searches of minority individuals," arrests of bystanders who "complain about police actions," a special unit using a racial slur in its name, and officers' use of "an illegal kung-fu device . . . to inflict pain on passive demonstrators." *Id.* at 136.

The committee found that the Justice Department "lack[ed] the authority to address systemic patterns or practices of police misconduct." *Id.* at 137. Specifically, the committee noted that "the Federal Government's criminal authority to prosecute police brutality is not adequate to address patterns or practices such as the lack of training or the routine use of deadly techniques like chokeholds, or the absence of a monitoring and disciplinary system." *Id.* at 138. And the committee further explained that two cases—*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), and *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980)—only underscored the need for congressional intervention. After *Lyons*, individual litigants could not

4

seek injunctive relief to address police abuses "absent a showing of likely future harm," and

*Philadelphia* made clear that the Attorney General did not have "implied statutory or

constitutional authority to sue a local government or its officials to enjoin violations of citizens'

constitutional rights by police officers." *Id.* at 137.  This created a "gap in the law" where

neither individual litigants "nor anyone else" could eliminate systemic constitutional violations

caused by "police brutality." *Id.* at 137–38.

Congress sought to "close this gap in the law, [by] authorizing the Attorney

General . . . to sue for injunctive relief against abusive police practices." *Id.* at 138.  The

committee report cited two cases as illustrative of "the need for this authority and how it will

work"; both involved excessive force.  *Id.* at 138–39 (detailing how residents in Washington

State were "beaten by police officers following traffic stops" and a "young black man" in North

Carolina was "strangled to death by city police officers").  Nonetheless, the report stressed that

"[t]he Act does not increase the responsibilities of police departments or impose any new

standards of conduct on police officers" because "[t]he standards of conduct under the Act are

the same as those under the Constitution." *Id.* at 138; *see id.* at 136 (stating that "[p]olice

brutality is a violation of the U.S. Constitution").

### B.    Past Practice

Since Section 12601's enactment, the Justice Department has developed standard

practices for Section 12601 cases.  Defs.' Ex. 2, Civ. Rts. Div., U.S. Dep't of Just., *The Civil

Rights Division's Pattern and Practice Police Reform Work: 1994-Present* at 1–2 (2017) (2017

Rep.).  Until very recently, Section 12601 cases had been handled by the Special Litigation

Section in the Civil Rights Division, which "consists of career professional attorneys with many

decades of collective experience working on police reform cases." *Id.* at 3.  A Section 12601

case begins with a preliminary, internal inquiry of whether to open an investigation into a police

5

department's conduct. *Id.* at 5. If the Division decides to open an investigation, it notifies the jurisdiction and makes the investigation public. *Id.* at 8.

Investigations of police conduct often take over a year and include extensive evidence and observation. *Id.* at 9–10, 14. "[T]he Division emphasizes outreach to all levels of a law enforcement agency." *Id.* at 10–12. The Division meets with law enforcement leadership and "engages officers . . . at roll-calls [and] during ride-alongs" as well as "in face-to-face meetings." *Id.* at 10, 12. The Division also engages the community through "community or town hall meetings." *Id.* at 13. These efforts are necessary because "the thoroughness of the Division's investigations underpins the credibility and effectiveness of its reform efforts." *Id.* at 15. At the end of an investigation, if the Division determines that there is reasonable cause to believe that a Section 12601 violation exists, the Division notifies the jurisdiction of the Division's determination and meets with police and community stakeholders. *Id.* at 15–16.

The focus then shifts to cooperatively finding solutions to eliminate the pattern or practice. *Id.* at 17. "The Division's goal in every case is to avoid contentious litigation and begin the process of reform as quickly as possible." *Id.* at 18. The Division engages the police department in negotiations to reach a reform agreement and consent decree, with input from stakeholders. *Id.* at 17–18, 20. Reform agreements and consent decrees provide for termination once their terms have been implemented. *Id.* at 35. Only if a reform agreement cannot be reached does the Division bring a lawsuit. *Id.* at 2, 18. At the time of the Division's 2017 report, only six out of dozens of cases had required litigation. *Id.* at 18.

The Division's Section 12601 cases have "focus[ed] on systemic police misconduct." *Id.* at 1. Accordingly, "[m]any of the Division's investigations focus on core issues in police reform common to many law enforcement agencies—such as patterns of unlawful use of force; unlawful

6

stops, searches and arrests; and racial discrimination." *Id.* at 6.  Indeed, "[a]ddressing systemic excessive force is one of the core functions of the Division's pattern-or-practice cases." *Id.* at 27.  Accordingly, the Justice Department had never used a Section 12601 case to bring a facial challenge to a state or local criminal statute—until this case.  *See id.* at 41–48 (summarizing past Section 12601 cases); *Roundtable* Rep. at 8–9 (cataloguing past Section 12601 cases).

In fact, between 2017 and 2021, the Justice Department brought only one Section 12601 investigation and even declined to open an investigation into the Minneapolis Police Department following the murder of George Floyd.  Christy E. Lopez, *DOJ Police Pattern-or-Practice Investigations*, 37-SPG Crim. Just. 34, 35–36 (2022).  The lack of investigations was consistent with that administration's pronouncement that it "is not the responsibility of the federal government to manage non-federal law enforcement agencies."  Defs.' Ex. 3, Memo. From Jefferson B. Sessions III, Atty. Gen., to Heads of Dep't Components & U.S. Attys. at 1 (Mar. 31, 2017).  Indeed, the federal government curtailed the use of consent decrees because, in its view, "federal court decrees that impose wide-ranging and long-term obligations on, or require ongoing judicial supervision o[f], state or local governments are extraordinary remedies that raise sensitive federalism concerns."  Defs.' Ex. 4, Memo. From Jefferson B. Sessions III, Atty. Gen., to Heads of Civ. Litigating Components & U.S. Attys. at 2 (Nov. 7, 2018) (citation modified).  In the United States' view at the time, "[t]his supervision can deprive the elected representatives of the people of the affected jurisdiction of control of their government."  *Id.*

### III.    **This Case**

This case breaks from Section 12601's history and the Justice Department's prior practices.  There was no public investigation or engagement with the District's Metropolitan Police Department (MPD).  Instead, this case began with a Complaint [1] filed in December 2025 by the Justice Department's "newly established Second Amendment Section."  Press

Release, Off. of Pub. Affs., U.S. Dep't of Just., *Justice Department Sues the District of Columbia for the Unconstitutional Ban of Semi-Automatic Firearms* (Dec. 22, 2025), tinyurl.com/yu82pzdn.  That Complaint brought a single claim under Section 12601, alleging that MPD's enforcement of the District's assault weapons laws was a pattern or practice of law enforcement conduct that violated the Second Amendment.  Compl. [5-1] ¶¶ 39–42.[4]

The District moved to dismiss the Complaint for failure to state a claim, explaining that challenges to state and local criminal laws were not cognizable under Section 12601, and even if they were, the Complaint failed to plausibly allege that the assault weapons laws are unconstitutional or that MPD is engaged in an unlawful pattern or practice.  Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss Pl.'s Compl. (Defs.' MTD Compl.) [16] at 1.  In support, former Civil Rights Division officials, the Brady Center to Prevent Gun Violence, and the Giffords Law Center to Prevent Gun Violence filed an amicus brief explaining how the United States' claim breaks starkly from the Justice Department's understanding of the statute.  Amicus Br. [25].  The United States filed an opposition [23], and the District filed a reply [26].

Two days after the District filed its reply, the United States asked the District for consent to amend its Complaint.  The District consented, and the United States filed an Amended Complaint that makes three main changes: (1) it abandons the challenge to the District's assault weapons laws and instead only challenges the ban on AR-15s; (2) it adds a handful of allegations about AR-15s; and (3) it adds a challenge to the District's silencer ban.  *Compare* Compl., *with* Am. Compl.  The Amended Complaint seeks declaratory and injunctive relief to prevent Defendants from enforcing the AR-15 and silencer bans.  Am. Compl. at 14.

---

[4]    The United States designated this case as "related" to another case before this Court challenging the District's assault weapons laws and brought by private plaintiffs under 42 U.S.C. § 1983, *Yzaguirre v. District of Columbia*, No. 1:24-cv-01828.  Not. of Related Case [2].

**LEGAL STANDARD**

A complaint may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court need not accept as true conclusory "assertions devoid of further factual enhancement," *id.* (citation modified), or "legal conclusions," *Pueschel v. Chao*, 955 F.3d 163, 166 (D.C. Cir. 2020).

**ARGUMENT**

I.    **The United States' Challenge to the District's Proscription of AR-15s and Silencers Is Not Cognizable Under Section 12601.**

Following the beating of Rodney King and reports of police misconduct across the country, Congress enacted Section 12601 to authorize the Attorney General to bring civil suits to eliminate systemic constitutional and statutory violations caused by law enforcement officers. In so doing, Congress did not fundamentally reorder the federal government's relationship with states and localities. Instead, Congress crafted a powerful but targeted cause of action and remedial scheme with important limitations. The statute's text, history, and context, plus basic canons of construction, make clear that the United States may only invoke Section 12601 to challenge a "pattern or practice of conduct by law enforcement officers" that "deprives" individuals of protected rights. That reading respects states' and localities' historic police powers while accomplishing Congress's stated goal of empowering the Attorney General to redress a particular category of harm—systemic police misconduct—which is not easily redressed by individual litigants. Since its enactment 30 years ago, this is precisely how the United States has interpreted Section 12601.

