**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:25-cv-04458-APM |
| v. | |
| THE DISTRICT OF COLUMBIA, ACTING CHIEF OF POLICE JEFFREY CARROLL, in his official capacity as Chief of the Metropolitan Police Department of the District of Columbia, and THE METROPOLITAN POLICE DEPARTMENT OF THE DISTRICT OF COLUMBIA, | |
| Defendants. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 2

   I.     Defendants' Procedural Errors Bar Granting Their Motion. ................................. 3

      A.   The Court Cannot Consider Defendants' Extraneous Materials........................ 3

      B.   Plaintiff Is Not Required to Submit Evidence at This Pleading Stage. .............. 4

   II.    The Amended Complaint Plausibly States a Claim under Section 12601.............. 5

      A.   Defendants Cannot Meet the Arduous Standard for Dismissing a Complaint ... 5

      B.   The Amended Complaint Meets All Three Elements of a Section 12601 Claim. 6

      C.   Plaintiff Has Plausibly Pled That the District Is a Governmental Entity............ 6

      D.   Plaintiff Has Plausibly Pled That MPD Law Enforcement Officers Have
Engaged in a Pattern or Practice of Misconduct.......................................................... 6

      E.   Plaintiff Has Plausibly Pled That Enforcing the Arms Ban Deprives Persons of
Constitutionally Protected Rights ................................................................................ 8

   III.   The Plain Text of Section 12601 Authorizes the Relief That Plaintiff Seeks. ... 9

   IV.   The Rules of Statutory Interpretation Lead to the Same Conclusion as The Plain
Text Analysis that Plaintiff's Claim Is Properly Pled.................................................... 14

      A.   The Legislative History of the 1991 Bill Supports Plaintiff's Claim. .............. 14

      B.   Section 12601 and Section 1983 Should Be Interpreted In Pari Materia. ........ 16

      C.   The Court Must Construe Section 12601 Broadly as a Remedial Statute ........ 19

   V.   Defendants' Arguments that Section 12601 Does Not Apply Are Meritless ....... 19

      A.   No Authority Supports Defendants' Interpretation of Section 12601. ............. 19

      B.   Defendants' Enforcment of an Unconstitutional Law Incurs Section 12601
Liability........................................................................................................................ 20

      C.   An Unconstitutional Statute Harms Citizens When It Is Enforced................... 24

      D.   Defendants' Extratextual Criterion Frustrates the Statute's Remedial Purposes. 25

      E.   The Department's Past Practice Does Not Cabin the Scope of the Statute. ..... 26

      F.   The Scope of a Statute Is Not Constrained by the Limits of the Drafters'
Imagination; Nor Is the Statute Limited to Addressing the "Principal Evil" with
which They Were Concerned........................................................................................ 29

      G.   Legislative History Is Not the Law.................................................................... 30

      H.   Congress Could Have Easily Drafted a Narrow Statute ................................... 31

      I.   The United States Did Not Bring a "Facial Challenge" to the Arms Ban ........ 31

   VI.   The United States Sovereign Interests Support the Amended Complaint. ....... 32

i

VII.    Defendants' Argument That the Amended Complaint Fails to Plausibly Plead a Violation of the Second Amendment or a Pattern or Practice of Misconduct Is Meritless ................................................................................................................. 33

    A.    Plaintiff Must Plausibly Plead That the Arms Ban "Clashes" with the Plain Text of the Second Amendment ................................................................................. 33

    B.    Plaintiff Has Met Its Pleading Burden to Allege a Second Amendment Violation that Constitutes Law Enforcement Misconduct. ...................................... 35

    C.    *Wolford* Makes Clear That Plaintiff Is Not Required to Plead or Prove Common Use.. .......................................................................................................... 38

    D.    Plaintiff Plausibly Plead a Pattern or Practice of Conduct .............................. 39

CONCLUSION .................................................................................................................. 39

**INTRODUCTION**

This is a straightforward case. AR-15 style rifles are the most popular rifles in the Nation,[1] and Americans possess over six million firearm suppressors.[2] These weapons are in common use for lawful purposes by millions of law-abiding Americans and are therefore protected by the Second Amendment. *See District of Columbia v. Heller*, 554 U.S. 570, 624- 625, 627 (2008). Through the Metropolitan Police Department's (MPD) implementation of a series of interrelated ordinances (collectively, the "Arms Ban"), the District of Columbia (District) prohibits its citizens from possessing these constitutionally protected weapons. The Arms Ban is, therefore, unconstitutional, and MPD's ongoing enforcement of the Arms Ban is law enforcement misconduct.

The Amended Complaint validly challenges this law enforcement misconduct through a properly pled 34 U.S.C. § 12601 (Section 12601) claim. Section 12601 makes it unlawful for the District's law enforcement officers to engage in a pattern or practice of conduct that deprives persons of rights protected by the Constitution. Compl. ¶ 37. MPD routinely enforces the Arms Ban by arresting people who possess these constitutionally protected arms or by refusing to license the arms, thereby preventing them from lawfully possessing them in the first place. Compl. ¶¶ 39-40. That conduct deprives citizens of the District of their Second Amendment right to keep and bear the constitutionally protected arms. Compl. ¶ 41. Therefore, that conduct is unlawful under Section 12601, and the Department of Justice (Department) may seek to enjoin it. *See* 34 U.S.C. § 12601(b). Compl. ¶¶ 41-47.

---

[1] First Amended Complaint ("Compl.") ¶ 24 (quoting *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025)).
[2] Compl. 33.

Defendants assert that Section 12601 cannot reach their misconduct because MPD is merely following the District's criminal statutes.  However, Defendants' just-following-orders argument does not inoculate their unconstitutional conduct from Section 12601 liability. Defendants' reliance on its criminal statutes authorizing—indeed imposing—unconstitutional misconduct by law enforcement is no more convincing than Reconstruction Era states asserting a right to continue to violate federal civil rights based on their own state-level restrictions.  Just as Congress passed the Klan Act to equip private individuals to protect their civil rights in that era, so too did Congress equip the Department to protect against systemic law enforcement misconduct in the modern era.  No court rationally can condone the use of local law enforcement as a tool to systematically impose civil rights violations, even if that locality legislates such deliberate misconduct.

## ARGUMENT

This Court should protect civil rights and the United States' sovereign authority to defend society from all variety of law enforcement misconduct by denying Defendants' Motion to Dismiss because:  (1) Defendants' procedural errors bar granting their motion; (2) the Amended Complaint plausibly states a claim under Section 12601; (3) the plain text of Section 12601 authorizes the relief that Plaintiff seeks; (4) the rules of statutory interpretation lead to the same conclusion as the plain text analysis (i.e., that Plaintiff's claim is properly pled); (5) Defendants' arguments that Section 12601 does not apply are meritless; (6) the United States' sovereign interests support the Amended Complaint; and (7) Defendants' argument that the Amended Complaint fails to plausibly plead a violation of the Second Amendment or a pattern or practice of misconduct is meritless. Accordingly, this Court should deny Defendants' motion.

I.      **Defendants' Procedural Errors Bar Granting Their Motion.**

Defendants attempt to subvert the proper standards of review for Federal Rule of Civil Procedure 12(b)(6) motions.  Before addressing the substance of Defendants' arguments, Plaintiff will address Defendants' procedural errors.

A.      **The Court Cannot Consider Defendants' Extraneous Materials.**

Defendants attached voluminous materials to their motion and requested the Court to consider facts asserted in those materials.  Def. Memo., 3-7; Exhibits 1-4.  However, as the Supreme Court reaffirmed earlier this year, a "court *cannot consider* matters outside the pleadings" when ruling on a Rule 12(b)(6) motion.  *Berk v. Choy*, 607 U.S. 187, 193 (2026) (emphasis added; citation and internal quotation marks omitted).  A Rule 12(b)(6) motion is "focused solely" on the allegations of the complaint.  *Murphy v. Dept of Air Force*, 326 F.R.D. 47, 48 (D.D.C. 2018). Thus, a defendant may not assert a defense unless the factual basis for the defense is evident from the "face of the complaint."  *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1268 (D.C. Cir. 2019).[3]  Accordingly, the Court must disregard the extraneous materials Defendants submitted and their arguments based upon those materials.  If a Court cannot consider extraneous facts a party submits, it should go without saying that it cannot consider the factual assertions of *Amici*.[4]

---

[3] Defendants argue that the Court can disregard these rules because it may take judicial notice of these "publicly available" documents.  Def. Memo. 3 n.3.  This rule does not apply, however, because Defendants admit that these documents are not "publicly available" on the Department's website.  Memorandum [ECF 16]. 6 n.3.  The Court may not, as Defendants suggest, take judicial notice of these non-public documents merely because they are somewhere in the government's files.  Extending the exception to that extent would allow courts to take judicial notice of all of the billions of documents in the government's computers and file drawers.

[4] The *Amici* include former Civil Rights Division attorneys.  Those attorneys' discussion of the internal, deliberative work product of their former client in their prior brief was unseemly at best. This is an additional reason not to consider the *Amicis'* factual assertions.