9

Today, however, the United States asks the Court to adopt a reading of Section 12601 that is atextual and out of step with history, congressional intent, past practice, and basic principles of prudence. The United States seeks to use Section 12601 to bring a facial challenge to the District's AR-15 and silencer laws. But Section 12601's text does not support such a reading because substantive criminal prohibitions, like the challenged laws, proscribe *individual* conduct; they are not directed at "conduct by" law enforcement officers. And allegedly unconstitutional criminal prohibitions are far afield from the types of harms that Congress sought to remedy when it enacted Section 12601, *i.e.*, harms caused by police misconduct. The United States' novel interpretation also dramatically expands the federal government's ability to superintend state and local affairs at the expense of state and local sovereignty. For these and the reasons that follow, this Court should dismiss the Amended Complaint with prejudice because the United States' suit based on its newly minted interpretation of Section 12601 is not cognizable. *See Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015) ("Dismissal with prejudice is warranted when the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." (citation modified)).

A. **Section 12601 Does Not Authorize the United States to Challenge Substantive Criminal Prohibitions.**

Section 12601's text, especially when interpreted in light of its context, its history, and canons of interpretation, reveals that the statute does not authorize facial constitutional challenges to state and local criminal laws.

1. **The Text of Section 12601 Does Not Authorize Challenges to State and Local Criminal Statutes.**

To resolve a question of statutory interpretation, the Court "begin[s] with the text," which "must be read in the context of the entire statute." *Noble v. Nat'l Ass'n of Letter Carriers*, 103 F.4th 45, 50 (D.C. Cir. 2024). In construing statutory text, the Court generally interprets words

10

based on their ordinary meaning when Congress enacted the statute. *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019). Here, the text of Section 12601 makes three limiting principles clear: the statute provides a cause of action (1) targeted at specific actors (as relevant here, "law enforcement officers") (2) when "a pattern or practice of conduct by" those actors (*i.e.*, the way in which they perform their duties) (3) causes the deprivation of constitutional rights. The import of these limitations is that Section 12601 does not authorize the United States to challenge substantive criminal prohibitions, such as the District's proscription of AR-15s and silencers.

First, Section 12601 provides an avenue for redressing harms caused by specific actors: "law enforcement officers" and "officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles." 34 U.S.C. § 12601(a). The statute's focus on specific actors is evidenced not only by the text itself, but also by the title and subtitle heading under which Congress enacted Section 12601, "State and Local Law Enforcement" and "Police Pattern or Practice," respectively. *See* Pub. L. No. 103-322, 108 Stat. 2061, 2071 (1994). "[T]he title of a statute and the heading of a section" can help determine a statute's "meaning." *Dubin v. United States*, 599 U.S. 110, 120–21 (2023) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)). Here, the statute's title and heading "point to a narrow[ ] reading" that is "centered around" police officers. *Id.* at 120; *Lauderdale Cnty.*, 914 F.3d at 966 (referring to title and subtitle in interpreting Section 12601).

Second, Section 12601's phrase "engage in a pattern or practice of conduct by" law enforcement officers shows that the statute concerns *how* officers perform their duties. As used here, "engage in" means "[t]o involve oneself or become occupied" or to "participate." *Engage*, The American Heritage College Dictionary (3d ed. 1993). "Pattern" means "[a] characteristic

11

form, style, or method." *Pattern*, The American Heritage College Dictionary (3d ed. 1993); *see Pattern*, Webster's New World Dictionary (3d ed. 1988) ("a regular, mainly unvarying way of acting or doing"). "Practice" means "[a] habitual or customary action or way of doing something." *Practice*, The American Heritage College Dictionary (3d ed. 1993); *see Practice*, Webster's New World Dictionary (3d ed. 1988) ("a frequent or usual action; habit; usage . . . a usual method or custom"). "Conduct" means "the way that one acts; behavior; deportment." *Conduct*, Webster's New World Dictionary (3d ed. 1988); *see Conduct*, Black's Law Dictionary (6th ed. 1990) ("[p]ersonal behavior; deportment; mode of action"); *Conduct*, The Compact Oxford English Dictionary (2d ed. 1989) ("Manner of conducting oneself or one's life; behaviour; usually with more or less reference to its moral quality (good or bad)"). "Conduct" is distinct from an "act," for example, which means simply "a thing done," stripped of any normative gloss as to how that act is performed. *Act*, Webster's New World Dictionary (3d ed. 1988). And "[c]onduct" is coupled in Section 12601 with "by," which indicates agency and means "[t]hrough the means, act, agency or instrumentality of." *By*, Black's Law Dictionary (6th ed. 1990); *see By*, Webster's II New Riverside University Dictionary (1984) ("[t]hrough the agency or action of"). "By" is used to "[i]ntroduc[e] the principal agent." *By*, The Compact Oxford English Dictionary (2d ed. 1989); *see Bank of Am. Corp. v. United States*, 148 F.4th 171, 177–78 (4th Cir. 2025) (relying on the definition of "by" to interpret "interest is payable . . . on equivalent underpayments and overpayments by the same taxpayer" to mean the "taxpayer *made* the 'equivalent underpayments and overpayments'").

Putting these terms together along with "law enforcement officers," "engage in a pattern or practice of conduct by law enforcement officers" refers to repeated or habitual modes of action by law enforcement officers. The statutory language is focused on officers' own conduct,

not the conduct of others.  "Engage in" reinforces that this provision is focused on something law enforcement officers are actually doing.  And, critically, the statute's references to "pattern," "practice," and "conduct" are limited to *how* officers act, as evidenced by past actions targeting police misconduct.  "By" indicates that the law enforcement officer is responsible for the pattern or practice of relevant "conduct."  Accordingly, the phrase "conduct by" limits Section 12601's scope so that it creates a cause of action to remedy abuses of authority by law enforcement officers.  It does not grant the United States a roving license to seek redress for *any* alleged harm with a connection to law enforcement officers.

Third, the "pattern or practice of conduct by" law enforcement officers must cause the alleged deprivation of rights.  The clause "that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States" is a restrictive relative clause that limits the preceding text and meaning of "pattern or practice of conduct by law enforcement officers" such that this pattern or practice of conduct must be the source of the deprivation.  *See* H.W. Fowler, *The New Fowler's Modern English Usage* 672 (R.W. Burchfield rev. 3d ed. 1996) (explaining how restrictive relative clauses limit phrases); *United States v. Nishiie*, 996 F.3d 1013, 1021–22 (9th Cir. 2021) (explaining that "[r]estrictive relative clauses are usually introduced by *that* . . . and are never set off by commas from the rest of the sentence" and "provide[ ] information that is essential to understanding the intended meaning of the rest of the sentence" (citation omitted)).  If something else causes the alleged deprivation—for instance, an underlying statute that restricts conduct by private individuals—then there is no police "pattern or practice" that falls within the scope of Section 12601.

Altogether, these text-based limitations mean that Section 12601 cannot be used to challenge substantive criminal prohibitions.  A criminal statute enacted by the legislature and

13

signed by the executive is not "conduct by" law enforcement officers.  Rather, criminal

prohibitions are legislative acts.  Law enforcement officers have no control over what criminal

laws proscribe.  Nor do substantive criminal prohibitions establish or regulate a "pattern or

practice of conduct by law enforcement."  To the contrary, they impose restrictions and

concomitant penalties on private individuals.  As such, criminal prohibitions do not speak to the

way in which "law enforcement officers" conduct their duties.  This means that challenges to

criminal prohibitions are, in essence, facial challenges to legislative acts—not challenges to

harms allegedly caused by a pattern or practice of police conduct.  And, when a criminal statute

is challenged as unconstitutional, it is the legislature's proscription of individual conduct that

causes any alleged deprivation of rights.  Even if law enforcement officers make arrests for

allegedly unconstitutional criminal laws, the "principal agent" behind any constitutional harm

from the arrest is the legislature that wrote the law.  *See By*, The Compact Oxford English

Dictionary (2d ed. 1989).  At bottom, Section 12601 is an avenue for the correction of systemic

police misconduct, *i.e.*, repeated abuses of authority by officers.  It does not give the federal

government carte blanche to challenge any state or local law that it opposes.

Section 12601's remedial scheme confirms that the statute cannot be used to challenge

substantive criminal prohibitions.  *See City & Cnty. of S.F. v. EPA*, 604 U.S. 334, 347 (2025)

("[O]ur interpretation of the meaning of the term 'limitation' in § 1311(b)(1)(C) must take into

account the way in which the term is used in the two preceding statutory subsections."); *United

States v. Wilson*, 290 F.3d 347, 355 (D.C. Cir. 2002) ("It is the 'classic judicial task' of

construing related statutory provisions 'to make sense in combination.'" (quoting *United States

v. Fausto*, 484 U.S. 439, 453 (1988))).  While subsection (a) of Section 12601 proscribes "a

pattern or practice of law enforcement conduct" that deprives individuals of constitutional rights,

14

subsection (b) authorizes a limited remedy, and the two must be construed together.  Subsection (b) provides that courts may grant only "appropriate equitable and declaratory relief to eliminate the pattern or practice," *i.e.*, the "pattern or practice of conduct by law enforcement officers . . . that deprives persons" of rights guaranteed by federal law.  In the case of a challenge to police conduct, that equitable and declaratory relief would "eliminate" the constitutional harm because the abusive police conduct could be declared unlawful or enjoined.  For example, a police department could enter into a consent decree to stop using a particular method of force and thus "eliminate" the constitutional harm of excessive force.