Defendants submitted their extraneous materials as evidence that they believe proves the Department's past Section 12601 enforcement actions were narrowly focused. As noted, the Court should disregard those materials. However, if the Court reviews them, the Court should know that, as set forth below, the Defendants' characterization of past agency practice is inaccurate. Thus, even if the Court decides to take notice of Defendants' documents, it cannot take notice of the underlying "fact" Defendants are trying to prove, i.e., that all of the Departments' enforcement actions were as narrowly focused as Defendants suggest. As the Supreme Court has noted, in a constitutional case where facts are disputed, courts should not "decide the legal questions posed by the parties without a more thoroughly developed record . . . in which the parties have an opportunity to prove those disputed factual assertions upon which they rely." *City of Los Angeles v. Preferred Commc'ns, Inc*., 476 U.S. 488, 494 (1986). Because this factual dispute is inappropriate at this pleading stage of the litigation, this Court should deny the motion.

**B.**    **Plaintiff Is Not Required to Submit Evidence at This Pleading Stage.**

Defendants assert that Plaintiff's Complaint must have "evidentiary support" for its claim. Def. Memo. 40. Again, however, the Supreme Court recently ruled otherwise in *Berk*. There, the Court noted that Rule 8 prescribes the information a plaintiff must present about the merits of its claim at the outset of litigation: "a short and plain statement of the claim showing that [it] is entitled to relief." *Berk*, 607 U.S. at 193 (quoting Fed. Rule Civ. Proc. 8(a)(2)). "By requiring no more than a statement of the claim, Rule 8 establishes implicitly, but with unmistakable clarity, that evidence of the claim is *not* required." *Id*. (internal citation and quotation marks omitted; emphasis in original).

4

## II.    The Amended Complaint Plausibly States a Claim under Section 12601.

### A.    Defendants Cannot Meet the Arduous Standard for Dismissing a Complaint.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Factual allegations need not be detailed, but facts must be "enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  At the pleading stage, a plaintiff does not need to state facts to establish a *prima facie* case of a pattern or practice.  *Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019).  Thus, to overcome a motion to dismiss in a pattern-or-practice case, the allegations need only create a reasonable inference that a pattern or practice exists.  *See, e.g.*, *United States v. Prashad*, 437 F. Supp. 3d 105, 108-109 (D. Mass. 2020); *EEOC v. Glob. Horizons, Inc.*, 904 F. Supp. 2d 1074, 1085 (D. Haw. 2012); *United States v. Nobel Learning Cmtys.*, 676 F. Supp. 2d 379, 384 (E.D. Pa 2009).  Whether a pattern or practice exists is ordinarily a factual question for the jury and "each case must stand on its own facts." *United States v. Balistrieri*, 981 F.2d 916, 930 (7th Cir. 1992).  A complaint that plausibly asserts facts supporting a plaintiff's claims, "may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Berk*, 607 U.S. at 193 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "By design, this system of pleading makes it relatively easy for plaintiffs to subject defendants to discovery . . .." *Berk*, 607 U.S. at 194.  The Supreme Court has "consistently rejected" efforts to require more. *Id*. Accordingly, Defendants' attempt to require more than the pleading standards is improper and must fail.

**B.      The Amended Complaint Meets All Three Elements of a Section 12601 Claim.**

The United States brought this action pursuant to the statutory authority set forth in Section 12601.  Compl. ¶ 47.  Section 12601(a) states in pertinent part:

> It shall be unlawful for any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority, to engage in a pattern or practice of conduct by law enforcement officers . . . that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

Thus, to state a claim under Section 12601, the Amended Complaint must—and does— plausibly allege three elements: (1) a "governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority;" (2) "engage[d] in a pattern or practice of conduct by law enforcement officers;" and (3) that conduct operated to "deprive[] persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States." As set forth in this section, the United States' Complaint more than satisfies the *Twombly* standard.

**C.      Plaintiff Has Plausibly Pled That the District Is a Governmental Entity.**

The Complaint alleges that the District is a governmental authority, as that term is used in Section 12601, and MPD is an agency of that governmental authority.  Compl. ¶ 38.  The Complaint alleges that MPD's police officers act on behalf of the District in the course of their law enforcement activities. *Id*.  Defendants do not suggest that these allegations are not plausible (nor could they).  Therefore, it is undisputed that Plaintiff has plausibly alleged the first element of its claim.

**D.      Plaintiff Has Plausibly Pled That MPD Law Enforcement Officers Have Engaged in a Pattern or Practice of Misconduct.**

The Complaint makes the following allegations:

- MPD is a law enforcement agency that enforces the laws within the District. Compl. ¶ 8 (citing D.C. Code § 5–105.05).

6

- Police officers within MPD are "law enforcement officers" as that term is used in Section 12601.  *Id.*
- MPD serves as the registration and licensing office for all applicants for firearms-related licenses in the District.  *Id.* (citing D.C. Mun. Regs. Tit. 24, § 2305).
- MPD police officers have and exercise the authority to arrest individuals committing a violation of the Arms Ban.  *Id.* (citing D.C. Code § 23-581).
- Members of the MPD are required to "familiarize themselves with the statutes, laws, and regulations in force in the District of Columbia."  *Id.* (citing D.C. Mun. Regs. tit. 6-A, § 200.13).
- Members of the MPD are required to "take action respecting violations of those statutes, laws, and regulations coming to their attention or about which they have knowledge."  *Id.* (citing D.C. Mun. Regs. tit. 6-A, § 200.13).
- When such police officers perform their duty pursuant to these regulations, they are engaging in "conduct by law enforcement officers" as that phrase is used in Section 12601.  *Id.*
- Defendant Jeffrey Carroll is the interim Chief of Police of the MPD, and in that capacity, he "shall take any measures that will insure prompt and vigorous enforcement of all criminal statutes, laws, regulations, and ordinances . . .." Compl. ¶ 9 (quoting D.C. Mun. Regs. tit. 6-A, § 800.02).
- Chief Carroll or his designee promulgates and enforces the regulations that implement the District's unconstitutional gun registration system.  *Id.* (citing D.C. Mun. Regs. tit. 24, § 2305.1).
- MPD regularly enforces the District's firearms laws including the Arms Ban and hundreds of people have been convicted for violating those laws. Compl. ¶ 35.

The District can hardly assert that it is not plausible that its police officers enforce its law.

Moreover, Defendants have had plenty of opportunity to disavow enforcement of the Arms Ban

and have not done so.  In such cases, enforcement of the statute is presumed.  *See Virginia v. Am.*

*Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988). Defendants have not disavowed enforcement

because they obviously have been enforcing the Arms Ban and will continue to do so.  In summary,

the Complaint plausibly alleges that the police officers of the MPD engage in the pattern or practice

of conduct of enforcing the District's laws, including the Arms Ban.

### E.    Plaintiff Has Plausibly Pled That Enforcing the Arms Ban Deprives Persons of Constitutionally Protected Rights

Last month, in *Wolford v. Lopez*, the Supreme Court summarized the two-part "*Bruen* test"[5] required in a Second Amendment case.  2026 WL 1825723, *6 (U.S. June 25, 2026).  "First, a court must determine whether the law before it clashes with the 'plain text' of the Amendment's language." *Id*. (citation omitted).  This inquiry requires the Court to ask three subsidiary questions: (1) Does the law apply to "the people"?  (2) Does it concern any form of "Arms"? (3) Does the law place any restrictions on either the possession or carrying of arms? *Id*. (cleaned up).  "If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional, which means that it *may* violate the preexisting right that the Amendment codified." *Id*. (citation omitted; emphasis in the original).  The "relevant government"—here, Defendants—will then have an opportunity to rebut that presumption by showing that its law did not infringe the historical understanding of the right to keep and bear arms codified in the Second Amendment. *Id*. (internal citation omitted).

The "plain text" burden under step of one is on the party attacking the law (here, the United States) and the "history and tradition" burden under step two is on the government defending the law (here, the Defendants).  *Hanson v. D.C.*, 120 F.4th 223, 232 (D.C. Cir. 2024), *abrogated on other grounds* by *Wolford v. Lopez*, 609 U.S. ___ (2026).  A plaintiff's pleading burden under *Bruen* step one (as clarified in *Wolford*) is very light.  To state a Second Amendment claim, a plaintiff need only plausibly plead the three elements under step one that it is required to prove: (1) The law applies to "the people," (2) the law concerns any form of arms, and (3) the law places any restriction on either the possession or carrying of arms.  A defendant's burden under step two

---

[5] *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022).

is an affirmative defense to any presumption that arises at step one, and a plaintiff "need not anticipate and negate affirmative defenses" in its complaint. *United States ex rel. O'Connor v. U.S. Cellular Corp.*, 153 F.4th 1272, 1277 (D.C. Cir. 2025) (internal citations and internal quotation marks omitted). The Amended Complaint sets forth those three elements of constitutional deprivation:

1. The Complaint alleges that Defendants' law enforcement officers are enforcing the Arms Ban against those law-abiding the *District's citizens* who desire to keep and bear arms in common use for self-defense. Compl. ¶¶ 29, 31.

2. The Complaint alleges that the law concerns two *forms of arms*, i.e. AR-15 style rifles and suppressors. Compl. ¶¶ 19-26; 31-34.

3. The Arms Ban *bans the possession* of AR-15 style weapons and suppressors. Compl. ¶¶ 2, 4.

These allegations are plausible. Indeed, they cannot be reasonably disputed.[6] In summary, the United States has more than met its pleading burden for a Section 12601 claim. Plaintiff has plausibly alleged: (1) the governmental authority element, (2) the pattern or practice of conduct by law enforcement officers element, and (3) the deprivation of rights elements. The Court should, therefore, deny Defendants' Motion to Dismiss.