But when the United States challenges a substantive criminal prohibition, the only relief the statute allows—equitable and declaratory relief to eliminate the "pattern or practice of conduct by" law enforcement officers—would not eliminate the source of the alleged harms.  At most, a court could enjoin the police from enforcing a criminal prohibition, but that would not redress the alleged constitutional violation caused by the prohibition itself.  The offending law would remain on the books, and individuals would remain subject to enforcement in any other way and prosecution and punishment for violating it.  Accordingly, any redress granted by this Court would not remedy the harms alleged by the United States.  That is a nonsensical outcome when Congress designed Section 12601 to "*eliminate*" constitutional harms.

> **2.    History and Context Make Clear That Section 12601 Should Not Be Construed to Authorize Challenges to Substantive Criminal Statutes.**

In addition to the statute's plain text, its context and history (both pre- and post-enactment) indicate that the United States can only use Section 12601 to target "conduct by" law enforcement officers, not to bring facial challenges to substantive criminal statutes.

15

a.    **Congress Enacted Section 12601 Against the Backdrop of Other Pattern-or-Practice Laws, Which Do Not Contain Similar Constraints.**

Comparing Section 12601 to Congress's other "pattern or practice" laws further evinces that Congress crafted a narrow statute here.  Before Section 12601 was enacted, "pattern or practice" laws existed in a range of areas, including employment, housing, and public accommodations.  Differences between Section 12601 and these predecessor laws are meaningful because "Congress legislates against the backdrop of existing law." *McQuiggin v. Perkins*, 569 U.S. 383, 398 n.3 (2013); *see Orton Motor, Inc. v. HHS*, 884 F.3d 1205, 1214 (D.C. Cir. 2018).  "Congress's choice to depart from the model of a closely related statute is a choice neither [the Court] nor the agency may disregard." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018).  In this Court's words, "[o]ther statutes may bear on Congress's intent." *Merck & Co. v. HHS*, 385 F. Supp. 3d 81, 95 (D.D.C. 2019) (Mehta, J.), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020).

Other "pattern or practice" laws allow for the vindication of only a specific subset of rights in a particular field.  *See, e.g.*, 42 U.S.C § 2000a-5(a) (public accommodations "rights secured by this subchapter"); *id.* § 2000e-6(a) (employment "rights secured by this subchapter"); *id.* § 3614(a) (housing "rights granted by this title").  By contrast, Section 12601 has no express subject-matter constraint.  It allows for the vindication of "rights, privileges, or immunities secured or protected by the Constitution or laws of the United States."  34 U.S.C. § 12601(a).  That breadth, however, is counterbalanced by clear actor-based constraints.  Section 12601 allows for the vindication of only those harms caused by "law enforcement officers" and other specified actors not relevant here.  *Id.*  Conversely, other "pattern or practice" laws allow the Attorney General to sue "any person or group of persons" "engaged in a pattern or practice of resistance" to protected rights, *e.g.*, 42 U.S.C §§ 2000a-5(a), 2000e-6(a), 3614(a), or any "State

16

government or unit of local government" that "has engaged in or is engaging in a pattern or practice in violation" of specified rights, 34 U.S.C. § 10228(c)(3), without actor constraints.

Congress's decision to exclude subject-matter constraints and instead include actor constraints in Section 12601 is a marked and deliberate choice that must be respected. It underscores Congress's laser focus on only one type of harm: harm caused by "conduct by" law enforcement officers. This is especially true because the 1994 Crime Bill, within which Section 12601 was enacted, contained another "pattern or practice" law that again was limited by subject matter but not by actor. *See* 31 U.S.C. § 6715 (authorizing the Attorney General to sue "a unit of general local government that the Attorney General has reason to believe has engaged or is engaging in a pattern or practice in violation of section 6711 (a) or (b)").[5] "[B]ecause Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another," the presence of actor-based constraints in Section 12601 but not in 31 U.S.C. § 6715 carries particular weight. *DHS v. Maclean*, 574 U.S. 383, 391 (2015); *see Orton Motor*, 884 F.3d at 1214 (similar); A. Scalia & B. Garner, *Reading Law* 170 (2012) ("[W]here [a] document has used one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.").

It makes no sense to conclude that regardless of Section 12601's clear actor-based constraints, Congress nonetheless sought to authorize broader challenges to substantive criminal prohibitions. *Cf. FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("[The

---

[5]   Section 6711(a) states that "[n]o person in the United States shall be excluded from participating in, be denied the benefits of, or be subject to discrimination under, a program or activity of a unit of general local government because of race, color, national origin, or sex if the government receives a payment under this chapter." And Section 6711(b) applies further prohibitions to governments that "receive[ ] a payment under this chapter," *i.e.*, age-based discrimination, "discrimination against an otherwise qualified handicapped individual," and "discrimination because of religion."

17

Court] must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision of such economic and political magnitude to an administrative agency."). Congress knows how to authorize or refer to challenges to statutes. *See, e.g.*, 42 U.S.C. § 1983 (providing a cause of action against "[e]very person who, under color of any *statute*, *ordinance*, *regulation*, custom, or usage, of any State or Territory or the District of Columbia" deprives a plaintiff of constitutional or statutory rights (emphases added)); 28 U.S.C. § 2284(a) ("A district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body."). In Section 12601, however, Congress did not refer to state or local "criminal statutes" or "actions challenging the constitutionality" thereof. Instead, Congress used "pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights." The United States thus asks this Court to endorse "the doubtful proposition that Congress sought to accomplish in a surpassingly strange manner what it could have accomplished in a much more straightforward way." *Azar v. Allina Health Servs.*, 587 U.S. 566, 577 (2019) (citation modified). At base, Section 12601 is a targeted tool, aimed at remedying a particular kind of harm caused by specific actors. To avoid warping the statutory text, Section 12601's textual constraints should be respected by limiting Section 12601 to suits alleging misconduct by law enforcement, not allegedly unconstitutional lawmaking.

        **b.**        **Legislative History Also Evidences Section 12601's Narrow Focus on Eliminating Police Misconduct.**

Legislative history confirms and reinforces what the text shows. *See Sec'y of Labor v. KC Transport, Inc.*, 173 F.4th 294, 314 n.10 (D.C. Cir. 2026) ("Though legislative history is not the law, it can be helpful in confirming or reinforcing what the text shows." (citation modified)); *Inst. S'holder Servs. Inc. v. SEC*, 718 F. Supp. 3d 7, 27 (D.D.C. 2024) (Mehta, J.) (consulting

18

legislative history, after the text, to decide which party's interpretation "better reflects the purposes and history" of the statute), *aff'd*, 142 F.4th 757 (D.C. Cir. 2025).  As explained, Section 12601 was designed to address a specific problem: police misconduct.  Background § II.A, *supra*.  The committee report for the Police Accountability Act makes clear that the Act was a direct reaction to the brutalization of Rodney King and police misconduct across the country.  The harm to be remedied was expressly and repeatedly identified as "pattern[s] of abuse," *i.e.*, patterns of "[p]olice brutality," "police misconduct," and "abuse[s]" of "the authority granted" to officers.  H.R. Rep. No. 102-242, at 136, 138.  And Congress called out specific examples of these unacceptable "abusive police practices," including "the lack of training or the routine use of deadly techniques like chokeholds, or the absence of a monitoring and disciplinary system."  *Id.* at 138.

Not once in the thorough committee report did Congress express any concern with state and local criminal laws.  To the contrary, Congress indicated that the problem it sought to correct was not flawed legislative acts, but rather police departments "ignor[ing]" state statutes that mandated proper "police training standards," *id.* at 139, among other troubling instances of police misconduct, *id.* at 138.  Facial challenges to substantive criminal prohibitions are fundamentally different from the sorts of suits that Congress plainly had in mind.  Authorizing such challenges would be a major and consequential undertaking.  If Congress had sought to authorize them, surely Congress would have at least mentioned that somewhere in the legislative history.  *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 380 (1988) (Scalia, J.) ("[I]t is most improbable that [a major change] would have been made without even any mention in the legislative history.").