**III.    The Plain Text of Section 12601 Authorizes the Relief That Plaintiff Seeks.**

The plain text of Section 12601 authorizes the United States to seek an injunction against enforcement of the unconstitutional Arms Ban, and the United States has plausibly pled the elements of a claim under the statute. Nevertheless, Defendants assert that the statutory text does not authorize the United States to seek an injunction against enforcement of the Arms Ban *even if*

---

[6] Defendants quite properly did not attempt to make a step-two showing in their motion to dismiss because no facts supporting that affirmative defense appear from the "face of the Complaint." *See United States ex rel. O'Connor v. USCC Wireless Inv., Inc.*, 128 F.4th 276, 285 (D.C. Cir. 2025) (In a motion to dismiss, defendant may not raise an affirmative defense based on facts that are not clear from the "face of the complaint.").

*it is unconstitutional*.  *See* Def. Memo. 14 (arguing that even if law enforcement officers are enforcing unconstitutional laws, Section 12601 is not applicable).[7]  Defendants are wrong.  Section 12601 plainly authorizes the relief Plaintiff seeks against Defendants.

The "cardinal canon" of statutory interpretation is that a "legislature says in a statute what it means and means in a statute what it says there" regardless of whether "*legislative history points to a different result*."  *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-254 (1992) (emphasis added).  Accordingly, when the words of a statute are unambiguous, this first canon is also the last and the "judicial inquiry is complete."  *Id.* at 254 (citations and internal quotation marks omitted); *see also Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) (internal citations omitted) (A court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself, and where that examination yields a clear answer, judges must stop.); *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)) (When interpreting a statute, the first step is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case and, if so, the inquiry ceases.).  Thus, the best evidence of the purpose of a statute is the statutory text itself. *W. Virginia Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991).  "Where [statutory text] contains a phrase that is unambiguous . . . [courts] do not permit it to be expanded

---

[7] To be sure, Defendants do not concede that the Arms Ban is unconstitutional.  They argue that Section 12601 does not give the United States authority to enjoin enforcement of an unconstitutional statute.  For purposes of determining the merits of Defendant' argument regarding the scope of Section 12601, the Court must assume the merits of Plaintiff's claim.  In other words, whether a plaintiff can assert a claim in the first place "must not be confused with [a court's] assessment of whether the party could succeed on the merits."  *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 113 (D.C. Cir. 1990).  Thus, in considering whether the United States may bring its claim under Section 12601, the Court must "assume *arguendo* the merits" of the United States' claim that enforcement of the Arms Ban statute is unconstitutional. *See Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007), aff'd sub nom.  *District of Columbia v. Heller*, 554 U.S. 570 (2008).

10

or contracted by the statements of individual legislators or committees during the course of the enactment process." *Id*. at 98-99.

As noted, Section 12601 has three textual elements. Under the statute it is unlawful for (1) a "governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority;" (2) to "engage in a pattern or practice of conduct by law enforcement officers;" (3) that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States. There is no dispute in this case regarding the first and third elements. Defendants must admit that the District is a governmental authority and MPD police officers act on its behalf when they enforce its laws, and they admit that the statute prohibits depriving persons of their constitutional rights.[8]

The dispute regarding the meaning of the statute concerns whether it authorizes the United States to seek to enjoin enforcement of the Arms Ban. The resolution of that dispute hinges on the meaning of the second element: pattern or practice of conduct by law enforcement officers. But there should be no dispute. The statute is simple and unambiguous, and its broad remedial scope is inescapable to any reasonable reader. The plain text authorizes the United States to seek an injunction when law enforcement officers "engage in a pattern or practice of conduct" that operates to deprive persons of their constitutional rights. Enforcing an unconstitutional law obviously deprives persons of their constitutional rights. Therefore, the statute authorizes the United States to seek to enjoin such conduct.

---

[8] As noted above, while Defendants do not dispute that the plain language of the statute prohibits depriving persons of their constitutional rights, they do dispute that they have in fact deprived anyone of their constitutional rights. *See infra*, note 7. Again, however, in determining whether the language of the statue allows Plaintiff to bring its claim, the Court must assume *arguendo* the merits of the claim. *See Parker*, 478 F.3d at 377.

11

An analogy is helpful to demonstrate law enforcement misconduct stemming from enforcement of an unconstitutional statute. Suppose the District passed a law making it illegal to make "grossly offensive" Facebook posts that tend to stir up hatred. As patently offensive as such posts might be, such a law clearly violates the First Amendment. Now, suppose MPD police officers go to a person's home and arrest him or her for posting on Facebook that "Belgians are bad people and should not be allowed in the country." In that scenario, MPD officers engaged in certain conduct (i.e., arresting a person because he or she made offensive Facebook posts), and that conduct thus deprived the person of his or her First Amendment rights. If MPD police officers engaged in a pattern or practice of such conduct, the United States would be authorized to seek relief under Section 12601.

Contrary to Defendants' reading of Section 12601, enforcement of an unconstitutional restraint on a protected right is precisely "conduct" within Section 12601's plain meaning. The text of the statute proscribes law enforcement officers from engaging in "a pattern or practice of *conduct*" that deprives persons of their constitutional rights. The most common sense of the word "conduct" is "personal behavior." *The Random House Dictionary of the English Language*, 2nd ed., unabridged (New York: Random House, 1987);[9] *Conduct*, Black's Law Dictionary (12th ed. 2024) ("[p]ersonal behavior . . ..").  Thus, "conduct" means "personal behavior, whether by action or inaction and is a term that transcends the legal context." *United States v. Jordan*, 509 F.3d 191, 196 (4th Cir. 2007) (citation and quotation marks omitted).

It follows that "to engage in a pattern or practice of conduct by law enforcement officers" means simply to engage in a pattern or practice of personal behavior by law enforcement officers.

---

[9] This is the first sense given in the definition, and the most frequently encountered meaning comes before a less common one. *See id.*, "III. Definitions, Sense Division, Order" in the instructions for use of the dictionary.

And a violation of Section 12601 occurs if, as a result of that behavior, persons are deprived of their constitutional rights.  This is a straightforward conclusion drawn from unambiguous text.

In stark contrast, Defendants' five-page-long argument on the meaning of the text (*see* Def. Memo. 10-15) deflects from the plain language that this Court must follow.  And the conclusions that Defendants reach about the meaning of the statutory text do not follow from their discussion of the meanings of the individual words and phrases.  The massive non sequitur at the end of Defendants' "plain text" analysis is difficult to understand until one realizes that Defendants' ultimate goal is not to elucidate the text of the statute at all.  Instead, their goal is to convince the Court to fix errors they apparently believe Congress made when it drafted the statute.

In short, Defendants want the Court to excise the word "conduct" from the text altogether because that word is far too capacious to reflect what, in their view, members of Congress should have been thinking about when they voted to enact Section 12601.  In its place, Defendants want the Court to substitute the narrowing phrase "employing abusive police practices."  *See* Def. Memo. 19 (arguing that statute proscribes only "unacceptable 'abusive police practices'").[10]  With Defendants' editing suggestions, the Court could then cabin the statute so that it applies only to law enforcement officers who have "engage[d] in a pattern or practice of ~~conduct~~ employing abusive police practices" that deprive persons of their constitutional rights.  Defendants offer their new version of the statute to exclude the disfavored right—the right to keep and bear arms.  Fortunately, neither Congress nor the Framers shared this myopic view of protected rights.

At the end of the day, Defendants' "plain text" argument amounts to this: Congress intended to confer a very narrow grant of remedial authority on the Department, but in a fit of

---

[10] Indeed, even if Defendants' edit were valid—it is not—abusive police practices would still fairly capture MPD's unconstitutional implementation of the Arms Bans.

inattentive drafting Congress accidentally conferred a very broad grant of authority. Therefore, the Court should "interpret" (by which Defendants mean "rewrite") the statute to fix Congress's mistake. But the Court has no authority to "fix" statutes, *Sea-Land Serv., Inc. v. United States*, 920 F.2d 922, 924 (Fed. Cir. 1990) (citation omitted), and should decline Defendants' request that it do so. *See United States v. Monsanto*, 491 U.S. 600, 611 (1989) (The interpretative canons are not "a license for the judiciary to rewrite language enacted by the legislature.") (citation omitted).

## IV.    The Rules of Statutory Interpretation Lead to the Same Conclusion as The Plain Text Analysis that Plaintiff's Claim Is Properly Pled.

As noted, the "cardinal canon" of statutory interpretation is that if a statute is unambiguous, the plain text controls and the judicial inquiry ends. *Barnhart*, 534 U.S. at 450. As discussed above, the unambiguous text of Section 12601 supports the conclusion that the statute authorizes the United States to seek injunctive relief in this case. Accordingly, the judicial inquiry into the meaning of the statute should end. Even if the text were ambiguous, though, the other rules of statutory construction overwhelmingly support the same conclusion.

### A.    The Legislative History of the 1991 Bill Supports Plaintiff's Claim.

In 1994, Congress passed Section 12601 as part of the Violent Crime Control and Law Enforcement Act of 1994, 108 Stat 1796 (the "Crime Act"). Congress did not hold hearings on the provision of the Crime Act that became Section 12601. Thus, the statute does not have any legislative history. Section 12601 is, however, similar to a provision of H.R. 3371, a failed bill that would have enacted a statute called the Omnibus Crime Control Act of 1991 (the "1991 Bill"). *United States v. City of Columbus, Ohio*, 2000 WL 1133166, at *3 (S.D. Ohio 2000). Significantly, the legislative history of the 1991 Bill states: "The standards of conduct under the Act *are the same as those under the Constitution*, presently enforced in damage actions under section 1983." H.R. Rep. No. 102–242, 102nd Cong., 1st Sess. at 138 (emphasis added) (the "Committee Report").