19

Indeed, Congress was clear that it did *not* intend to greatly upset the federal and state balance.  Congress evidenced a clear intent to "create[ ] an enforceable right to be free of patterns of police brutality" by empowering the Attorney General to hold police "department[s] . . . responsible" by "su[ing] for injunctive relief against abusive police practices."  H.R. Rep. No. 102-242, at 138.  But in so doing, Congress also acknowledged competing federalism concerns and reiterated that it did not intend to upset the balance of power between the federal government and states and localities.  Specifically, Congress acknowledged, when considering the 1991 Crime Bill that incorporated the Police Accountability Act, that, "[h]istorically, day-to-day responsibility for operation of the Nation's criminal justice system has rested with those units of government that are closest to the people."  *Id.* at 88.  In Congress's own words, the 1991 Crime Bill "reflects that historical relationship while giving impetus to certain initiatives and policy decisions that must start at the Federal level i[f] the fight against crime is to be waged efficiently and vigorously."  *Id.*

Further, Section 12601 was enacted against the backdrop of two cases (*Lyons*, 461 U.S. 95, and *Philadelphia*, 644 F.2d 187) and existing limits on the United States' authority to criminally prosecute police misconduct.  *See* H.R. Rep. No. 102-242, at 137–39.  *Lyons* limited private litigants' ability to seek systemic fixes for police misconduct.  Afterwards, but prior to Section 12601's passage, Congress expressed concern that "courts were powerless to correct" systemic police abuses and "had no authority to order remedies for the glaring deficiencies" described in reports of police abuse across the nation.  *Id.* at 139.  Section 12601 was meant to fix that shortfall.  Yet, that sort of remedial gap simply does not exist when it comes to substantive criminal prohibitions.  Criminal defendants can always challenge laws via a motion

20

to dismiss the indictment, among other mechanisms; and individual litigants can bring affirmative facial challenges to state and local laws under 42 U.S.C. § 1983.

Further, in *Philadelphia*, the Third Circuit held that the Attorney General had no "implied statutory or constitutional authority" to sue localities "to enjoin violations of citizens' constitutional rights." *See* H.R. Rep. No. 102-242, at 137. Notably, the injunction sought in *Philadelphia* was not a facial challenge to a substantive criminal prohibition. Instead, the United States sought to enjoin a widespread practice by "police officers" of "violating the rights of persons . . . on the streets" and police misconduct designed to "discourage victims of abuse from complaining" and "suppress evidence," among other alleged abuses of power. 644 F.2d at 190. In Congress's view, the Attorney General's inability to "change the policy of a police department that tolerates officers beating citizens on the street" "represent[ed] a serious and outdated gap in the federal scheme for protecting constitutional rights." H.R. Rep. No. 102-242, at 137. Section 12601 was designed to remedy that "gap." Nothing in the relevant legislative history suggests that Congress drafted Section 12601 to authorize challenges to state or local criminal statutes and make Section 12601 the Justice Department's own Section 1983.

###  c.  Since Its Enactment 30 Years Ago, Section 12601 Has Never Been Used to Challenge a Substantive Criminal Prohibition.

This suit is entirely anomalous and out of step with past practice. When, as here, the federal executive has never interpreted a statute to confer a power, that past practice is "significant in determining whether such power was actually conferred." *Refugee & Immigrant Ctr. Educ & Legal Servs. v. Mullin*, 174 F.4th 81, 101 (D.C. Cir. 2026) (quoting *West Virginia v. EPA*, 597 U.S. 697, 725 (2022)) (looking to the Executive Branch's "past practice," including that of the first Trump Administration); *see also, e.g.*, *FTC v. Bunte Bros, Inc.*, 312 U.S. 349, 352 (1941). After all, "the longstanding practice of the government . . . can inform a court's

21

determination of what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (citation modified)).

The United States's recent invocation of Section 12601 to challenge substantive criminal prohibitions on individual conduct—in the Assistant Attorney General's own words—has "never been done before" and is "revolutionary." The Arena America First Legal (@TheArenaFL), X at 28:48–29:10, 32:15–32:26 (Jun. 1, 2026), perma.cc/FZM3-ZVDQ, perma.cc/WF3P-LQHM (contending that the United States's Section 12601 suits against the District and other jurisdictions are unprecedented in "the history of the United States"). Amici, including former leaders of the Justice Department's Civil Rights Division, as well as career supervisors from the Division's Special Litigation Division, know Section 12601 better than anyone and confirm that this suit is "the first of its kind" and a "stark[ ] depart[ure]" from past practice. Amicus Br. [25] at 2, 3.

Historically, the United States has used Section 12601 only to target law enforcement officer conduct deviating from the law. *See* 2017 Rep. at 41–48 (summarizing the United States' pattern-of-practice cases through 2017). Examples of past suits include challenges to patterns or practices of "unlawful stops, searches and arrests," "discriminatory policing," "excessive force, including deadly force," "theft by officers," "unlawful retaliation against people who make complaints or criticize [the police department]," and "violations of the First Amendment right to observe and record police activity." *Id.* Those suits are different in kind from facial challenges to substantive criminal prohibitions.

Further, when the United States has previously sought to challenge state or local laws, it has not, to the District's knowledge, done so by invoking Section 12601. Rather, it has either attempted to proceed directly under the Supremacy Clause (and established standing to do so),

22

*see, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012) (challenging Arizona's law as preempted by federal immigration law); *United States v. California*, 921 F.3d 865 (9th Cir. 2019) (challenging California immigration laws); *United States v. Texas*, 586 F. Supp. 3d 574 (W.D. Tex. 2022) (challenging an executive order issued by state governor), or else relied on different statutory authority, *see, e.g.*, *United States v. Skrmetti*, 605 U.S. 495 (2025) (invoking 42 U.S.C. § 2000h-2 to intervene in a suit challenging Tennessee law).  If Section 12601 did grant the United States broad authority and standing to challenge state and local laws that it opposes, presumably the United States would have invoked it for that purpose previously, rather than invoking other causes of action and bases for standing.

> ### 3.    Construing Section 12601 to Authorize Challenges to Criminal Prohibitions Is Contrary to Federalism and Common Sense.

Endorsing an interpretation of Section 12601 that allows for challenges to substantive criminal prohibitions would be a sweeping—and unjustifiable—grant of authority to the United States.  After all, police officers can lawfully arrest individuals for the infraction of "even a very minor criminal offense," *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001), and officers enforce not only criminal laws, but also a range of civil laws by, for example, citing individuals for traffic infractions or noise violations, *see, e.g.*, *United States v. Rodenhauser*, No. 94-5709, 1996 WL 331157, at *2 n.2 (4th Cir. June 18, 1996) (noting that the duties of county police officers included the enforcement of the municipal code and "all other laws and ordinances" (quoting Prince George's Cnty., Md., Code § 18-135(a) (1991))).  If the mere enforcement of state and local laws were enough to ground a Section 12601 suit, the United States could bring constitutional challenges to any number of laws that the administration in power opposes.  Basic canons of federalism and common sense weigh against such a seismic shift in police power.

23

For starters, it is a "well-established principle that it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014) (citation modified); *see also Vt. Agency of Nat. Res. v. United States*, 529 U.S. 765, 787 (2000) ("[I]f Congress intends to alter the usual constitutional balance between States and the Federal Government, it must make its intentions to do so unmistakably clear in the language of the statute." (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989))).  In the balance of federal and state power, "[f]oremost among" the states' powers is "the power to create and enforce a criminal code."  *Heath v. Alabama*, 474 U.S. 82, 93 (1985).  In a similar vein, states and localities are responsible for local law enforcement, and the Supreme Court has thus long recognized that the "proper balance between state and federal authority counsels restraint" when federal courts are called upon to enjoin local law enforcement.  *Lyons*, 461 U.S. at 112.  More broadly, federal courts have long "disfavored" facial challenges to state and local laws because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."  *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008).

Authorizing federal-court, facial challenges by the federal executive to state and local criminal laws and enjoining police officers from enforcing them would upset this balance.  And these would not be just any constitutional challenges, but challenges brought by "the world's largest law firm," the Justice Department, with all its resources and powers that far outmatch those of municipalities' and states' law departments.  *United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 471 (1983) (Burger, J., dissenting).  Yet, nothing in Section 12601's text or history indicates—let alone *clearly* indicates—that this was Congress's desired outcome.

24

Even if that were not apparent from a plain-text review, it is underscored by Congress's express acknowledgment that the lion's share of police powers has historically rested with "those units of government that are closest to the people."  H.R. Rep. No. 102-242, at 88.  In defining the contours of Section 12601's predecessor, Congress emphasized that it was crafted to "reflect[ ] that historical relationship."  *Id.*  That statement only reinforces the commonsense intuition that had Congress desired to dramatically expand the United States' ability to superintend state and local affairs, it would have made its intention clear.  Indeed, Congress legislated against the backdrop of decades of case law that cautioned that "[w]here . . . the exercise of authority by states officials is attacked, federal courts must be constantly mindful of the special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law."  *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) (citation modified).  Had Congress desired to cast these longstanding federalism concerns aside and grant the United States a newly minted license to challenge state and local law as unconstitutional, it would have said so explicitly rather than use "pattern or practice of conduct by law enforcement officers."

Further, even prototypical Section 12601-type suits raise federalism concerns—making it all the more important that the Attorney General toe the line of the cause of action created by Congress.  Prior to Section 12601's enactment, the Third Circuit in *Philadelphia*, 644 F.2d 187, rejected an attempt by the United States to bring a pattern-or-practice suit against a police department for police misconduct absent clear congressional authorization.  *Philadelphia* cogently and powerfully detailed the "important principles of federalism and separation of powers" at stake.  *Id.* at 200–01.  It explained that permitting the "Justice Department to bring a civil suit against any state or local administrative body merely because the Attorney General and his subordinates" opine that their practices are unconstitutional "would be to vest an excessive

25

and dangerous degree of power in the hands of the Attorney General." *Id.* at 200 (citation modified). The court went on to explain that "[t]he conceivable variations" on this type of "lawsuit are practically infinite" and would "compel drastic and far-reaching changes in local governments" fundamentally "inconsistent with a proper division of power in a federal system." *Id.* at 201. A broad reading of the Attorney General's powers would allow him to "sweep across the nation, thrusting himself into the policy-making machinery at every level of government from the village hall to the governor's mansion." *Id.* at 198. Undoubtedly, Congress drafted Section 12601 to provide the statutory authority found lacking in *Philadelphia*. *See* H.R. Rep. No. 102-242, at 137–38. But that authorization of authority goes only so far as the statute's plain text. When the United States seeks judicial sanction of an atextual reading of the statute—as it does here—all the federalism concerns described by *Philadelphia* reemerge with full force.