14

Thus, the legislative history expressly states that Congress intended the text of the law to create an extremely broad remedy for the United States to redress violations of any constitutional right similar to the broad remedy available to private litigants under Section 1983.[11]

Moreover, the legislative history contains an informative discussion of *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980), and *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). The Committee Report stated that *City of Philadelphia* limited the Attorney General's authority to seek injunctive relief to remedy constitutional violations, and *Lyons* limited private litigants' ability to obtain injunctive relief against future constitutional violations as opposed to money damages for past violations. Committee Report, 137-138. The legislative history states that the limitations in these two cases were a problem that needed to be remedied. Congress perceived *City of Philadelphia's* constraints on the United States' "authority to sue a local government or its officials to enjoin violations of citizens' constitutional rights by police officers" as "a serious and outdated gap in the federal scheme for protecting constitutional rights." *Id*. at 137. Thus, the legislative history indicates that Section 12601 was a reaction against constraints on the United States' authority to seek injunctive relief against constitutional violations. This indicates that Congress intended to give the Attorney General broad and robust authority to address such violations.[12]

---

[11] To be sure, the legislative history of the 1991 Bill also discusses the Rodney King incident and other incidents of police misconduct, but nothing in that legislative history supports Defendants' argument that the text must therefore be strictly limited to apply only to incidents of this nature.

[12] Similarly, Congress enacted the Civil Rights for Institutionalized Persons Act, 42 U.S.C. § 1997, to ensure that the United States could vindicate the rights of Americans in institutional settings following the Ninth Circuit's holding in *United States v. Mattson*, 600 F.2d 1295 (1979). Both enactments support Plaintiff's broad authority to obtain equitable remedies for any pattern or practice of constitutional violations.

15

Given that Congress enacted Section 12601 to remedy the perceived problems created by *City of Philadelphia*, Defendants' reliance on that case is particularly puzzling.[13]    There, the Attorney General asserted that the Fourteenth Amendment granted *him* the power to bring actions against cities to remedy civil rights violations.  644 F.2d at 199.  The court disagreed, holding that only Congress has the power under Section 5 of the Fourteenth Amendment "to enforce, *by appropriate legislation*, the provisions of this article."  *Id*. at 200 (emphasis added).  The court noted that Congress had exercised this power on many occasions but had refused to grant to the Attorney General the civil-rights enforcement power he asserted.  *Id*.  Thus, the fundamental holding of *City of Philadelphia* is that "it would be entirely inappropriate for a federal court to overrule the explicit decisions of Congress not to increase federal executive and judicial authority over state and local governments in this manner."  *Id*.  The court never held that Congress could not give the Attorney General the authority, if it chose to do so; the court held only that Congress had not yet done so.

Fourteen years later, Congress did exercise its power to confer on the Attorney General the authority to bring cases to remedy civil rights violations when it enacted Section 12601.  Thus, Defendants' argument that this Court should interpret Section 12601 to somehow limit the Attorney General's authority as discussed in *City of Philadelphia* is unsupported given that Section 12601 was intended to overturn those very limitations.

### B.    Section 12601 and Section 1983 Should Be Interpreted In Pari Materia.

Section 12601 and 42 U.S.C. § 1983 ("Section 1983") are sister statutes in that both create a broad remedy for redressing violations of all federally protected civil rights, the former in actions

---

[13] This is not to mention the fact that Defendants' federalism concerns are meritless for the simple reason that, unlike a state (which retains power under the Tenth Amendment), the United States has plenary power over the District.

the United States brings and the latter in actions private litigants bring. *See United States v. Cnty. of Maricopa,* 889 F.3d 648, 653 (9th Cir. 2018). Congress passed Section 1983 as part of the Ku Klux Klan Act of 1871, ch. 22, 17 Stat. 13 (the "Klan Act"). As the name of the Klan Act implies, the members of the 42nd Congress who voted to enact Section 1983 had a very specific problem in mind (vindicating the constitutional rights of the freedmen). Moreover, despite the statute's broad remedial language, it languished in obscurity for nearly a century.[14] If Defendants' theory of Section 12601's statutory interpretation were correct—i.e., that the Court should apply the statute to redress only the few types of constitutional violations that Defendants think should be redressed—then Section 1983 likewise would have been cabined in and would long ago have been relegated to the status of a historical relic of the Reconstruction Era. After all, Section 1983 was passed to address a particular problem and it was sparsely enforced for decades. Thankfully, that did not occur. Section 1983 ultimately emerged as a powerful engine for vindicating deprivations of constitutional rights by government actors.

The scope of Section 12601 is no more limited to addressing the problem the members of the 103rd Congress were thinking about when they voted for the Crime Act than the scope of Section 1983 is limited by what the members of the 42nd Congress were thinking when they passed the Klan Act. As with Section 1983, the specific context in which Congress enacted the statute and the history of the statute's enforcement in no way limit the scope of the United States' enforcement authority. Rather, for both statutes, the plain text of the statute controls, and the Court should read them consonantly with one another.

---

[14] "Despite its noble beginnings, § 1983 remained in disuse for nearly a century." Rodney A. Smolla, *The history of § 1983—The Civil Rights Act of 1871*, 2 Federal Civil Rights Acts § 14:2 (3d ed. 2026) (citations omitted).

Under the *in pari materia* canon, statutes that address the same subject matter should be construed consistently with each other.  *See Wachovia Bank v. Schmidt*, 546 U.S. 303, 305 (2006); *see also Branch v. Smith*, 538 U.S. 254, 281 (2003) (holding that "if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them") (quoting *United States v. Freeman*, 3 How. 556, 564 (1845).  In *County of Maricopa,* the court noted that Section 12601 shares important similarities with Section 1983.  *Id*. at 653.  Congress enacted Section 1983 to create a broad remedy for violations of federally protected civil rights.  *Id*. (citation and quotation marks omitted).  Congress likewise enacted Section 12601 as a remedy for violations of federal civil rights.  *Id*.  Both statutes impose liability on local governments.  *Id*.  "Indeed, *the language of § 12601 goes even further than § 1983*, making it unlawful for 'any governmental authority, or any agent thereof, or any person acting on behalf of a governmental authority' to engage in the prohibited conduct."  *Id*. (emphasis added).[15]  The statutes plainly should be interpreted *in pari materia*.  Therefore, Section 12601 should be construed in a manner that is consistent with the way courts have construed Section 1983.

In *Dennis v. Higgins*, 498 U.S. 439, 443 (1991), the Supreme Court held that "[a] broad construction of Section 1983 is compelled by the statutory language, which speaks of deprivations of any rights, privileges, or immunities secured by the Constitution and laws."  *Id*. at 443 (citation and internal quotation marks omitted).  Section 12601 contains language that is practically identical to the language that compelled a broad construction of Section 1983 ("deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws").  Accordingly, Section 12601's plain language likewise compels a broad construction.

---

[15] *See also United States v. City of Columbus, Ohio*, 2000 WL 1133166, at *7 (S.D. Ohio 2000) (holding that the grant of authority to the Attorney General reflected Section 12601 was drafted in light of Section 1983).

18

**C.    The Court Must Construe Section 12601 Broadly as a Remedial Statute.**

A remedial statute "is broadly construed, and "must not be interpreted or applied in a narrow, grudging manner." *Uronis v. Cabot Oil & Gas Corp.*, 49 F.4th 263, 269 (3d Cir. 2022); *See Schmiedigen v. Celebrezze*, 245 F. Supp. 825, 827 (D.D.C 1965) (holding that "a remedial statute . . . should receive a liberal construction, rather than a narrow interpretation." Section 12601 is a remedial statute that the Court should interpret broadly to achieve its remedial purpose. *See Cty. of Maricopa*, 889 F.3d at 653. Similarly, the Court should reject efforts to impose a "narrow" or "grudging" interpretation on the statute.

**V.    Defendants' Arguments that Section 12601 Does Not Apply Are Meritless.**

Defendants advance several arguments in support of their assertion that Section 12601 does not impose liability. Plaintiff will address those arguments in this section.

**A.    No Authority Supports Defendants' Interpretation of Section 12601.**

Defendants attempt to restrict the ability of the Department to use 12601 to enjoin deprivations of civil rights. Defendants assert that Section 12601 covers only certain rights. Def. Memo. 13-14. Defendants justify this by claiming that (1) members of Congress were thinking about the infamous Rodney King incident when they passed Section 12601, and (2) the Department has enforced the statute sparsely, and the actions that have been brought redressed police misconduct similar to Mr. King's beating.[16] Therefore, according to Defendants, this Court should look past the extraordinarily broad remedial language of the statute that authorizes the Department to seek to enjoin any "pattern or practice of conduct by law enforcement officers" that operates to deprive any person of "rights, privileges, or immunities secured or protected by the Constitution

---

[16] Defendants' factual assertion goes beyond the face of the Complaint and is untrue to boot. But, as discussed below, even if it were true, past agency practice cannot operate to restrict the textual scope of a statute.

or laws of the United States." *See* 34 U.S.C. § 12601(a).  Instead, Defendants insist that this Court must impose a judicial gloss on Section 12601's plain language to "cabin"[17] its applicability to addressing only police misconduct similar to Mr. King's beating.  Def. Memo 5-7, 9.  There is no support for Defendants' limited view of Section 12601's authorization to the Department.