Worse still, the United States' interpretation of Section 12601 does not just upset the balance of power between the federal government and states—it also upsets the balance of power *within* the federal government by setting the Justice Department on a collision course with Congress. Many District criminal laws were passed by Congress and signed by the President— including the silencer ban challenged here. *See Palmore v. United States*, 411 U.S. 389, 398 (1973) ("Congress has from time to time enacted laws that compose the District of Columbia Code."). It defies common sense to think that Congress wanted the Justice Department to undo Congress's own enactments, and "[t]he court must steer clear of outcomes that are . . . 'contrary to common sense,'" *Media Matters for Am. v. Paxton*, 732 F. Supp. 3d 1, 16 (D.D.C. 2024) (Mehta, J.) (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998)), *aff'd*, 138 F.4th 563 (D.C. Cir. 2025). Instead, the Court should "interpret Congress's statutes as a harmonious whole rather than at war with one another." *Epic Sys. Corp. v. Lewis*, 584 U.S.

26

497, 502 (2018).  After all, the Attorney General has a "duty to defend" Acts of Congress, and "if executive officers were to adopt a policy of ignoring or attacking Acts of Congress whenever they believed them to be in conflict with the provisions of the Constitution, their conduct in office could jeopardize the equilibrium established within our constitutional system."  The Att'y Gen.'s Duty to Def. & Enforce Constitutionally Objectionable Legis., 4A Op. O.L.C. 55, 55–56 (1980); *see United States v. Windsor*, 570 U.S. 744, 762 (2013) ("[I]t poses grave challenges to the separation of powers for the Executive . . . to be able to nullify Congress' enactment solely on its own initiative.").  Yet that is precisely what the United States asks this Court to condone: "government by injunction in which the courts and the Executive Branch can 'make law' without regard to the action of Congress."  *Phila.*, 644 F.2d at 203 (quoting *N.Y. Times Co. v. United States*, 403 U.S. 713, 742–43 (1971)).

In addition, the United States' reading of Section 12601 violates the baseline principle that "[r]epeals by implication are not favored" and when two statutes are "capable of co-existence" courts must "regard each as effective" absent clear "congressional intent to the contrary."  *P&Z Co. v. District of Columbia*, 408 A.2d 1249, 1251 (D.C. 1979); *Me. Cmty. Health Options v. United States*, 590 U.S. 296 (2020).  Similarly, "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Strawberry v. Albright*, 111 F.3d 943, 947 (D.C. Cir. 1997).  After enacting the District's silencer law, it is unlikely that Congress would have declared that prior statute "unlawful" and authorized the Attorney General to seek to enjoin it through the passage of Section 12601 without a clear and manifest statement.  Because the United States' interpretation strains both the separation of powers and common sense, the Court should reject it.

27

Besides a clash with Congress, the United States' reading of Section 12601 risks fractures within the Justice Department.  Congress gave the United States Attorney for the District of Columbia (USAO) the duty to prosecute District-law felonies and, in certain instances, District-law misdemeanors—including the laws challenged here.  *See* District of Columbia Court Reform and Procedure Act of 1970, § 210(a), Pub. L. No. 91-358, 84 Stat. 473, 605 (codified at D.C. Code § 23-101(c)–(d)).  It strains common sense to think that Congress intended one component of the Justice Department to have the power to challenge the very laws that another component prosecutes.  *See U.S. Sugar Corp. v. EPA*, 113 F.4th 984, 999 (D.C. Cir. 2024) ("[W]e should not lightly read the statutory text to require EPA to act in a manner that is 'self-defeating.'" (quoting *Quarles v. United States*, 587 U.S. 645, 654 (2019))).  In all, the United States' interpretation of Section 12601 threatens the demarcation of authority between Congress and the Justice Department, and risks instability within the Department itself.  Those are, to say the least, "anomalous result[s]" that should be "avoid[ed]."  *Validus Reins., Ltd. v. United States*, 786 F.3d 1039, 1045–46 (D.C. Cir. 2015) (citation modified).

## B.  The Amended Complaint Brings a Facial Challenge to Substantive Criminal Laws That Section 12601 Does Not Permit.

Applying the correct understanding of Section 12601 outlined above, the Complaint fails to state a claim because it is an effort to facially invalidate substantive criminal prohibitions, and such a suit is not cognizable under Section 12601.  The source of the alleged constitutional harms are "unconstitutional law[s]" that proscribe the possession of AR-15s and silencers.  Am. Compl. ¶ 5.  Specifically, the Complaint challenges, at its core, the D.C. Council's inclusion of AR-15s in the substantive definition of "assault weapon," *see, e.g.*, *id.* ¶¶ 14–17, and Congress's ban on the possession of silencers in the District, *id.* ¶ 32.  By the United States' telling, these "*laws* violate the Second Amendment." *Id.* ¶ 41 (emphasis added).  But these laws are

28

prohibitions on private conduct passed by the D.C. Council, signed by the Mayor, and approved by Congress (in the case of the AR-15 ban) and passed by Congress and signed by the President (in the case of the silencer ban), which both subject individuals to criminal penalties.  MPD does not determine the substance of these laws, and the United States only sues MPD because officers are "required" to enforce the challenged laws.  *Id.* ¶ 8.  That is quite different from a situation where law enforcement makes an independent judgment about the amount of force to use in executing a law or making an arrest, for example, where the harm flows from "conduct by" law enforcement officers rather from the substantive criminal law itself.

In addition, the United States seeks broad relief, including "injunctive relief . . . enjoining Defendants from enforcing the provisions of the District's laws that make it a crime to possess AR-15 style rifles or [silencers]."  *Id.* at 14.  That request is striking.  In effect, the United States asks this Court to enlist MPD in nullifying laws enacted by the people's representatives.  At base, the incongruence between the source of the harm alleged (legislative enactments) and the relief available under Section 12601 (proscription of law enforcement conduct) evidences the fundamental problem with the Complaint:  It is not directed at the type of harm that Section 12601 is designed to redress, and accordingly, it does not state a claim that is cognizable under Section 12601.

Nonetheless, the Amended Complaint tries to shoehorn its facial challenge into Section 12601 by alleging two ways that MPD enforces the challenged laws: (1) MPD "serves as the registration and licensing office for all applicants for firearms-related licenses in the District," and (2) MPD has the authority to make arrests when individuals violate the laws.  *Id.* ¶ 8.  Neither role suffices to state a viable Section 12601 claim.

29

For starters, these roles are nothing more than the ordinary ways that police enforce criminal prohibitions across the country.  If these roles were sufficient to allow the United States to bring a facial challenge to state or local law under Section 12601, the United States could use this statute to challenge any criminal law it opposed, along with a slew of civil laws.  For all the reasons stated above, Section 12601 does not grant the United States such sweeping authority.

Moreover, neither of MPD's roles triggers Section 12601 because they do not *cause* the alleged "depriv[ation]" of constitutional rights.  As explained, Section 12601 proscribes only patterns or practices of "conduct by" law enforcement officers "that deprives persons" of constitutional or statutory rights.  That is simply not the case here.  Rather, the alleged deprivation the United States challenges is caused by the underlying criminal laws written by the D.C. Council and Congress.  It is the challenged laws that limit individual rights that the United States alleges are protected by the Second Amendment—for instance, by proscribing the possession of "all AR-15 platform rifles."  *Id.* ¶ 14.  MPD is simply not responsible for the constitutional harm alleged and should not be subject to liability for it under Section 12601.  After all, "[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality," and "[s]ociety would be ill-served if its police officers took it upon themselves to determine which laws are and which are not constitutionally entitled to enforcement." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979).

## II.    The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement That Deprives Persons of Constitutional Rights.

Even if the United States' claim is cognizable, the Amended Complaint fails to plausibly allege (1) that the challenged laws deprive persons of constitutional rights or (2) that MPD officers are engaging in a pattern or practice of enforcing the laws in a manner that effects any such deprivation.

30

A.    **The Amended Complaint Fails to Plausibly Allege a Deprivation of Constitutional Rights.**

If the United States can use Section 12601 to challenge the District's criminal laws, then the United States must allege facts plausibly showing that those laws "deprive[ ] persons of [constitutional] rights." 34 U.S.C. § 12601(a); *see* Am. Compl. ¶ 37. The United States alleges that the District's bans on silencers and AR-15s are unconstitutional, Am. Compl. ¶¶ 2–5, so the United States must allege facts plausibly showing that silencers and AR-15s are protected by the Second Amendment. The Amended Complaint fails to do so.