According to Westlaw, as of July 6, 2026, Section 12601 (or, as it was previously codified, 42 U.S.C. § 14141) has been cited in 654 cases.  Plaintiff's counsel reviewed all 654 cases.  In the overwhelming majority of those cases (approximately 95%), courts dismissed *pro se* plaintiffs' attempts to assert a private right of action under the statute or mentioned the statute only incidentally in their discussion of other issues.  Of the handful of remaining cases, only six courts engaged in any meaningful analysis of the statutory text.  Based on this exhaustive research, no court has ever held that Section 12601 should be interpreted to radically narrow the reach of its plain text in the way Defendants suggest.

**B.     Defendant's Enforcement of an Unconstitutional Law Incurs Section 12601 Liability.**

According to Defendants, Section 12601 does not impose liability in cases where law enforcement officers are acting pursuant to a law, because that would, in effect, be an attack on the law itself.  Def. Memo. 17.  Defendants cite no case holding that conduct by law enforcement officers pursuant to a city's unconstitutional laws cannot be the basis for liability under Section 12601.  Plaintiff has exhaustively researched all of the cases that have cited the statute.  No case supporting Defendants' proposed limitation exists.  Indeed, just the opposite is true.

For example, in *County of Maricopa*, the United States used Section 12601 to attack alleged racially discriminatory policing policies that a former Sheriff implemented.  The United

---

[17] *See* Reply in Support of Defendants' Motion to Dismiss Plaintiff's Complaint (ECF 26) ("Reply") at 4.

States alleged that, pursuant to these official policies, the county's law enforcement officers routinely targeted Latinos for pretextual traffic stops aimed at detecting violations of federal immigration law. *Cnty. of Maricopa,* 889 F3d at 649. One of the issues the *Maricopa* court decided was whether Section 12601 authorizes municipal liability for the implementation of such official policies. The court held that it does. *Id*. at 652-53.

> Importantly, the court found that Section 12601
>
> . . . *imposes liability on a governmental authority whose own official policy causes* it to engage in 'a pattern or practice of conduct by law enforcement officers' that deprives persons of federally protected rights . . .. In short, Maricopa County is liable for violations of . . . § 12601 stemming from its own official policies.

*Id*. at 653 (emphasis added).

Similarly, in *United States v. Town* of *Colorado City*, 935 F.3d 804, 810 (9th Cir 2019), the court held that the legislative history of the 1991 Bill supports the conclusion that the United States may prosecute municipalities under Section 12601 when local police departments violate constitutional rights, and this is the case "*whether or not* those violations resulted from implementation of an official policy . . .." *Id*., 935 F.3d at 810 (emphasis added).

Finally, there is nothing novel about the Department using Section 12601 to remedy law enforcement officers' enforcement of unconstitutional laws. For example, in the Department's Report of Investigation of the Ferguson Police Department, March 4, 2015 (available at http://bit.ly/4vWiJ2j),[18] the Department reported on a Section 12601 enforcement action against Ferguson, Missouri. The Department reported that law enforcement officers' enforcement of

---

[18] The Court may take judicial notice of *this* report. *See Bowman v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (on a motion to dismiss, a court may consider "public records subject to judicial notice"). The difference is that this report actually is publicly available on the Department's website.

Ferguson's unconstitutional Failure to Comply municipal ordinance was one of the patterns or practices of conduct that gave rise to constitutional violations. *Id*. at 16, 19.

Consistent with *County of Maricopa*, Defendants admit that "Section 12601 may be used to challenge 'conduct by' law enforcement officers, taken pursuant to official policy, that causes violations of rights 'protected by the Constitution or laws of the United States.'" Reply at 4. They even tacitly admit that liability under the statute applies to conduct that deprives citizens of their Second Amendment rights. *Id*. at 1 (stating that Defendants "never argued for a Second Amendment exemption" to Section 12601 liability).[19] The legislative acts of the governing body of a city, such as the Arms Ban, certainly constitute the official policy of that city. *See Cnty. of Maricopa,* 889 F3d at 652 (holding that "[t]he government's legislative body . . . of course" has "the power to establish official policy on the government's behalf" for purposes of Section 12601 liability). It logically follows, then, that Defendants would admit that that Section 12601 applies to acts by law enforcement officers taken pursuant to the Arms Ban. Defendants do not.

Instead of embracing the conclusion that follows logically from their admissions, Defendants continue to insist that Section 12601 cannot be used "to challenge substantive criminal prohibitions." Def. Memo 10. Defendants argue that law enforcement officers' enforcement of a criminal statute cannot be a basis of liability because the statute itself, and not the officers'

_____

[19] Moreover, the statute applies to redress the deprivation of Second Amendment rights even absent Defendants' admission. In *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166 (2023), the Court wrote: "We have been asked before to narrow the scope of this express authorization, i.e., to read 'laws' to mean only 'civil rights or equal protection laws.' We declined to do so, reasoning that a straightforward reading of the 'plain language' of § 1983 is required. That should have been no surprise; 'Congress attached no modifiers to the phrase ['and laws'].'" 599 U.S. at 175 (citation omitted). Similarly, in Section 12601, Congress attached no modifiers to the phrase "the Constitution," and the statute must be interpreted according to its "plain language" to apply to protect all rights protected by the Constitution.

22

enforcement of the statute, deprives persons of their constitutional rights.  Def. Memo. 15.  This is wrong, as *County of Maricopa* plainly holds.[20]  *See id*., 889 F.3d at 653.

Moreover, Defendants' position conflicts with decisions under Section 12601's sister statute, Section 1983.  In *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), the Supreme Court stated: "Local governing bodies . . . can be sued directly under § 1983 for . . . injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a[n] . . . ordinance . . ." *Id*. at 690.  Defendants argue that its ordinances are the source of the harm alleged here, not the conduct of the law enforcement officers who enforce the ordinances.  *See* Def. Memo. 15.  *Monell* held otherwise.  The Court stated that the "*execution* of a government's policy . . . inflicts the injury [for which] the government as an entity is responsible under § 1983." *Id*. at 694. (emphasis added).  Thus, the *execution* of the Arms Ban by the District's law enforcement officers results in liability.[21]

Of course, the District is familiar with courts ordering injunctive relief barring its law enforcement officers from enforcing its ordinances that violate the Second Amendment.  That is exactly what the Supreme Court did in *Heller*.[22]  It is difficult to understand why Defendants would argue that *Heller* got it wrong.

---

[20] The difference between the "official policy" at issue in that case and the ordinances at issue here is of no consequence.  As common sense indicates, "there is no question that [an ordinance] reflect[s] the 'official policy' of [a] municipality." *Christensen v. Park City Mun. Corp*., 554 F.3d 1271, 1279 (10th Cir. 2009).

[21] Indeed, courts follow this same rule when imposing municipal liability for law enforcement's execution of unconstitutional statutes in other contexts.  *See, e.g.*, *Cooper v. Dillon*, 403 F.3d 1208 (11th Cir. 2005) (First Amendment deprivation); *Vigue v. Shoar*, 494 F. Supp. 3d 1204, 1221 (M.D. Fla. 2020), appeal voluntarily dismissed, 2021 WL 11628665 (11th Cir. Sept. 1, 2021) (liability imposed when municipal law enforcement officer enforced unconstitutional state statutes).

[22] Technically, the Circuit Court of Appeals ordered this Court to enter judgment for the plaintiffs in accordance with their prayer for relief, *Parker v. District of Columbia*, 478 F.3d 370, 401 (D.C. Cir. 2007), and the Supreme Court affirmed that order.  *Heller*, 554 U.S. at 636.  The plaintiffs'

Here, like a Section 1983 case, it is the City—not the individual officers—that is liable for its law enforcement officers' implementation of the unconstitutional Arms Ban. In a Section 1983 case, the individual law enforcement officers enforcing an unconstitutional ordinance may or may not be liable depending on whether their conduct is immunized by qualified immunity.[23] *See Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1278 (10th Cir. 2009). But the defense of qualified immunity is not available to a city. *Id.* at 1278. Thus, a city can be liable "when *enforcement* of its [ordinance] causes a constitutional deprivation." *Id.* at 1279 (emphasis added). *See also Grossman v. City of Portland*, 33 F.3d 1200, 1203–04 (9th Cir. 1994) (holding that plaintiff's claim stemmed from his arrest pursuant to an unconstitutional ordinance).

## C.      An Unconstitutional Statute Harms Citizens When It Is Enforced.

Next, Defendants argue that enjoining enforcement of the Arms Ban would not remedy the constitutional violation because "[a]t most, a court could enjoin the police from enforcing a criminal prohibition, but that would not redress the alleged constitutional violation caused by the prohibition itself. The offending law would remain on the books, and individuals would remain subject to enforcement . . .." Def. Memo. 15. This argument runs headlong into established law supporting this Court's authority to enjoin the ongoing enforcement of an unconstitutional law.

A law that is never enforced does not violate anyone's rights. That is why no one has standing to challenge a moribund law. *See Mayle v. State of Illinois*, 956 F.3d 966, 970 (7th Cir. 2020) (citation omitted) (holding that plaintiff lacked standing to challenge criminal laws that were no

_____

prayer for relief to which the Circuit Court referred in its order requested this Court to issue an "order permanently enjoining" the District and its "officers, agents, servants, [and] employees" from "from *enforcing*" the unconstitutional ordinances. *See* page 9 of the "Complaint," (ECF 1), in *Heller v. District of Columbia*, Case No. 2003-cv-213, United States District Court for the District of Columbia (emphasis added).