1.    **The United States Must Plausibly Allege That Silencers and AR-15s Are Protected by the Second Amendment.**

"[T]o determine what the plaintiff must plausibly allege at the outset of a lawsuit, we usually ask what the plaintiff must prove in the trial at its end." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 332 (2020). The court "take[s] note of the elements" of a plaintiff's claim and "then determines whether the plaintiff has pleaded those elements with adequate factual support to state a claim to relief that is plausible on its face." *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 395 (D.C. Cir. 2022) (citation modified). To decide whether the Amended Complaint's facts rise to the level of plausibility, the Court "peer[s] down the road towards [the United States'] eventual evidentiary burden to deduce whether [it] plausibly alleged the types of facts that can, if proven, satisfy that burden." *Couch v. Verizon Commc'ns Inc.*, 105 F.4th 425, 432 (D.C. Cir. 2024).

In *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024), the Supreme Court articulated a two-step test for Second Amendment challenges. At the first step, the plaintiff bears the burden to show that the challenged law infringes conduct that falls within "the Second Amendment's plain text," as originally understood and interpreted by precedent. *Hanson v. District of Columbia*, 120 F.4th

31

223, 231–32 (D.C. Cir. 2024) (per curiam) (quoting *Bruen*, 597 U.S. at 17), *cert. denied*, 145 S. Ct. 2778 (2025).  If so, the Court proceeds to the second step, and the law must be upheld if it "is consistent with the principles that underpin our regulatory tradition."  *Rahimi*, 602 U.S. at 692.

In a challenge to a regulation of an alleged "Arm," *Bruen*'s step one "encompasses two more precise questions": (1) is the regulated device a "bearable arm[ ]," and if so, (2) is the device "in common use for a lawful purpose, such as self-defense?"  *Hanson*, 120 F.4th at 232 (citation modified).

Starting with the first question, the term "arm" in the Second Amendment is "fixed according to its historical understanding."  *Bruen*, 597 U.S. at 28.  That is, to fall within the Second Amendment's protection, a device must fit within the Founding-Era understanding of an "arm," although the device need not have existed at the Founding.  *See Hanson*, 120 F.4th at 232; *Heller*, 554 U.S. at 582.  Relying on Founding-Era dictionaries, *Heller* explained that "arms" were defined as "weapons of offence, or armour of defence" or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  554 U.S. at 581 (citation modified).  Thus, the "most natural reading" of the Second Amendment's right to "keep and bear Arms" is the right to "have *weapons*."  *Id.* at 582 (emphasis added). Although the Second Amendment's text only refers to "arms," *Hanson* noted that "[c]onstitutional rights . . . implicitly protect those closely related acts necessary to their exercise."  120 F.4th at 232 (quoting *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring)).  Accordingly, the court found that a magazine was likely protected by the Second Amendment because it "is necessary to make meaningful an individual's right to carry a handgun for self-defense."  *Id.*

Even if a regulated device qualifies as an "arm" or is otherwise necessary to the exercise of Second Amendment rights, it only receives Second Amendment protection if it is "in common use for a lawful purpose, such as self-defense." *Id.*; *see Heller*, 554 U.S. at 622 (not every "*type of weapon*" is "eligible for Second Amendment protection"). And of course, self-defense is the core of the Second Amendment right, as the Supreme Court's decisions emphasize. *See, e.g.*, *Bruen*, 597 U.S. at 29 ("[I]ndividual self-defense is the *central component* of the Second Amendment right." (citation modified)); *Rahimi*, 602 U.S. at 690 (the Second Amendment "secures for Americans a means of self-defense"); Am. Compl. ¶ 29 ("[T]he Second Amendment's plain text covers the conduct of those law-abiding the District's citizens who desire to keep and bear arms in common use for self-defense.").

As the plain meaning of the phrase "in common *use* for self-defense" suggests, both the Supreme Court and the D.C. Circuit have looked to the suitability of the weapon for self-defense and whether it is actually used for self-defense. Start with *Heller*, which held that "the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever." 554 U.S. at 626. Rather, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625. In determining that handguns were the "quintessential self-defense weapon" and thus protected, the Court examined the handgun's distinguishing functionality—the practical "*reasons* that a citizen may prefer [one] for home defense," including that handguns are easier to access in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand "while the other hand dials the police." *Id.* at 629 (emphasis added). The Supreme Court then noted, quoting from a D.C. Circuit decision, that handguns are, in fact, "the most preferred firearm in

33

the nation to 'keep' *and use* for protection of one's home and family." *Id.* at 628–29 (emphasis added) (quoting *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)).

Building on *Heller*, *Hanson* assessed common use for self-defense in a challenge to the District's prohibition on extra-large-capacity magazines (ELCMs), that is, ammunition magazines containing 12 to 17 bullets. 120 F.4th at 230; *see id.* at 231 n.2. The D.C. Circuit explained that the "answer" to the question of whether an arm is in common use for self-defense "is not to be found solely by looking to the number of a certain weapon in private hands." *Id.* at 232–33.[6] The court approvingly cited the en banc Fourth Circuit's observation that "the [Supreme Court's] choice of the phrase common *use* instead of common *possession* suggests that only instances of 'active employment' of the weapons should count." 120 F.4th at 233 (quoting *Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) (en banc), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025)). The court identified a key factual dispute "about the role of ELCMs for self-defense" because the District argued that ELCMs are "rarely used to fire more than a couple rounds in self-defense," while the plaintiffs argued that "one need not fire every bullet in an ELCM in order to use it." *Id.* Rather than resolve that dispute, the court "presume[d]" that ELCMs "can be used for self-defense" and proceeded to uphold the District's law at *Bruen*'s step two. *Id.* Thus, *Hanson*'s focus on "the role of ELCMs for self-defense" and its identification of the key factual dispute reflect that "common use for self-defense" at *Bruen*'s step one turns on an arm's suitability and actual use for self-defense. That understanding is in

---

[6]    The *Hanson* Court "assume[d], without deciding," that the "common-use" issue belongs at step one, reasoning that "the *Bruen* Court determined that handguns are in common use before conducting its historical analysis." 120 F.4th at 232 n.3. Unless and until the D.C. Circuit revisits the placement of the common-use issue, this Court should follow *Hanson*. *Cf. Ellis v. District of Columbia*, 84 F.3d 1413, 1418 (D.C. Cir. 1996) (a district court follows an "on point" case until the appellate court "instructs . . . otherwise").

34

step with the Supreme Court's emphasis elsewhere that "[d]ictionaries consistently define the noun 'use' to mean the 'act of employing' something." *Voisine v. United States*, 579 U.S. 686, 692 (2016) (citation omitted).

### 2.    The Amended Complaint Fails to Plausibly Allege That Silencers Are Protected by the Second Amendment.

The Amended Complaint fails to allege facts plausibly showing that silencers are either "arms," necessary to exercise the Second Amendment right, or in common use for self-defense. To start, a silencer does not fit the Founding-Era definition of an "arm." It is not a weapon. It cannot otherwise be "useth in wrath to cast at or strike another," *Heller*, 554 U.S. at 581—unless it is thrown, but the Second Amendment does not protect any potential projectile. It is useless without being attached to a firearm. It is, at most, an optional accessory; but the Second Amendment protects "arms," not accessories.

Nor does the Amended Complaint contain any facts plausibly alleging that silencers are "necessary to make meaningful an individual's right to carry a handgun for self-defense." *Hanson*, 120 F.4th at 232. To the contrary, a firearm can still be fired without a silencer. Accordingly, courts—including three federal courts of appeals—have overwhelmingly held that silencers are not protected by the Second Amendment.[7]

---

[7]    *E.g.*, *United States v. DeBorba*, --- F.4th ----, ----, No. 24-3304, 2026 WL 1587553, at *4 (9th Cir. June 3, 2026); *Duncan v. Bonta*, 133 F.4th 852, 868 (9th Cir. 2025) (en banc), *pet. for cert. docketed*, No. 25-198 (U.S. Aug. 19, 2025); *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *United States v. Saleem*, No. 23-4693, 2024 WL 5084523, at *2 (4th Cir. Dec. 12, 2024) (per curiam); *United States v. Speed*, 175 F.4th 272, 287–88 (4th Cir. 2026) (Wilkinson, J., concurring); *United States v. Bradley*, 766 F. Supp. 3d 769, 781 (S.D. Ohio 2025); *United States v. Berger*, 715 F. Supp. 3d 676, 702 (E.D. Pa. 2024); *People v. Hardy*, 343 Cal. Rptr. 3d 475, 479–80 (Ct. App. 2026); *see United States v. Ritsema*, 31 F.3d 559, 562 (7th Cir. 1994) (concluding that silencers "are not actual weapons").