[23] Individual officers cannot be held liable for damages under Section 12601, because the statute provides for only equitable and declaratory relief. 34 U.S.C. § 12601(b).

longer enforced but remained in statute books "as a residue of legislative inertia"). Where criminal laws are concerned, people's rights are violated only when other people (usually law enforcement officers) engage in conduct that violates them. This is why the remedy for an unconstitutional statute is to enjoin its enforcement, not to order the legislative body to repeal it. Courts have no power to do the latter. *See Whole Women's Health v. Jackson*, 595 U.S. 30, 44 (2021) (No court may enjoin challenged laws themselves; an injunction only prevents "named defendants from taking specified unlawful actions."); Jonathan Mitchell, *The Writ-Of-Erasure Fallacy* 104 VA. L. Rev. 933, 936 (2018) ("[C]ourts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute."). Accordingly, Defendants are mistaken when they argue that this Court cannot enjoin their unconstitutional conduct.

**D.    Defendants' Extratextual Criterion Frustrates the Statute's Remedial Purposes.**

The plain text of Section 12601 prohibits law enforcement misconduct if it deprives persons of their federal rights. Deprivation is the statute's sole criteria. The statute applies to misconduct of any type or nature whatsoever if it meets that criterion. There is no need to inquire into the type of misconduct in question.

The extratextual gloss for which Defendants advocate would add a second criterion. Under Defendants' theory, Section 12601 would prohibit conduct if it meets the following two criteria: (1) it is a particular type of misconduct (i.e. it falls within Defendants' concept of "abusive police practice"), and (2) it deprives persons of their rights. Adding this criterion creates an obvious problem—as a practical matter, it frustrates the statute's remedial purpose.

Defendants' new criterion would create a threshold inquiry in every Section 12601 case: Is the *type* of misconduct alleged in the United States' complaint the type of conduct prohibited? But "abusive police practice" is a vague, imprecise, and undefined term. Therefore, if the new

criterion were imposed on the statute, every defendant would have a ready-made ground for a motion to dismiss: "my conduct is not the type of misconduct prohibited by the statute." Every case would immediately bog down while the parties litigate that threshold question.[24]

As discussed above, a remedial statute such as Section 12601 must be interpreted liberally to achieve its remedial purpose. Adding this new criterion would frustrate that purpose and this Court should decline to do so. *See Raiford v. Buslease, Inc*., 825 F.2d 351, 354 (11th Cir. 1987) (rejecting "restrictive" interpretation of a statute that would frustrate its "broad remedial purpose"); *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr*., 597 U.S. 424, 439 (2022) (rejecting reading that would make statute "unworkable").

### E.      The Department's Past Practice Does Not Cabin the Scope of the Statute.

Defendants engage in an extensive discussion of past agency practice with respect to the enforcement of Section 12601. Def. Memo. 5-7. According to Defendants, in the past, the Civil Rights Division has focused exclusively on abusive police tactics cases and has not enforced Section 12601 in a manner similar to the way it is enforcing the statute in this action.[25] Even if the Court were to consider the matters that Defendants raised, their discussion of past agency practice would not move the needle in favor of their motion for several reasons.

---

[24] This case is an example. The Complaint was filed in December 2025. It is July 2026, and the case is still a long way from being in a posture where the merits of the United States' claims can be litigated.

[25] As noted earlier, the Court should limit its review to the face of the Compliant. Moreover, Defendant's allegations about the scope of past agency practice are contested, and that factual dispute cannot be resolved in Defendants' favor at this stage of the litigation.

First, the Defendants' assertions are false.[26]  The Division's past practice has not been as limited as Defendants suggest.[27]  For example, one of the Division's major enforcement actions was instituted to address violations of citizens' religious liberties under the First Amendment.  In *United States v. Town of Colorado City*, 935 F.3d 804 (9th Cir. 2019), there were no allegations of police brutality.  In *Maricopa County*, 915 F. Supp. 2d at 1081, the allegations of misconduct included filing baseless lawsuits in retaliation for exercising First Amendment rights.  It is difficult to imagine conduct less similar to Mr. King's incident.  If the Department has employed the statute to remedy First Amendment violations, why can't it also employ it to remedy Second Amendment violations?  Defendants do not say.

More importantly, even if it is true that the Department is enforcing the statute in a way that is different from its past practice, that fact has no relevance to the scope of the authority Congress granted to the Attorney General in Section 12601.  In other words, past agency practice does not delineate the scope of the authority set forth in a statute.  Nor does it bind the agency or preclude it from deviating from that practice in the future.  The Supreme Court made this clear in *United States v. Am. Union Transp.*, where it stated:

> An administrative agency is not ordinarily under an obligation immediately to test the limits of its jurisdiction.  It may await an appropriate opportunity or clear need for doing so.  It may also be mistaken as to the scope of its authority . . . Although failure to exercise power may be significant as a factor shedding light on whether

---

[26] Defendants want the Court to decide their motion to dismiss on the basis of a disputed factual claim. The Court should decline to do so.

[27] Indeed, past administrations have exercised their prosecutorial discretion to use Section 12601 to investigate and bring enforcement actions to remedy:  enforcement of local ordinances that are facially unconstitutional; First, Fourth, Sixth, Eighth, and Fourteenth Amendment violations, Title VI violations, and to challenge the conduct of law enforcement exercised through court clerks, prosecutors, non-sworn staff, and sworn officers and deputies.  *See* "Special Litigation Section Cases and Matters, Law Enforcement Agencies," available at https://www.justice.gov/crt/special-litigation-section-cases-and-matters#police.  Arguably, some of the findings that past administrations have reached have identified alleged misconduct beyond the bounds of a constitutional or federal statutory requirement, but none have suffered the opposition offered here.

it has been conferred . . . that fact alone neither extinguishes power granted nor establishes that the agency to which it is given regards itself as impotent. *Authority actually granted by Congress of course cannot evaporate through lack of administrative exercise.*

327 U.S. 437, 454 n.18 (internal citations and quotation marks omitted) (emphasis added). *See also Fed. Trade Comm'n v. Bunte Bros.*, 312 U.S. 349, 352 (1941) ("Authority actually granted by Congress of course cannot evaporate through lack of administrative exercise."); *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 590 (1957) (holding that the mere failure of an administrative agency to act is in no sense "a binding administrative interpretation" that the government lacks the authority to act); *Nat'l Ass'n of Sec. Dealers, Inc. v. S.E.C.*, 431 F.3d 803, 811 (D.C. Cir. 2005) (explaining that agency's past practice may be noteworthy, but court is not legally bound by its past practices under a statute); *Jones Bros., Inc. v. Sec'y of Labor, Mine Safety & Health Admin.*, 68 F.4th 289, 301(6th Cir. 2023) (holding that an agency's past enforcement practices did not alter its authority under the relevant law). Not only is an agency not bound by its past practice, it might also be required to reverse that practice if it contradicts the statute. *See Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (internal citation omitted) ("[W]e have to give effect to this plain command . . . even if doing that will reverse the longstanding practice under the statute).

In the face of this precedent, Defendants cite *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 386 (2024), where the Court held that an agency's longstanding practice can inform a court's analysis of an ambiguous statute. Def. Memo. 21-22. Defendants' reliance on *Loper Bright* is problematic for three reasons. First, in that passage, the *Loper Bright* court was *not* referring to the interpretation of unambiguous statutes such as Section 12601. Moreover, in the very next paragraph, the Court stated that even if a court considers past practice, it is not bound by it. *Id*. Third, *Loper Bright* stands for exactly the contrary proposition for which Defendants cite

28

it.  Defendants claim that it supports an extratextual gloss on Section 12601.  But, the Court directed the opposite.  The Court stated that "statutes . . . have a single, best meaning" that is "'fixed at the time of enactment.'"  *Id*. at 400 (quoting *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018)).[28]

F.   **The Scope of a Statute Is Not Constrained by the Limits of the Drafters' Imagination; Nor Is the Statute Limited to Addressing the "Principal Evil" with which They Were Concerned.**

The members of the 42nd Congress who voted to enact Section 1983 would doubtless have been astounded by some of the myriad "novel" applications of the statute.  Similarly, those who adopted the Civil Rights Act of 1964 almost certainly did not anticipate that one day the statute would be interpreted to protect gay and transgender employees.  But in interpreting a statute, it simply "does not matter whether Congress considered or anticipated the specific application at issue."  *See White v. United Airlines, Inc*., 987 F.3d 616, 624 (7th Cir. 2021) (citation and internal quotation marks omitted).  The limits of the drafters' imagination do not in any way constrain the scope of the statute,  and "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth."  *Woodhull Freedom Found. v. United States*, 72 F.4th 1286, 1304 (D.C. Cir. 2023).

Defendants use the word "novel" as a term of derision when the say the United States' "novel" interpretation of Section 12601 would dramatically expand its authority.  *See, e.g.*, Def. Memo. 25.  This is simply incorrect.  Either the plain text of the statute confers certain authority

---

[28] Indeed, the passage in *Loper Bright* most applicable to this case is from Justice Gorsuch's concurrence where he cautioned against following the example of those who "abhor plain meaning and preferred instead to elevate legislative history and their own curated accounts of a law's 'purpose' over enacted statutory text."  *Id*., 603 U.S. at 443 n.6 (2024) (Gorsuch, J., concurring) (cleaned up) (internal citation and quotation marks omitted).  In other words, Justice Gorsuch warned against the very tactics used by Defendants, who want to elevate their "curated account" of Section 12601's real "purpose" over the statutory text.