The United States nonetheless alleges that silencers are constitutionally protected because they "facilitate armed self-defense."  Am. Compl. ¶ 34 (quoting *Bruen*, 577 U.S. at 28).  No part of the test articulated in *Hanson* offers protection for a device that merely facilitates self-defense. *See Hanson*, 120 F.4th at 232.  Nor did *Bruen* create a "facilitates self-defense" test; the Supreme Court explained that the petitioners' proposed conduct was protected by the Second Amendment because, among other reasons, they sought to carry handguns, which were "weapons 'in common use' today for self-defense."  597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627); *see Speed*, 175 F.4th at 288–89 (Wilkinson, J., concurring) (rejecting the United States' argument).  Such a test would be hopelessly indeterminable and expansive as an array of devices could in theory "facilitate self-defense."  *See Speed*, 175 F.4th at 289 (Wilkinson, J., concurring).  But even if "facilitates self-defense" were the test for Second Amendment protection, none of the few factual allegations in the Amended Complaint plausibly show that silencers facilitate self-defense.[8]

Even assuming that silencers could be considered "arms," necessary to the exercise of Second Amendment rights, or facilitative of self-defense, the Amended Complaint fails to allege facts plausibly showing that silencers are *in common use for* self-defense.  The Amended Complaint contains no facts "about the role of [silencers] for self-defense."  *Hanson*, 120 F.4th at 233.  For example, there are no facts showing that silencers have features that make them useful for self-defense or that silencers have been used in self-defense scenarios.  Rather, it is "common sense," *Iqbal*, 556 U.S. at 679, that silencers are well suited for criminal uses because by

---

[8]    For those reasons, the United States can find no help in the Fifth Circuit's outlier conclusion that silencers are "arms" because they facilitate self-defense.  *United States v. Comeaux*, --- F.4th ----, ----, No. 24-30307, 2026 WL 1758170, at *3–4 (5th Cir. June 18, 2026). Anyway, that conclusion was dicta because the panel resolved the case based on circuit precedent holding that, even assuming silencers are "arms," a silencer-registration scheme is presumptively constitutional.  *Id.* at *2, 4.

silencing or muffling gunfire, they allow criminals to shoot guns undetected.  And so, courts have long associated silencers with criminal uses.  *See, e.g.*, *United States v. Brooks*, 330 A.2d 245, 247 (D.C. 1974) (observing that the items prohibited by what is now D.C. Code § 22-4514(a) "are so highly suspect and devoid of lawful use that their mere possession is forbidden"); *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) ("Silencers . . . are not typically possessed by law-abiding citizens for lawful purposes . . . ." (citation modified)).  Because silencers are suited for criminal uses, they are not protected by the Second Amendment.  *See United States v. Speaks*, No. 25-cv-217, 2025 WL 3701958, at *5 (D.D.C. Dec. 19, 2025) (holding that a gun without a serial number is not protected by the Second Amendment because its "primary advantage . . . is its utility in illicit activity").

Further, silencers are subject to what the United States characterizes as an "arduous process" of registration and taxation under the National Firearms Act (NFA), ch. 757, Pub. L. No. 73-747, 48 Stat. 1236 (1934).  Am. Compl. ¶ 31.  Logically, the "arduous" registration process makes it more difficult to obtain a silencer and thus makes silencers less common.  *See Bianchi*, 111 F.4th at 470 (explaining that the NFA "severely curtailed the civilian possession and general circulation of . . . silencers").  So "it is implausible" that silencers are even commonly possessed, let alone commonly used in self-defense.  *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1050 (D.C. Cir. 2012).

The United States should agree with all this.  Elsewhere, the United States has recently taken the position that "[s]uppressors . . . are susceptible to criminal misuse because they make it harder for law enforcement to identify or detect the source and direction of gunfire, such as in drive-by or mass shootings or assassination attempts."  Supp. Br. for the U.S. at 7–8, *Speed*, 175 F.4th 272 (No. 23-4308), 2025 WL 3159454.  Likewise, the United States previously took the

37

position—before the Supreme Court no less—that "the Second Amendment does not protect silencers" because they are not "arms," and the Second Amendment right would not be "meaningless" without them.  Br. of the U.S. in Opp'n at 10–12, *Kettler v. United States*, No. 18-936 (U.S. May 6, 2019), 2019 WL 2006238.  That position had been consistent.  *E.g.*, Br. of the U.S. at 29–37, *United States v. Saleem*, No. 23-4693 (4th Cir. May 10, 2024), 2024 WL 2186414.

Despite all the above, the Amended Complaint makes only three factual allegations about silencers that could speak to the common-use inquiry, but they do not suffice to state a claim.

First, the Amended Complaint alleges that "[a]ccording to the American Suppressor Association, as if [*sic*] April 2026, there are approximately six million registered suppressors in the United States."  Am. Compl. ¶ 33.[9]  But common use "is not to be found solely by looking to the number of a certain weapon in private hands."  *Hanson*, 120 F.4th at 232–33.

Second, the Amended Complaint alleges that "according to acting former [Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)] Deputy Director Ronald B. Turk, [silencers] are rarely used in criminal shootings and should not be viewed as a threat to public safety."  Am. Compl. ¶ 33.  The allegation cites a white paper, which the Court may consider.  *See Simmons v. Rubio*, 170 F.4th 905, 910 (D.C. Cir. 2026) (on a motion to dismiss, a court may consider documents incorporated by the complaint).  That white paper states that it "merely" expresses "the ideas and opinions of this writer" that "cannot be taken as . . . quotable specifics" and that are "not intended to be public."  Ronald B. Turk, *White Paper: Options to Reduce or Modify*

---

[9]    The United States bizarrely relies on an advocacy organization's estimates even though the United States itself publishes a count of registered silencers, and the last published count was about 3.5 million—around half of what the Amended Complaint alleges.  Bureau of Alcohol, Tobacco, Firearms & Explosives, *Firearms Commerce in the United States: Statistical Update 2024* at 12, tinyurl.com/4v8k65yk.

*Firearms Regulations* at 11 (Jan. 20, 2017), perma.cc/JXF5-CULT. The author states—without citation—that "silencers are very rarely used in criminal shootings." *Id.* at 6. This statement is conclusory, devoid of factual enhancement, and merely the opinion of the author, so the Court disregards it. *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1134 (D.C. Cir. 2015) (ignoring, on a motion to dismiss, "the opinions and conclusions" of a report referred to in a complaint).

Third, the Amended Complaint alleges, seemingly based on Turk's report, that "in 2017, the ATF reported that it had recommended prosecutions in only *44* suppressor related cases on average per year." Am. Compl. ¶ 33. Without any factual enhancement, it is impossible to understand this allegation or how it shows that silencers are in common use for self-defense. ATF's prosecution recommendations could depend on any number of factors that have nothing to do with the common-use inquiry, such as resource constraints.

### 3. The Amended Complaint Fails to Plausibly Allege That AR-15s Are Protected by the Second Amendment.

The Amended Complaint fails to allege facts plausibly showing that AR-15 rifles are "in common use," let alone for self-defense. For example, there are no allegations about the AR-15's suitability for self-defense or incidents in which the AR-15 was used in self-defense. Instead, the Amended Complaint adds a handful of allegations relying on ownership statistics, judicial opinions, two surveys, and 2019 data about homicides. Am. Compl. ¶¶ 19–26. These allegations do not show that AR-15s are suitable for or actually used in self-defense.

First, the Amended Complaint includes statistics alleging the number of AR-15s owned or in circulation. *Id.* ¶¶ 20–22. But, again, the D.C. Circuit has expressly disavowed possession alone as the measure of "common use." *Hanson*, 120 F.4th at 232–33. In doing so, it joined a growing consensus among the federal courts. *See, e.g.*, *Bevis v. City of Naperville*, 85 F.4th

39

1175, 1198–99 (7th Cir. 2023) (declining to base its analysis "on numbers alone" because "the idea of 'common use' cannot be severed from the historical scope of the common-law right that the Second Amendment was designed to protect"), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024); *Or. Firearms Federation v. Kotek*, 682 F. Supp. 3d 874, 912–18 (D. Or. 2023) (similar), *stayed*, No. 23-35478 (9th Cir. Dec. 19, 2023); *Bianchi*, 111 F.4th at 460 (rejecting challengers' attempt to equate "common use" with "common possession" as a "trivial counting exercise" that leads to "absurd consequences").

Second, the Amended Complaint parrots conclusions expressed in judicial opinions, mostly by individual jurists and mostly dissenting. Am. Compl. ¶¶ 2–3, 24. A complaint cannot survive a motion to dismiss by relying on facts contained in a judicial opinion. *See Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017) (on a motion to dismiss, courts cannot rely on court records "for the truth of the matter asserted" therein); *Cherokee Nation v. Nash*, 267 F. Supp. 3d 86, 92 n.9 (D.D.C. 2017) (courts cannot take judicial notice of facts contained in a judicial opinion). That makes sense because facts alleged in a pleading must "have evidentiary support." Fed. R. Civ. P. 11(b)(3). Relying on judicial opinions means the pleader is relying on someone else's opinions about facts, instead of reviewing the evidence himself. Thus, the Court should ignore all the allegations relying on judicial opinions. Even if the Court nonetheless considers those allegations, the Amended Complaint cites judicial opinions only for their legal conclusions or statements about the ownership of "[s]emiautomatic rifles like the AR-15." Am. Compl. ¶ 24. Legal conclusions do not state a claim, *Pueschel*, 955 F.3d at 166, and allegations about ownership do not show common use for lawful purposes, *see Hanson*, 120 F.4th at 232–33. And allegations that are not attuned to the AR-15, but "[s]emiautomatic rifles like the AR-15," Am. Compl. ¶ 24, do not show that AR-15s specifically are commonly owned.