29

on the United States or it does not.  The fact that the United States has never used the statute in a particular way is irrelevant to the issue of whether it has the power to do so.  No one had ever used Section 1983 to seek recognition of same sex marriages until someone did.  The fact that it had never been done in the 145-year history of the statute was irrelevant to whether the statute conferred the authority to seek redress for that purpose.

Defendants argue that the legislative history of the 1991 Bill indicates that "abusive police practices" were the principle evil Congress sought to address when it enacted Section 12601 three years later.  *See, e.g.,* Def. Memo. 19.  Even if that were the case, the scope of the United States' authority embodied in the text of the statute would not be affected.

### G.    Legislative History Is Not the Law.

Defendants' arguments find no purchase in the text of Section 12601. Now, they face the same predicament the defendants in *Colorado City* faced, and the court's observation there is equally pertinent: "Unable to muster support for its position in the statutory text, Colorado City urges us to examine § 12601's legislative history.  But the Supreme Court has admonished that 'legislative history is not the law.' That principle is particularly salient in a case where the legislative history is virtually non-existent."  935 F.3d at 810 (cleaned up; citations and selected quotation marks omitted; emphasis added).

Defendants nevertheless urge this Court to impose their preferred judicial gloss on the text and narrow its application based on that same virtually non-existent legislative history.  The first and most fundamental problem with this is that the statute is not ambiguous and, therefore, legislative history is irrelevant to its interpretation.  *See Noble v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 103 F.4th 45, 50 (D.C. Cir. 2024) (quoting *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 338-39 (D.C. Cir. 2020)) (holding that "we need not address legislative history if 'after analyzing

30

the text, structure and context, we conclude that the language is unambiguous'"").  This is true even if—as Defendants mistakenly believe—the legislative history of the 1991 Bill actually pointed in a different direction than the text of Section 12601.  "[T]here would be no need for a rule—or repeated admonition from the Supreme Court—that there should be no resort to legislative history when language is plain and does not lead to an absurd result, if the rule did not apply precisely when plain language and legislative history may seem to point in opposite directions."  *U.S. ex rel. Totten v. Bombardier Corp*., 380 F.3d 488, 494–95 (D.C. Cir. 2004).

Defendants' second problem is that the legislative history—such as it is—actually supports a very expansive interpretation of the scope of Section 12601 consistent with the broad scope of Section 1983 and Congress' desire to close the "serious and outdated gap in the federal scheme for protecting constitutional rights" that *City of Philadelphia* created.  Finally, Defendants' devotion to legislative history has the same problem the Court articulated last month in *FS Credit Opportunities Corp. v. Saba Cap. Master Fund, Ltd*, 146 S. Ct. 1546, 1558–59 (2026).  The Court noted that there is really no way to know what the committee members (much less the other members of Congress) thought about a bill by perusing a committee report.  146 S. Ct. at 1558.[29] The Court declined to revive the "old-time devotion to legislative history," because it is far better to focus on the text of the statute instead of a "psychoanalysis of Congress."  *Id*. at 1559 (citation omitted).

### H.      Congress Could Have Easily Drafted a Narrow Statute

In *Colorado City*, the court noted that if "Congress wished to eliminate respondeat superior liability under § 12601, it could have easily done so with explicit statutory language.  Its decision

---

[29] This observation has even greater force here because the committee members addressing the 1991 Bill were members of a different Congress and they were talking about a different bill that was under consideration three years before a later Congress enacted Section 12601.

not to do so suggests that it intended for § 12601, like most civil rights statutes, to allow for respondeat superior liability." 935 F.3d at 810 (internal citation omitted). Similarly, here there is no doubt that when Congress drafted Section 12601, it could have easily written "conduct that constitutes abusive police practices" instead of just "conduct." *See United States Postal Serv. v. Postal Regul. Comm'n*, 963 F.3d 137, 140 (D.C. Cir. 2020) (holding that if Congress "intended to cabin" a statute, it could have done so easily). Congress's decision not to cabin the statute in the manner that Defendants suggest was a deliberate choice. The Court must respect that choice.

**I.      The United States Did Not Bring a "Facial Challenge" to the Arms Ban**

Finally, Defendants argue that the United States' Complaint is a "facial challenge" to the Arms Ban. Def. Memo. 28. It is not. A "facial challenge" to a law is a challenge in which the plaintiff must "establish that no set of circumstances exists under which the [law] would be valid." *United States v. Rahimi*, 602 U.S. 680, 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Nowhere in the Amended Complaint does the United States use the term "facial challenge." The District has a vast and complicated array of firearms statutes. Plaintiff has not brought a facial challenge to any of them. Instead, the relief Plaintiff seeks is limited. It seeks to enjoin enforcement of the laws to the extent that they apply to ban AR-15 style rifles and suppressors. Compl. ¶ 5. Defendants even admit this. Def. Memo. 8. The Complaint is as far from a facial challenge as it can be.

**VI.     The United States Sovereign Interests Support the Amended Complaint.**

Defendants have failed to establish that Section 12601 does not authorize the United States to assert its claims for injunctive relief in this case. In addition, they have not established that the United States cannot seek injunctive relief to vindicate its own sovereign interests. It is "beyond doubt" that the United States suffers "an injury to . . . its sovereignty" when a federal law is

violated, *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000), including the United States Constitution, *see Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 430-431 (1976).  There is similarly no "doubt[]" that "the United States" may "represent [its citizens] as *parens patriae*" to "enforce their [federal] rights" in court, *Massachusetts v. Mellon*, 262 U.S. 447, 485-486 (1923) (emphasis added).  The Second Amendment protects just such a fundamental federal right. *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) (acknowledging that the Second Amendment protects the right to keep and bear arms "among those fundamental rights necessary to our system of ordered liberty.").

**VII.    Defendants' Argument That the Amended Complaint Fails to Plausibly Plead a Violation of the Second Amendment or a Pattern or Practice of Misconduct Is Meritless.**

Defendants assert that Plaintiff has not plausibly pled a violation of the Second Amendment (Def. Memo. 31-43) or a pattern or practice of conduct by law enforcement officers (Def. Memo. 43-45).  Defendants' assertion is meritless.

**A.    Plaintiff Must Plausibly Plead That the Arms Ban "Clashes" with the Plain Text of the Second Amendment.**

As discussed above, in an arms ban case such as this, Plaintiff's pleading burden is very light.  To demonstrate that the District's Arms Ban "clashes with the 'plain text' of the Second Amendment's language," Plaintiff need only show that the law "concerns any form of arms." *See Wolford v. Lopez*, 2026 WL 1825723, *6 (U.S. June 25, 2026).[30]  Defendants disagree, but their disagreement is based on a case that the Supreme Court abrogated on the same day Defendants

---

[30] Plaintiff will not address the first and third questions under *Bruen* step one ((1) Does the law apply to "the people"? and (3) Does the law place any restrictions on either the possession or carrying of arms?).  Defendants did not raise any issue with respect to these two questions.  This is understandable because the Arms Ban obviously applies to all law-abiding citizens of the District and it obviously restricts possession of the banned weapons.

33

filed their motion. *Id.* Defendants write that "[i]n a challenge to a regulation of an alleged 'Arm,' *Bruen*'s step one 'encompasses two more precise questions': (1) is the regulated device a 'bearable arm[ ],' and if so, (2) is the device 'in common use for a lawful purpose, such as self-defense?'" Def. Memo., 32 (quoting *Hanson v. D.C.*, 120 F.4th 223, 232 (D.C. Cir. 2024)). As Defendants note, *Hanson* "assumed" that the common use test was part of the step one inquiry. In light of *Wolford*, that assumption turned out to be wrong. Indeed, the assumption was never warranted.[31] Concerning the question of "whether courts can smuggle additional limits, drawn from our regulatory tradition, into the plain-text stage of the inquiry. The answer is and always has been no." *Wolford,* at \*14 n.1 (Barrett, J., concurring). Thus, *Hanson's* holding importing the common use inquiry into the step one analysis was never correct, and after *Wolford* it is no longer binding law. *See Bahlul v. United States*, 77 F.4th 918, 925 (D.C. Cir. 2023) (Circuit precedent is not binding if inconsistent with an intervening Supreme Court decision).

The Seventh Circuit tacitly acknowledged that extraneous matters cannot be imported into the step-one analysis only seven days ago in *Barnett v. Raoul*, 2026 WL 1982951 (7th Cir. July 9, 2026). *Barnett* was before the circuit court in 2023 when it was consolidated for purposes of an interlocutory appeal with other cases in *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023). In *Bevis*, the court engaged in a complex, multipage analysis of the step one issue. *See id.* at 1192-97. In stark contrast, when *Barnett* returned after remand, the court gave up on its effort to complicate the step one inquiry. Instead, it reduced its step-one inquiry down from several pages to a single sentence in which it conceded the step-one issue and moved to step two. *See Barnett* at \*8. The court went on to hold that Illinois had rebutted the presumption of constitutional

---

[31] *Wolford* did not change the *Bruen* test; it insisted on it as a corrective to "lower courts" that had been "bent on distorting th[e] Court's Second Amendment precedents." *See Snope v. Brown*, 145 S. Ct. 1534, 1538 (2025) (Thomas, J., dissenting from denial of certiorari).

protection at step two. *Id*. at \*18. The option of merely jumping to step two is not available, here, because Defendants did not assert a step-two defense in their motion. And, even if they had, it would be improper to consider it at the motion to dismiss stage because Plaintiff has no step-two pleading burden and no facts supporting such a defense appear in the Complaint.