40

Third, the Amended Complaint relies on two surveys that purported to ask participants why they owned "AR-style rifles." *Id.* ¶ 23 (first citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 33 (May 13, 2022), perma.cc/9L8W-Y3HT; then citing Emily Guskin *et al.*, *Why Do Americans Own AR-15s?*, Wash. Post (Mar. 27, 2023), tinyurl.com/436xdvku).  At the outset, these studies are outdated by several years and rely in part on what Americans "have owned" in the past. *Id.* ¶ 22. Furthermore, many of the reasons for owning AR-15s—like "competitive sports shooting"—do not speak to the core of the Second Amendment right, which is self-defense.  As the Seventh Circuit has concluded, although there may be "other lawful purposes for weapons," including "sporting uses, collections, and competitions," "the constitutional protection exists to protect the individual right to self-defense." *Bevis*, 85 F.4th at 1192; *see also, e.g.*, *Bianchi*, 111 F.4th at 460–61; *United States v. Charles*, 159 F.4th 545, 547 (8th Cir. 2025) (emphasizing the "'common use for self-defense' rationale for the private right to bear arms").  And *Bruen* itself, in analyzing step one, asked specifically whether handguns were "'in common use' today *for self-defense*." *Bruen*, 597 U.S. at 32 (emphasis added) (quoting *Heller*, 554 U.S. at 627).

But more fundamentally, the subjective reasons for purchasing a firearm do not show anything about whether the firearm is in fact in use or has features that *objectively* make it well suited for a particular use.  *See Heller*, 554 U.S. at 629.  It would be absurd if the scope of the Second Amendment right were determined by subjective feelings—let alone survey results— because some survey respondents may feel that grenades, machine guns, or other extremely dangerous weapons could help them better defend themselves.  In other words, a machine gun should not be "in common use for self-defense" simply because survey respondents subjectively wish to use them for home defense.  Nor is an AR-15—"[b]uilt to generate maximum wound

41

effect," and resulting in "multiple organs shattered, bones exploded, and soft tissue absolutely destroyed"—any better suited for hunting on account of an individual's subject desire to use it for that purpose. *Bianchi*, 111 F.4th at 455 (citation modified). Accordingly, the D.C. Circuit in *Hanson* made no mention of subjective reasons as relevant to the common-use inquiry. Likewise, courts have found that facts about subjective reasons for owning a firearm—and the English survey in particular—are insufficient to show common use for self-defense.[10]

Fourth, the Amended Complaint alleges that "AR-15 type rifles are not commonly used by criminals" because data from the Federal Bureau of Investigation (FBI) on homicides in 2019 allegedly shows that "364 homicides were known to have been committed with *rifles of any type*, compared to 6,368 with handguns, 1,476 with knives or other cutting instruments, 600 with personal weapons (hands, feet, etc.) and 397 with blunt objects." Am. Compl. ¶ 25 (citing FBI, *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015-2019*, bit.ly/3HdolNd). For starters, the FBI data indicates that an additional 3,281 homicides were committed by "[f]irearms" where the firearm type was simply "not stated." So the data cannot be used to draw any concrete conclusions about the use of AR-15s by criminals. Further, proportional use of rifles in homicides says nothing about whether AR-15s are useful for or used in self-defense. Finally, the single citation about homicides from seven years ago does not support the sweeping conclusion that AR-15s are not commonly used by criminals generally.

---

[10]     *See Rupp v. Bonta*, 723 F. Supp. 3d 837, 858 n.17 (C.D. Cal. 2024), *stayed*, No. 24-2583 (9th Cir. June 7, 2024); *Or. Firearms Fed'n*, 682 F. Supp. 3d at 918; *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 87, 97 (D. Conn. 2023), *aff'd*, 153 F.4th 213 (2d Cir. 2025), *pet. for cert. docketed*, No. 25-421 (U.S. Oct. 7, 2025); *Banta v. Ferguson*, No. 23-cv-112, 2024 WL 4314788, at *9 (E.D. Wash. Sept. 26, 2024), *stayed*, No. 24-6537 (9th Cir. Jan. 8, 2025); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 190–91 (D. Vt. 2024), *argued*, No. 24-2026 (2d Cir. Apr. 28, 2026); *State v. Gator's Custom Guns, Inc.*, 568 P.3d 278, 283–84 (Wash. 2025) (en banc), *pet. for cert. docketed*, No. 25-153 (U.S. Aug. 8, 2025).

All said, none of the few factual allegations about AR-15s speak to common use, let alone for self-defense.  The Amended Complaint's challenge to the District's AR-15 ban is thus legally insufficient because none of its factual allegations are aimed at the correct legal test.  *See Sanchez*, 45 F.4th at 395 (a complaint must provide "adequate factual support" for the elements of a claim); *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344 (D.C. Cir. 2018) ("A Rule 12(b)(6) motion tests the legal sufficiency of a claim or complaint.").

## B. The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement Officers.

As explained in Argument § I, *supra*, the Amended Complaint fails to identify a pattern or practice that is cognizable under Section 12601.  Even if the Court disagrees, the Amended Complaint does not allege facts plausibly showing that the supposed pattern or practice is actually occurring and depriving individuals of their Second Amendment rights.  The Amended Complaint's theory is that when MPD officers "enforce" the AR-15 and silencer proscriptions, "they are engaging in a pattern or practice" under Section 12601.  Am. Compl. ¶ 40.  But in support of this theory, the Amended Complaint makes just two allegations that could be considered "factual," and neither suffices to state a claim.

First, the Amended Complaint alleges that "[t]he District routinely enforces" the laws "as evidenced by the fact that hundreds of people have been convicted for violating them."  *Id.* ¶ 35. This allegation is conclusory and "devoid of further factual enhancement" necessary to make the United States' claim plausible.  *Iqbal*, 556 U.S. at 678 (citation modified).  The allegation does not say, for example, when these "hundreds of people" were convicted; and if the convictions are outdated, then this allegation does not show that MPD is currently enforcing the proscriptions. The allegation also does not say that these convictions arose from MPD arrests.  After all, federal law enforcement agencies have a large presence in the District, may recover unlawful firearms or

43

devices, and may refer the possessors for prosecution.  Further still, the allegation does not say anything about the circumstances of these convictions, such as whether these defendants had committed other crimes, used AR-15s or silencers in crimes of violence, or were ineligible to possess firearms.  Yet, the Amended Complaint alleges that only a subset of conduct prohibited by the statutes is constitutionally protected: possession of AR-15s and silencers by *otherwise law-abiding individuals*.  *See, e.g.*, Am. Compl. ¶¶ 29, 50.  If, for example, the individuals referenced in this allegation were possessing AR-15s and silencers while ineligible to possess any gun (say, due to a felony conviction, *see* D.C. Code § 22-4503(a)(1)), then this allegation does not support the United States' claim.  And it is neither intuitive nor obvious that MPD or prosecutors would focus their limited enforcement resources on regularly arresting and prosecuting otherwise law-abiding individuals.

Second, the Amended Complaint alleges that, "[o]n information and belief," MPD officers "are fulfilling (and will continue to fulfill) their statutory duty to enforce" the challenged laws.  Am. Compl. ¶ 40.  Pleading "on information and belief" is only permitted "when the necessary information lies within defendants' control," and the allegations are "accompanied by a statement of the facts upon which [they] are based."  *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (citation modified).  If either requirement is not met, the Court does not accept the allegation as true.  *Mahoney v. U.S. Capitol Police Bd.*, 566 F. Supp. 3d 22, 28 (D.D.C. 2022).  The allegation here is not accompanied by any additional facts.  Yet, information about MPD's arrests is available to the United States because the United States shares responsibility for prosecutions arising from MPD's arrests.  *See* D.C. Code § 23-101(c)–(d).  Thus, the Court should disregard this allegation.

44

Regardless, the Court cannot reasonably infer a pattern or practice merely from the existence of the underlying substantive criminal prohibition that MPD has authority to enforce.  That would mean that every police force in every jurisdiction engages in an actionable pattern or practice any time a criminal law is enforced.  Such an inference is furthermore contrary to ordinary principles of prosecutorial discretion.  The decision of whether to arrest individuals for violating a criminal statute involves more considerations than just whether the officer has probable cause to believe a crime was committed.  *See United States v. Texas*, 599 U.S. 670, 680 (2023) ("the Executive Branch must balance many factors when devising arrest and prosecution policies").  Indeed, federal law criminalizes marijuana possession, but police do not usually arrest for simple possession of marijuana.

* * *

For all those reasons, the Amended Complaint fails to plausibly allege a pattern or practice of conduct by law enforcement officers that deprives individuals of their Second Amendment rights, even assuming the United States' challenge is cognizable.  Worse, the District raised essentially the same pleading deficiencies before, yet the United States does not correct them.  *See* Defs.' MTD Compl. at 31–40.  It is no pleading misstep, then, that the United States cannot muster facts to support its claim.  "[T]his basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the [C]ourt," and so this case should be dismissed.  *Twombly*, 550 U.S. at 558 (citation modified).

**CONCLUSION**

For the foregoing reasons, the Court should dismiss the Amended Complaint.

Date: June 25, 2026                                   Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

45

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

/s/ Matthew R. Blecher
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

/s/ Honey Morton
HONEY MORTON [1019878]
Assistant Chief, Equity Section

/s/ Adam J. Tuetken
ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

Counsel for Defendants

46