*Barnett* was correct when it tacitly acknowledged that in an arms ban case the plaintiff's step-one burden is easy to meet. Conversely, *Hanson* was wrong when it held that a plaintiff must make complex empirical demonstrations such as whether the arm is in common use for lawful purposes including self-defense. *Wolford* clarified that plaintiffs are not required to demonstrate those matters at step one. In summary, Plaintiff's burden is simply to plausibly allege Defendants' regulation concerns forms of arms—and that imposition of these lead to law enforcement misconduct. Plaintiff has done so.

**B.    Plaintiff Has Met Its Pleading Burden to Allege a Second Amendment Violation that Constitutes Law Enforcement Misconduct.**

The Complaint alleges that the Arms Ban bans AR-15 style rifles. Compl. ¶¶ 19-26. As the root of the word implies, all fire*arms* are arms. *Heller*, 554 U.S. at 581 (discussing founding-era authority that "stated that all firearms constituted 'arms'"). Accordingly, with respect to AR-15 style rifles, Plaintiff has plausibly alleged that the Arms Ban bans a form of arms. As *Barrnett* tacitly acknowledged, this can hardly be disputed.

The Complaint alleges that the Arms Ban bans suppressors. Compl. ¶¶ 31-34. *Bruen* held that the definition of arms under the Second Amendment covers modern instruments that facilitate armed self-defense. *Bruen*, 597 U.S. at 28. The Complaint alleges that suppressors fall within this category. Compl. ¶34. Accordingly, with respect to suppressors, Plaintiff has plausibly alleged that the Arms Ban bans a form of arms.

35

Defendants argue that suppressors are not arms.  Def. Memo. 35.  The Court must reject Defendants' argument for two reasons.  First, Defendants' argument is based on factual assertions.  Def. Memo 35-36.  Once again, Defendants want to litigate factual issues at the motion to dismiss stage.  The Court should deny the motion for this reason alone, because a Rule 12(b)(6) motion must be "focused solely" on the allegations of the complaint.  *See Murphy v. Dept of Air Force*, 326 F.R.D. 47, 48 (D.D.C. 2018).  Second, Defendants' argument is based on a misunderstanding of (indeed, a rejection of) *Bruen's* formulation of the term "arms."  Defendants assert that suppressors do not qualify at step one because a suppressor is not, itself, a weapon.  Def. Memo. 35.  But, the Complaint alleges that a suppressor is a modern instrument that facilitates armed self-defense and therefore falls within the definition of arms presumptively protected by the Second Amendment's text.  Compl. ¶34.  Defendants scoff at these allegations because "[n]o part of the test articulated in *Hanson* offers protection for a device that merely facilitates self-defense.  *See Hanson*, 120 F.4th at 232.  Nor did *Bruen* create a "facilitates self-defense" test . . .."  Def. Memo. 36.  Defendants are wrong.  *Bruen* used those exact words when it described the type of arms protected by the text of the Second Amendment.[32]  The Supreme Court stated:

> We have already recognized in *Heller* at least one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to 'arms' does not apply only to those arms in existence in the 18th century.  Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.  Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, *that general definition covers modern instruments that facilitate armed self-defense.*

597 U.S. at 28 (cleaned up; citations and quotation marks omitted; emphasis added).

---

[32] As discussed below, Defendants are also wrong about *Hanson*.

36

Thus, Plaintiff is not required to plead that a suppressor is, itself, a weapon. Plaintiff is required to plead that suppressors facilitate armed self-defense, and it has. Compl. ¶34. Moreover, Plaintiff's allegations are plausible. Suppressors facilitate armed self-defense because they lead to reduced loudness (and reduced risk of hearing loss), lower recoil from the firearm, elimination of muzzle blast, increased accuracy, and faster follow-up shots, all critical functions that make firearms both safer and more effective for their core lawful purpose of self-defense. *See United States v. Comeaux*, 2026 WL 1758170, at *3 (2026). *Comeaux* stands for the same proposition the United States asserts in this case. Suppressors are arms protected by the Second Amendment. Even so, under *Bruen* they may be subjected to a non-abusive licensing regulation. *Id*. at *3-*4 (citing *Bruen*, 597 U.S. at 38 n.9). But the power to regulate the use of an arm is not the same as the power to ban that arm. *See Heller*, 554 U.S. at 636 (the District of Columbia may regulate appropriately arms in common use but banning them is a policy choice that is "off the table."). The former is consistent with the Second Amendment; the latter is not. *Id*.

Defendants dismiss Plaintiff's allegations on the ground that they have not made a detailed demonstration of how suppressors facilitate armed self-defense. Def. Memo. 36. Defendants misapply *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Under *Twombly*, Plaintiff is required to give Defendants "fair notice" of its claim and the grounds on which it rests. *Id*. at 555. Plaintiff has given Defendants fair notice of its claim: suppressors are protected by the Second Amendment and therefore the Arms Ban is unconstitutional. Compl. ¶ 4. Plaintiff has given Defendants fair notice of the grounds on which that claim rests: suppressors are "arms," as that term is used in the Second Amendment, and they are in that category because they are instruments that facilitate armed self-defense. Compl. ¶ 34. Plaintiff has plainly met its *Twombly* pleading burden.

37

In response, Defendants demand more details.  Defendants misapply *Twombly*.  Plaintiff is not required to "set out *in detail* the facts upon which [it] bases [its] claim." *Id*. at 555 n.3. (citation and internal quotation marks omitted).  The factual allegations need only "be enough to raise a right to relief above the speculative level." *Id*. at 555.  There is no requirement of "heightened fact pleading of specifics." *Id*. at 570.  The real thrust of Defendants' motion is that the Court should hold as a matter of law that suppressors are not protected.  At this pleading stage of the litigation, however, the Court has no ground for deciding as a matter of law that suppressors do not facilitate armed self-defense, and it should give Plaintiff an opportunity to develop a factual record proving they do.  *See Kangethe v. D.C.*, 281 F. Supp. 3d 37, 42 (D.D.C. 2017) (declining to decide factual issue as a matter of law at the motion to dismiss stage).  *See also City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 494 (1986) (in a constitutional case, a party should have opportunity to develop factual record).

**C.**     ***Wolford* Makes Clear That Plaintiff Is Not Required to Plead or Prove Common Use**

Relying on *Hanson*, Defendants assert that the Complaint should be dismissed because it does not plausibly allege that AR-15 style rifles and suppressors are in common use.  Def. Memo. 35, 39.  As discussed above, *Hanson's* holding that a plaintiff must prove (and by extension, plead) common use at the step one stage was abrogated by *Wolford*.  Accordingly, Defendants' arguments based on *Hanson's* erroneous holding must be rejected.[33]

"Common use" is a step-two issue.  Even there, a plaintiff has no obligation to prove common use, but if he does, he cuts off the government's path to prevailing at step two.  In a

---

[33] In addition, the Complaint pre-dated *Wolford* and Plaintiffs pled facts to satisfy *Hanson*. Compl. ¶¶ 19-26; 31-34.  Though in retrospect it was not necessary, Plaintiff plainly pled common use, and Defendants' assertion to the contrary is wrong.

dissent that *Wolford* ultimately vindicated, Judge Brennan noted that proving that a weapon is in common use is a sufficient condition for finding that the weapon is protected under step two's history and tradition test; it is not a necessary condition for finding that it is an "arm" in the first place under step one. *Bevis*, 85 F.4th at 1209 (Brennan, J., dissenting) (citation and internal quotation marks omitted).

### D.       Plaintiff Plausibly Plead a Pattern or Practice of Conduct

Finally, Defendants argue that the Amended Complaint does not plausibly allege that the District enforces its own firearms laws.   However, the Amended Complaint made several allegations regarding the District's law enforcement officers' legal duty to enforce its firearms laws.  Compl. ¶¶ 8, 9.  The Amended Complaint then alleges that those law enforcement officers have, in fact, enforced those laws.  Plaintiff set those allegations out in Section II.D, *supra*, and will not repeat them here.  Compl. ¶ 35.

In summary, the Complaint plausibly alleges that the District's law enforcement officers enforce the Arms Ban.  Defendants' assertion that those allegations are not plausible is frivolous.

## CONCLUSION

For the foregoing reason, Plaintiff respectfully requests the Court to deny Defendants' motion.  If this Court grants Defendants' motion in any part, Plaintiff seeks leave to amend its Amended Complaint.

DATED: July 16, 2026

Respectfully submitted:

HARMEET K.  DHILLON
Assistant Attorney General
Civil Rights Division

JESUS OSETE
Principal Deputy Assistant Attorney General

R. JONAS GEISSLER
Deputy Assistant Attorney General

/s/ Barry K.  Arrington

_____
BARRY K.  ARRINGTON
Acting Chief
Second Amendment Section

WILLIAM J.  HANRAHAN
ANDREW COFFARELLI
Trial Attorneys
Second Amendment Section

Attorneys for Plaintiff
UNITED STATES OF AMERICA

40