UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 1:25-cv-04458-APM |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

REPLY BRIEF IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 1

I.     The United States' Challenge to the District's Proscription of AR-15s and Silencers Is Not Cognizable Under Section 12601 ................................................ 1

      A.    Substantive Criminal Prohibitions May Not Be Challenged Under Section 12601 ................................................................................... 2

          1.    The United States Has No Meaningful Response to the District's Plain-Text Reading of Section 12601. ........................... 2

          2.    Context and History Reinforce That Section 12601 Does Not Authorize Challenges to Substantive Criminal Statutes. ......... 6

              a.    The United States Cannot Explain the Striking Differences Between Section 12601 and Other Pattern-or-Practice Laws. ...................................................... 7

              b.    This Court Should Decline the United States' Invitation to Ignore Legislative History That Reinforces the Text. ............................................................... 9

              c.    The Novelty of the United States' Claim Should Trigger Close Scrutiny by This Court. .............................. 11

          3.    Basic Canons of Federalism and Common Sense Caution Against Reading Section 12601 to Authorize the United States' Challenge. ......................................................... 15

      B.    The United States' Claim Falls Outside Section 12601 ........................... 18

II.    The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement That Deprives Persons of Constitutional Rights. ............................................................................................................. 19

      A.    The Amended Complaint Fails to Plausibly Allege a Deprivation of Constitutional Rights. ........................................................... 19

          1.    The Amended Complaint Must, but Does Not, Plausibly Allege That Silencers Are "Arms." ............................................. 20

2.      The Amended Complaint Must, but Does Not, Plausibly Allege That Silencers and AR-15s Are In Common Use for Self-Defense..................................................................................... 22

B.      The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement Officers. ................................. 25

CONCLUSION.............................................................................................................................. 25

**INTRODUCTION**

The United States' defense of its novel invocation of 34 U.S.C. § 12601 can be summed up in one line: the statute's language is broad, so it encompasses the United States' claim. *See* Pl.'s Opp'n [36] at 10–14. But the United States fails to engage with the plain meaning of almost all the statute's terms, which indicate that the statute does not authorize challenges to substantive criminal prohibitions; rather, it permits the United States to challenge "a pattern or practice of conduct *by law enforcement officers* . . . that deprives persons" of constitutional rights. 34 U.S.C. § 12601(a) (emphasis added). Those terms must be read in light of the statute's context, its history, and canons of construction—all of which the United States would rather ignore because they affirm that Congress did not vest the United States with roving authority to challenge any state or local criminal prohibition to which it objects. Even if the Court accepts the United States' interpretation, the Amended Complaint does not plausibly allege that the challenged laws are unconstitutional or that the Metropolitan Police Department (MPD) has a pattern or practice of enforcing them in a way that deprives constitutional rights. For either of those reasons, the Court should dismiss the Amended Complaint.

**ARGUMENT**

**I.      The United States' Challenge to the District's Proscription of AR-15s and Silencers Is Not Cognizable Under Section 12601.**

The District moved to dismiss the Amended Complaint based on a simple frontline thesis: Challenges to substantive criminal prohibitions are not cognizable under Section 12601, and, accordingly, the United States' challenge to the District's proscription of AR-15s and silencers fails. Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss Pl.'s Am. Compl. (Defs.' Mot.) [34] at 9–30. The United States responds that its claim survives dismissal because the

statute is "broad."  *E.g.*, Pl.'s Opp'n at 11.  The United States' say-so cannot override the text and other indicia of Congress's more limited intent.

### A.    Substantive Criminal Prohibitions May Not Be Challenged Under Section 12601.

The United States' interpretation of Section 12601 fails to account for text, context, history, and canons of construction.  Thus, it cannot be the best interpretation.

### 1.    The United States Has No Meaningful Response to the District's Plain-Text Reading of Section 12601.

When Section 12601's terms are defined and read together, three limiting principles emerge.  The statute provides a cause of action (1) targeted at specific actors ("law enforcement officers"), (2) when "a pattern or practice of conduct by" those actors, *i.e.*, the *way* in which they perform their duties, (3) causes the deprivation of constitutional rights.  *See* Defs.' Mot. at 10–13.  A challenge to a substantive criminal statute runs afoul of these limitations.  *Id.* at 13–15.

The United States' response focuses on a single word in Section 12601: "conduct," which it says means "personal behavior," and which it contends is broad enough to include the act of making an arrest—even absent any misconduct.  Pl.'s Opp'n at 9–14.  First off, the United States does not explain how its definition of "conduct" conflicts with the District's reading of the statute; nor is any conflict obvious.  *See* Defs.' Mot. at 12 (explaining that "conduct" means "the *way* one acts; behavior; deportment" (emphasis added)).  But the bigger problem is that by focusing its "entire argument . . . on defining [one] word," the United States forgets that the Court "must give effect, if possible, to every word of a statute," *Doherty v. Turner Broad. Sys., Inc.*, 72 F.4th 324, 329 (D.C. Cir. 2023) (citation modified), and "a statute's meaning does not always turn solely on the broadest imaginable definitions of its component words," let alone one component word, *Crowley Gov't Servs., Inc. v. GSA*, 143 F.4th 518, 533 (D.C. Cir. 2025) (citation omitted).  The United States does not even try to define or understand the other key

terms in subsection (a) (*e.g.*, "*by* law enforcement officers," "*that* deprives," "pattern or practice"), subsection (b) (*e.g.*, "eliminate"), or the title (*e.g.*, "*Police* Pattern or Practice"). When all those terms and "conduct" are precisely understood and read in context, it becomes apparent that Section 12601 does not create liability for the mere enforcement of legislative acts. The statute reaches only those circumstances where the manner in which police officers regularly perform their duties causes the alleged harm.  *See* Defs.' Mot. at 10–13.

Besides misfocusing on "conduct," the United States' textual analysis consists of oscillating between either restating the statutory text without elaboration, Pl.'s Opp'n at 11, or else dicing the text into elements without considering how these elements interact, *id.* & n.8. The United States contends that this case "hinges on" the meaning of "pattern or practice of conduct by law enforcement officers" and that the Court need not consider the remainder of the statute because the District "admit[s] that the statute prohibits depriving persons of their constitutional rights."  *Id.* at 11.[1]  But the statute prohibits only those "patterns or practices of conduct by law enforcement officers" that *cause* the deprivation of rights.  Defs.' Mot. at 13. The United States does not, and cannot, respond to the contention that its claim is not cognizable because the harms alleged are not caused by "conduct by" law enforcement officers.  Curiously, at times, the United States appears to recognize this principle.  *See* Pl.'s Opp'n at 12 (conceding that officers' conduct must "deprive[ ]" persons of rights); *id.* at 13 ("as a result of [officers'] behavior, persons are deprived of their constitutional rights"); *id.* at 11 (similar).  But elsewhere the United States ignores it without explanation.  For example, the United States wrongly

---

[1]     The United States also cites case law that states "a federal court must assume *arguendo* the merits" of a claim "when considering whether a plaintiff has Article III standing."  Pl.'s Opp'n 10 n.7 (quoting *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007)); *id.* at 11 n.8; *see also id.* at 32–33.  Article III standing is not at issue, so this argument is misplaced.

3

suggests that Section 12601 would apply if officers arrested individuals for violating a law that bans "grossly offensive" Facebook posts. *Id.* at 12. In that hypothetical, it is the law that restricts individuals' First Amendment rights—the officers' conduct is not the cause of the constitutional violation, and enjoining that conduct would not "eliminate" the violation. 34 U.S.C. § 12601(b). So Section 12601 would not be applicable, but the individual could challenge the arrest and law in other ways.

Rather than engaging with the District's textual arguments, the United States spends an outsized share of its brief attacking arguments that the District never made or else making arguments that lack merit. First, the United States argues that Section 12601's scope is not limited to "only certain rights" and that the District's interpretation improperly "exclude[s]" "the right to keep and bear arms." Pl.'s Opp'n at 13, 19; *see id.* at 17 (similar). The District made no such claim. Defs.' Mot. at 16 ("Section 12601 has no express subject-matter constraint."). Instead, the District explained that the universe of cognizable Section 12601 claims is cabined by the *source* of the harm alleged, not the right affected. The harms alleged must be caused by "conduct by" law enforcement officers, *i.e.*, the way in which officers conduct their duties. In a challenge to a criminal prohibition, the source of the alleged harm is a criminal statute, passed by the legislature and signed by the executive, and the harm will remain regardless of whether police make arrests under the law. Section 12601 is concerned with *how* law enforcement officers perform their duties, not *what* substantive criminal prohibitions they enforce.

Second, the United States argues that "enforcement of an unconstitutional law" can incur Section 12601 liability. Pl.'s Opp'n at 20 (capitalization altered). In certain circumstances, that may be true. *If* a law actually speaks to police conduct—*e.g.*, it authorizes chokeholds—it could fall within Section 12601's purview. No such law is at issue here because substantive criminal

4

prohibitions are not directed at "conduct by" law enforcement officers.  The Amended Complaint challenges District criminal law's definition of "assault weapon" and proscription on silencers, which do not speak to the way in which law enforcement officers conduct their duties.

Nor is it dispositive that Section 12601 has been used in two cases to hold governments liable for acts taken pursuant to "official policy."  *See* Pls.' Opp'n 21–23.  The type of policy at issue matters.  The United States cites *United States v. County of Maricopa*, 889 F.3d 648 (9th Cir. 2018), and *United States v. Town of Colorado City*, 935 F.3d 804 (9th Cir. 2019)—neither of which addressed whether Section 12601 can be used to challenge criminal laws.  *Maricopa County* involved a "culture of disregard . . . for Latinos" in the county sheriff's office that led to (1) the failure to "adopt basic policy, training and oversight practices"; (2) the unlawful "stop[ping], det[ention], and arrest[ ]" of Latinos; and (3) retaliation against critics of these practices.  Compl. [1] ¶¶ 1, 4, 79–80, 138–51, 165–70, 186–88, *United States v. County of Maricopa*, No. 12-cv-981 (D. Ariz. May 10, 2012).  The United States alleged that Maricopa County had "departed from standard law enforcement practices that protect against discriminatory policing," *id.* ¶¶ 79–100 (capitalization omitted)—not that the county had enacted an allegedly unconstitutional criminal law.  In *Colorado City*, the defendants allegedly "allowed the [Fundamentalist Church of Jesus Christ of Latter-day Saints (FLDS)] to direct or unlawfully influence" "policing services," including by "fail[ing] to provide policing services to non-FLDS individuals" and "selectively enforc[ing] laws and regulations."  Compl. [1] ¶¶ 15–17, 31, *United States v. Town of Colorado City*, No. 12-cv-8123 (D. Ariz. June 21, 2012).  Those are bread-and-butter Section 12601 claims involving the *way* police perform (or fail to perform) their duties.

The only notable thing revealed by these cases is that some courts have interpreted Section 12601 to allow for *respondeat superior* liability.  *See* Pl.'s Opp'n at 18, 31–32 (citing

5

*Colorado City*, 935 F.3d at 810).  That issue is untested in this Circuit and not teed up in this case.  But if Section 12601 does allow for *respondeat superior* liability, it authorizes the United States to litigate any number of instances of police misconduct.  That takes the wind out of any argument that the District's reading of Section 12601 results in an unduly narrow cause of action.  It also suggests that the actor-based limitations that counterbalance this breadth should not be casually swept aside.  The cause of action designed by Congress "reflect[s] a balance of multiple competing interests," and this Court should "respect the formula that Congress prescribed." *Advoc. Christ Med. Ctr. v. Kennedy*, 605 U.S. 1, 19–20 (2025).

Third, the United States argues that Section 12601 must be construed "broadly" because it is a "remedial statute."  Pl.'s Opp'n at 19.  But the D.C. Circuit has repeatedly rejected similar invitations because "[a]ll statutes seek to remedy some problem, so the maxim does nothing to identify what statutes should be 'liberally construed.'"  *Holland v. Williams Mountain Coal Co.*, 256 F.3d 819, 823 (D.C. Cir. 2001); *see also E. Bay Mun. Util. Dist. v. U.S. Dep't of Commerce*, 142 F.3d 479, 484 (D.C. Cir. 1998).  Even when the D.C. Circuit has cited this principle approvingly, it has underscored that a remedial purpose "does not give the judiciary license . . . to disregard entirely" a statute's "plain meaning."  *Belland v. Pension Ben. Guar. Corp.*, 726 F.2d 839, 844 (D.C. Cir. 1984) (citation omitted); *see Young v. United States*, 943 F.3d 460, 464 (D.C. Cir. 2019) (similar).  That is the problem:  The United States fails to engage with Section 12601's terms to explain why it can be used to challenge criminal prohibitions.

### 2.    Context and History Reinforce That Section 12601 Does Not Authorize Challenges to Substantive Criminal Statutes.

Section 12601's context and history confirm the plain meaning of its text:  The statute can be used only to target unlawful "conduct by" law enforcement officers that is itself the cause of deprivations of federal rights.

> **a.** **The United States Cannot Explain the Striking Differences Between Section 12601 and Other Pattern-or-Practice Laws.**

A straightforward comparison of Section 12601 to other pattern-or-practice laws underscores Section 12601's limitations. As the District explained, unlike other pattern-or-practice laws, Section 12601 has actor-based constraints rather than subject-matter constraints. Defs.' Mot. at 19–22. Those differences indicate that Congress did not intend Section 12601 to operate in lockstep with other pattern-or-practice laws. Instead, it designed a specific, targeted remedy for a specific problem: police misconduct.

The United States does not try to explain those differences and, accordingly, it concedes this issue. *See Texas v. United States*, 798 F.3d 1108, 1114–16 (D.C. Cir. 2015) (points raised in a motion and left unaddressed in an opposition brief are conceded). At most, the United States references the Civil Rights for Institutionalized Persons Act, 42 U.S.C. § 1997 *et seq.*, in passing, which it claims "support[s]" its "broad authority to obtain equitable remedies for any pattern or practice of constitutional violations." Pl.'s Opp'n at 15 n.12. But that statute only underscores the District's position. Like other pattern-or-practice laws—and unlike Section 12601—Section 1997a has no clear actor-based constraint. It allows the Attorney General to sue "any State or political subdivision of a State, official, employee, or agent thereof, or other person acting on behalf of a State or political subdivision of a State" that is "subjecting persons residing in or confined to an institution . . . to egregious or flagrant conditions" that violate the Constitution. 42 U.S.C. § 1997a. Had Congress wanted to model Section 12601 after Section 1997a it could have. Instead, it limited Section 12601's reach to harms caused by "conduct by" a particular subset of actors, *i.e.*, law enforcement officers. *See* Defs.' Mot. 16–17.

Next, the United States argues that Section 12601 and Section 1983 "should be interpreted *in pari materia*" because they both "remedy . . . violations of federal civil rights" and

7

"impose liability on local governments." Pl.'s Opp'n at 16–18 (italics added). Those broad descriptors are an extraordinarily thin reed upon which to hang such a claim, and the United States has not done the work of analyzing whether the *in pari materia* canon is actually applicable here. *See United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1248 (D.C. Cir. 2008) (explaining that "courts often ask four questions when deciding if" the canon applies). Even when statutes are part of a "comprehensive federal legislative effort" to achieve "broad, common goals," the canon does not apply to statutes that "play different roles in achieving" those goals. *Erlenbaugh v. United States*, 409 U.S. 239, 244–45 (1972). Section 1983 and Section 12601 are different tools to achieve different ends. Section 12601 allows the Attorney General to remedy systemic violations of rights caused by "conduct by" law enforcement officers, whereas Section 1983 allows individuals to challenge constitutional harms with no comparable limit on the source of the alleged harm. *See* Defs.' Mot. at 17–18, 21.

Even if the canon applied, it does not require these two statutes to be interpreted coterminously. Rather, the canon is "a logical extension of the principle that individual sections of a single statute should be construed together." *Motion Picture Ass'n of Am., Inc. v. FCC*, 309 F.3d 796, 801–02 (D.C Cir. 2002) (citation omitted). It allows basic principles of intratextual analysis to apply across legislative enactments—including the axiomatic principle that "Congress's choice to depart from the model of a closely related statute is a choice neither [the Court] nor the agency may disregard." *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018); *see Motion Picture Ass'n*, 309 F.3d at 802 (applying the *in pari materia* canon and focusing on "difference[s] in the language employed" to divine the text's meaning). As the District explained, unlike Section 12601, Section 1983 expressly contemplates challenges to statutes irrespective of the actor by providing a cause of action against "*[e]very person* who under color

8

of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia" deprives individuals of federal rights.  42 U.S.C. § 1983 (emphasis added); *see* Defs.' Mot. at 18.  It therefore comes as no surprise that Section 1983 has been used to "impos[e] municipal liability for law enforcement's execution of unconstitutional statutes."  Pl.'s Opp'n at 23 & n.21 (citing Section 1983 cases).  It does not follow that Section 12601 should be read in lockstep with Section 1983 when its text is markedly different.

### b.      This Court Should Decline the United States' Invitation to Ignore Legislative History That Reinforces the Text.

The District explained that legislative history confirms Section 12601's scope.  Defs.' Mot. at 18–21.  The United States' frontline retort is that "[l]egislative history is not the law." Pl.'s Opp'n 30.  True, but "it can be helpful in confirming or reinforcing what the text shows." *Sec'y of Labor v. KC Transport, Inc.*, 173 F.4th 294, 314 n.10 (D.C. Cir. 2026).  Legislative history does just that here by reiterating that the statute was designed to remedy systemic patterns of "[p]olice brutality" and "police misconduct"—not to grant the United States a roving license to challenge any state or local criminal law.  Defs.' Mot. at 18–21.

The United States implies that any reliance on legislative history is particularly inappropriate here "where the legislative history is virtually non-existent."  Pl.'s Opp'n at 30; *see id.* at 31 n.29 (suggesting that reliance on the legislative history of Section 12601's predecessor statute is improper).  But the United States relies on that same legislative history in this case, *id.* at 31, and has previously affirmed that while "[t]here is no separate legislative history for" Section 12601, "the legislative history of the predecessor bill is relevant because the language of that bill was identical, in pertinent part," Mem. of L. in Supp. of Joint Mot. for Entry of Consent Decree [2] at 3 n.2, *United States v. City of Steubenville*, No. 97-cv-966 (S.D. Ohio Aug. 28,

9

1997).  Courts agree.  *See, e.g.*, *United States v. City of Columbus*, No. 99-cv-1097, 2000 WL 1133166, at *3 (S.D. Ohio Aug. 3, 2000).

As to the content of the legislative history, the United States has next to nothing to say.  It contends that the legislative history demonstrates that "the standards of conduct" prescribed by Section 12601 "are the same as those under the Constitution."  Pl.'s Opp'n at 14 (emphasis omitted).  No one argued otherwise.  Section 12601 allows for the vindication of constitutional rights, but only when those rights are infringed by "conduct by" law enforcement officers, *i.e.*, the way in which officers perform their duties.  As Amici put it, a viable cause of action exists when rights are infringed upon by "*institutional* shortcomings" within police departments, not when they are allegedly infringed by substantive criminal prohibitions as written.  Amicus Br. [25] at 2, 4–9.

The United States also argues that the legislative history's discussion of *United States v. City of Philadelphia*, 644 F.2d 187 (3d Cir. 1980), and *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), suggests that Section 12601 "was a reaction against constraints on the United States' authority to seek injunctive relief against constitutional violations," and Congress sought to give the Justice Department "broad and robust authority to address such violations."  Pl.'s Opp'n at 15.  Congress's concern and response were more limited.  Congress sought to close a specific gap left open by *Lyons* and *Philadelphia*: the lack of remedies for systemic police misconduct.  Defs.' Mot. at 4–5.  But no such remedial gap existed concerning substantive criminal prohibitions, which can be challenged in other ways.  *Id.* at 20–21.  It would be "peculiar" to conclude that in "closing" the "gap" for remedies of police misconduct, "Congress actually hid away" a cause of action "that reaches far beyond the . . . scenarios that prompted the legislation in the first place."  *Fischer v. United States*, 603 U.S. 480, 492 (2024).

10

Finally, the United States argues that Section 12601's scope is not "constrained by the limits of the drafters' imagination" or the "principal evil" they sought to address. Pl.'s Opp'n 29–30. True enough, but the Court still reads the statute "in light of the history of the provision." *Fischer*, 603 U.S. at 491; *see id.* at 491–92 (interpreting statutory provision narrowly in light of a "loophole" revealed by the "Enron accounting scandal" that the statute was enacted to "plug"). The District has underscored—consistent with this Circuit's case law—that legislative history can confirm the meaning of Section 12601's text, including the meaning of "conduct by" law enforcement officers. Defs.' Mot. at 18–19. That every indicium of congressional intent—text, history, context, etc.—does not contemplate a suit like this one is a clear indication that the statute is not as unconstrained as the United States suggests.

### c.     The Novelty of the United States' Claim Should Trigger Close Scrutiny by This Court.

Past practice is "significant in determining whether . . . power was actually conferred." Defs.' Mot. at 21–22 (quoting *Refugee & Immigrant Ctr. Educ. & Legal Servs. v. Mullin* (*Refugee*), 174 F.4th 81, 101 (D.C. Cir. 2026)). Here, past practice reveals an unbroken tradition of Section 12601 actions aimed at "conduct by" law enforcement officers—not facial challenges to criminal laws. *Id.* A federal court has now recognized that "the use of Section 12601 to facially challenge a state criminal law is . . . a novel approach that deviates from the way the statute has historically been enforced." *United States v. California*, No. 26-cv-1697, 2026 WL 2004372, at *4 (C.D. Cal. July 9, 2026). The United States' contrary arguments lack merit.

First, the United States urges this Court to ignore the United States' past practices because a "court cannot consider matters outside the pleadings" when resolving a motion to dismiss. Pl.'s Opp'n at 3 (emphasis omitted). But the Court may take judicial notice of the Justice Department reports and memoranda cited by the District because they are publicly

11

available government documents.  *See* Defs.' Mot. at 3 n.3; Defs.' Exs. 1–4 [34-1, 34-2, 34-3, 34-4]; *United States v. Windsor*, 570 U.S. 744, 766 (2013); *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).  The United States provides no reason to believe that these documents are subject to "reasonable dispute."  Fed. R. Evid. 201(b).  At most, the United States claims that the District's "characterization" of these documents is "inaccurate" and "contested."  Pl.'s Opp'n at 4, 26 n.25.  Yet, the United States offers no explanation for this drive-by critique.  The United States also argues that some of these documents are no longer publicly available online.  *Id.* at 3 n.3.  But the government does not dispute the documents' source or authenticity, and it may not pull the wool over this Court's eyes by scrubbing its webpages of documents that no longer serve its aims.  Anyway, the District offered these documents for the purposes of statutory interpretation, so they are also properly considered as legislative facts.  *See* Fed. R. Evid. 201 advisory comm. notes (1972) (explaining that legislative facts need not follow Rule 201's judicial notice requirements); *United States v. Bello*, 194 F.3d 18, 22 (1st Cir. 1999) (explaining that legislative facts are used when a court is "interpreting a statute").

Second, the United States urges the Court to ignore the District's exhibits because affirmative "defense[s]" may not be asserted "unless the[ir] factual basis . . . is evident from the 'face of the complaint.'"  Pl.'s Opp'n at 3.  The District's contention that the United States' claim is not cognizable under Section 12601 is not an affirmative "defense"—it is a challenge to the legal sufficiency of the pleadings.  Affirmative defenses, by contrast, "limit[ ] or excuse[ ] a defendant's liability even if the plaintiff establishes a *prima facie* case."  *Bell v. Taylor*, 827 F.3d 699, 704–05 (7th Cir. 2016) (citation omitted).

Third, the United States claims that its "past practice has not been as limited as Defendants suggest" because it has previously brought a Section 12601 suit to vindicate First

12

Amendment violations.  *See* Pl.'s Opp'n at 27 (citing *Colorado City*, 935 F.3d 804).  As explained, *Colorado City* challenged quintessential police misconduct, and it is in no way in tension with interpreting Section 12601 to not cover challenges to substantive criminal prohibitions.  *See* p. 5, *supra*.  Further, in a footnote, the United States contends that it has previously used "Section 12601 to investigate and bring enforcement actions to remedy: enforcement of local ordinances that are facially unconstitutional."  Pl.'s Opp'n at 27 n.27.  As support for this contention, the United States directs the Court to its Special Litigation Section webpage—without identifying any specific case that challenged "local ordinances."  *Id.*  This Court "need not consider cursory arguments made only in a footnote."  *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (citation omitted).

Elsewhere, the United States references Justice Department findings regarding the Ferguson Police Department's enforcement of a purportedly unconstitutional ordinance.  Pl.'s Opp'n at 21.  Those findings were made after an investigation initiated under not only Section 12601, but also the Omnibus Crime Control and Safe Streets Act of 1968, 42 U.S.C. § 3789d, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.  C.R. Div., U.S. Dep't of Just., *Report of Investigation of Ferguson Police Department* at 1 (Mar. 4, 2015), perma.cc/T3T8-GUBM.  Although some findings suggest constitutional infirmities with a local ordinance, others are prototypical Section 12601 allegations, *i.e.*, "improper enforcement of code provisions" by law enforcement, including the arrests of individuals "on facts that do not meet the provision's elements."  *Id.* at 19–20.  Moreover, the resulting suit premised on these findings did not allege a facial challenge to a local ordinance—it alleged a quintessential Section 12601 claim that police enforced an ordinance in an unconstitutional *manner*, including by arresting individuals "despite lacking reasonable suspicion to stop them" and despite "lack[ing] probable cause of a crime."

13

Compl. [1] ¶¶ 45–51, 186, *United States v. City of Ferguson*, No. 16-cv-180 (E.D. Mo. Feb. 10, 2016) (emphasis added). Still further, the theory in *Ferguson* was never passed on by a court because the parties entered a consent decree; and one distinguishable, untested theory is hardly the type of past practice that could bolster the United States' newfound theory here.

At base, the United States has now had two full cycles of briefing in this case to come forward with *any* evidence that it has previously used Section 12601 to challenge a substantive criminal prohibition. It has repeatedly failed to do so, despite being the party best situated to identify such a case if one existed and the party that should bear the burden to support its novel interpretation. Instead, it asks for more time to "thoroughly develop[ ]" the record. Pl.'s Opp'n at 4. *But see id.* at 26 & n.24 (observing that the United States has had 8 months to litigate this issue). But no more time is due—if the United States could point to any such case, it would have done so by now.

Fourth, the United States argues that past practice "does not delineate the scope of the authority set forth in a statute." Pl.'s Opp'n at 27. Although past practice is not dispositive, "the fact that no [administration] has ever found such power in [Section 12601] is *strong evidence* that it does not exist." *Learning Res., Inc. v. Trump*, 607 U.S. 229, 250 (2026) (emphasis added); *see, e.g.*, *United States v. Morton Salt Co.*, 338 U.S. 632, 647 (1950). Indeed, both the Supreme Court and the D.C. Circuit recently relied on past executive practice to reject novel, sweeping readings of statutes by the current administration. *Learning Res.*, 607 U.S. at 250; *Refugee*, 174 F.4th at 101. At minimum, courts may consider past practice as one factor in the mix when interpreting statutory language. *See Ry. Lab. Executives' Ass'n v. Nat'l Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994) (en banc); *Velazquez v. Bondi*, 604 U.S. 712, 726–27 (2025). The

14

cases cited by the United States say as much. *See* Pl.'s Opp'n at 28 (citing *Nat'l Ass'n of Sec. Dealers, Inc. v. SEC*, 431 F.3d 803, 811 (D.C. Cir. 2005) ("past practices" are "noteworthy")).

### 3. Basic Canons of Federalism and Common Sense Caution Against Reading Section 12601 to Authorize the United States' Challenge.

As explained, the United States' novel reading of Section 12601 would upset the balance of power both between the federal government and the states and within the federal government. Defs.' Mot. at 23–28. The United States does not contest—and thus concedes—that its reading creates absurdity by allowing the Justice Department to challenge Acts of Congress and District laws that the U.S. Attorney is charged with prosecuting. *See id.* at 26–28. By producing such an indisputably absurd result, the United States' interpretation simply cannot be the best.

As to the serious federalism concerns with the United States' interpretation, the United States does not identify clear congressional intent to allow facial challenges to state and local laws to proceed under Section 12601. That is another critical oversight that should doom this suit. Without "certain[ty]" about "Congress' intent," this Court should not "find[ ] that federal law overrides the usual constitutional balance of federal and state powers." *Bond v. United States*, 572 U.S. 844, 858 (2014) (citation modified). In a case such as this with serious consequences for the balance of federal-state power, the United States cannot just say that a statutory term is "extremely broad[ ]"; it must point to a clearer indication that Congress sought to authorize facial challenges to state and local criminal laws, and there is none. *See id.* at 860.

Rather than try to satisfy the federalism canon, the United States makes a few arguments to avoid its application, but none should succeed. First, the United States suggests that any federalism concerns are "meritless" because it has "plenary power over the District." Pl.'s Opp'n at 16 n.13. But Section 12601 applies to states, localities, and the District alike. The Court must adopt an interpretation that applies to and works for all entities covered by the law

because a statute is not "a chameleon," *Clark v. Martinez*, 543 U.S. 371, 382 (2005), and "the meaning of words in a statute cannot change with the statute's application," *United States v. Santos*, 553 U.S. 507, 522 (2008) (plurality). Accordingly, even assuming that federalism concerns were less present with the District, the Court could not allow the United States to pursue a facial challenge here while forbidding facial challenges against states. Thus, because Section 12601 applies to states and localities, the Court must take into account federalism concerns when adopting an interpretation of Section 12601.

Regardless, the United States is wrong that there are no federalism concerns when it comes to the District. The Constitution vests "Congress"—not the Executive Branch—with authority to "exercise exclusive Legislation in all Cases whatsoever, over [the] District." U.S. Const. art. I, § 8, cl. 17. Congress exercised that power to enact the Home Rule Act, which "grant[ed] to the inhabitants of the District of Columbia powers of local self-government" and sought, "to the greatest extent possible, consistent with the constitutional mandate," to "relieve [Congress] of the burden of legislating upon essentially local District matters." District of Columbia Self-Government and Governmental Reorganization Act, § 102(a), Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified at D.C. Code §§ 1-201.01 to 1-207.71). That Act created an elected legislative body, the Council of the District of Columbia, and granted it "legislative powers," subject to limited restrictions. D.C. Code § 1-206.02(a). Those powers allow the District to enact firearms laws much like any state or locality—including the AR-15 proscription challenged here. *Heller v. District of Columbia*, 670 F.3d 1244, 1251 (D.C. Cir. 2011).

Further, the Justice Department is not Congress, and it may not casually invalidate the constitutionality of laws passed by the D.C. Council or Congress without a viable cause of action. More alarming still, there are virtually no limits to the United States' theory. By its own

16

telling, Section 12601 is a "very broad grant of authority." Pl.'s Opp'n at 14. If courts sanction the use of Section 12601 to challenge criminal laws, the United States could bring constitutional challenges to any number of state and local laws that the administration in power dislikes. Indeed, the United States has been doing just that, as it has recently initiated similar Section 12601 suits against states. *See California*, No. 26-cv-1697 (C.D. Cal. filed July 1, 2026); *United States v. Virginia*, No. 26-cv-610 (E.D. Va. filed July 1, 2026); *United States v. Colorado*, No. 26-cv-1950 (D. Colo. filed May 6, 2026).

Second, the United States criticizes the District's reliance on *Philadelphia*, 644 F.2d 187. Pl.'s Opp'n at 16. The United States misses the point. *Philadelphia* detailed the "important principles of federalism and separation of powers" that are implicated by suits by the United States against states and localities. 644 F.2d at 200–01; Defs.' Mot. 25–26. In the United States' own words: the court warned that "it would be entirely inappropriate for a federal court to overrule the explicit decisions of Congress not to increase federal executive and judicial authority over state and local governments." Pl.'s Opp'n at 16 (quoting *Philadelphia*, 644 F.2d at 200). That is precisely what the United States asks this Court to do—to expand its authority to enjoin state and local affairs far beyond the cause of action crafted by Congress.

In a stray paragraph, the United States goes further still, suggesting that even if its Section 12601 claim is not cognizable, it can invoke generalized "sovereign interests" to "seek injunctive relief." *Id.* at 32–33. But the Amended Complaint only pleads a Section 12601 claim, which fails. Regardless, *Philadelphia* already rejected the notion that the United States has some catchall, unenumerated authority to enforce constitutional rights. Absent a viable cause of action, the United States lacks standing and authority to pursue the relief it seeks. *See* 13B

17

Edward H. Cooper, *Fed. Prac. & Proc. Juris.* § 3531.11 (3d ed. 2025) (the United States must "bring suit under the aegis of [a] statute" to "advance the private interests of some third party").

### B.  The United States' Claim Falls Outside Section 12601.

For all the reasons given by the District, Section 12601 does not provide a cause of action for facial challenges to substantive criminal prohibitions.  The United States' claim is plainly an impermissible attack on democratically enacted District laws that regulate private conduct.  The alleged harm is caused by purportedly "unconstitutional law[s]," Am. Compl. ¶ 5, not by a pattern or practice of "conduct by" law enforcement officers.  It is therefore not sufficient to state a Section 12601 claim.

The United States does not meaningfully dispute that the harms alleged are caused by legislative enactments.  Pl.'s Opp'n at 22–23.  It argues that *Maricopa* and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), make legislative enactments actionable under Section 12601.  *Id.*  But as detailed, *see* p. 5, *supra*, *Maricopa* did not address whether Section 12601 can be used to challenge the constitutionality of a substantive criminal prohibition.  And *Monell* did not address Section 12601 at all, but Section 1983, which, as explained, has different language from Section 12601 and does not have the same actor-based limitations.  *See* pp. 7–9, *supra*.

The United States also states that Defendants are liable under Section 12601 because they "enforce[ ]," "execut[e]," and "implement[ ]" the allegedly "unconstitutional" laws.  Pl.'s Opp'n at 23.  As the District has explained, those conclusory allegations cannot establish the existence of a pattern or practice of enforcing the law against constitutionally protected conduct.  *See* Defs.' Mot. at 43–45.  And, in any event, the United States' description of the injury only underscores that the underlying alleged constitutional harm targeted in the Amended Complaint is caused by substantive prohibitions on private conduct enacted by the elected branches, not "conduct by" law enforcement officers.  It is District law that "deprives" individuals of their

18

alleged right to possess AR-15s and silencers; law enforcement officers do not cause that deprivation, and enjoining their conduct would not "eliminate" it.  34 U.S.C. § 12601(a)–(b).

Last, the United States critiques the District's characterization of its suit as a "facial" challenge to District laws.  Pl.'s Opp'n at 32.  That protest rings hollow.  For all the reasons detailed before and below, the United States frames its Amended Complaint as a wholesale attack on the District's allegedly "unconstitutional law[s]" proscribing the possession of AR-15s and silencers.  Am. Compl. ¶ 5; *see* Defs.' Mot. at 28–30.  In its own words, the United States "seeks to enjoin enforcement of the laws to the extent that they apply to ban AR-15 style rifles and suppressors."  Pl.'s Opp'n at 32; *see also* Am. Compl., Prayer (seeking injunction against "provisions of the District's laws that make it a crime to possess AR-15 style rifles or suppressors").  That is a facial challenge, and it matters not that the Amended Complaint did not use the term "facial challenge."  *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010).

## II.    The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement That Deprives Persons of Constitutional Rights.

Even if the United States' theory were cognizable under Section 12601, the United States has not plausibly alleged sufficient facts to show that silencers and AR-15s are protected by the Second Amendment or that MPD is engaging in a pattern or practice of enforcing the prohibitions in a manner that violates constitutional rights.  Defs.' Mot. at 30–45.  The United States' responses blink precedent and the District's arguments.

### A.    The Amended Complaint Fails to Plausibly Allege a Deprivation of Constitutional Rights.

To state a Second Amendment violation, the Amended Complaint needed—but failed—to plausibly allege that silencers and AR-15s meet the original meaning of "arms," or are otherwise necessary to exercise the Second Amendment right, and are in common use for self-defense.  Defs.' Mot. at 31–43.  The United States responds that it need only allege that silencers

19

facilitate self-defense, and it need not allege that silencers or AR-15s are in common use for self-defense. Pl.'s Opp'n at 33–39. That is not the law.

### 1. The Amended Complaint Must, but Does Not, Plausibly Allege That Silencers Are "Arms."

The Second Amendment protects weapons and the few instruments necessary to exercise the right to keep and bear arms, but the Amended Complaint does not plausibly allege that silencers are either. Defs.' Mot. at 32, 35. The United States does not argue that silencers are necessary to exercise the Second Amendment right, thereby conceding the point. *See Texas*, 798 F.3d at 1114–16. The United States also does not argue that silencers are weapons and instead complains that the District's explanation of why silencers are not weapons improperly relies on facts outside the Amended Complaint. Pl.'s Opp'n at 36. But the District's explanation of why silencers are not weapons follows directly from the statutory definition. *See* Defs.' Mot. at 2, 35. Anyway, the United States has things backwards: as the plaintiff, the United States needed to include allegations plausibly showing that silencers are weapons. It concededly has not. *See* Pl.'s Opp'n at 37 ("Plaintiff is not required to plead that a suppressor is, itself, a weapon.").

Instead of applying the correct test for Second Amendment protection, the United States responds that it need only plead that silencers "facilitate armed self-defense." *Id.* Ignoring near universal consensus holding otherwise, *see* Defs.' Mot. at 35 n.7, the United States clings to one line from *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), to create its "facilitates armed self-defense" test, Pl.'s Opp'n at 36. In the passage from which the United States plucks, the *Bruen* Court was not laying down the scope of the Second Amendment or the contours of *Bruen*'s step one. *See* 597 U.S. at 28. Instead, the Court was explaining that its new test for Second Amendment challenges must account for "circumstances beyond those the Founders specifically anticipated." *Id.* And the Court gave the example of "arms," which

20

include more than "'those arms in existence in the 18th century'" and instead "modern instruments that facilitate armed self-defense." *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)).  Later, when the Court applied step one of its new test, it stated that the petitioners satisfied step one precisely because, among other reasons, they wanted to carry handguns, and "handguns are weapons 'in common use' today for self-defense." *Id.* at 32 (quoting *Heller*, 554 U.S. at 627).

Reading the *Bruen* opinion as a whole, it is apparent that the Court was not creating a "facilitates armed self-defense" test because that was not the test the Court in fact applied. Although the Court's general discussion of historical analogizing included the "facilitate armed self-defense" language, the Court "has often cautioned that general language in judicial opinions should be read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Olivier v. City of Brandon*, 607 U.S. 552, 565 (2026) (citation modified); *see id.* (declining to rely on "phrasing [that] was not quite as tailored as it should have been" and "swept a bit too broad").  In the line relied upon by the United States, the Court was not purporting to define "arms."  Rather, the Court was referencing *Heller*—which *did* define "arms" to only include weapons.  The United States does not attempt to reconcile its test with *Heller*.

Even if *Bruen* left the door open for a "facilitates self-defense test," the D.C. Circuit closed that door in *Hanson v. United States*, 120 F.4th 223 (D.C. Cir. 2024) (per curiam), *cert. denied*, 145 S. Ct. 2778 (2025).  *Hanson* applied *Bruen* and made clear that to receive Second Amendment protection, a device must be a "bearable arm" or "necessary to make meaningful an individual's right to carry a handgun for self-defense." *Id.* at 232 (citation modified).  *Necessary* to exercise the right is a higher standard than merely *facilitates* self-defense.  *See United States v.*

21

*Speed*, 175 F.4th 272, 288–89 (4th Cir. 2026) (Wilkinson, J., concurring) ("[A] legal standard focused on utility rather than necessity . . . would remake the Second Amendment as we know it."). Although the United States argues that *Hanson* misapplied *Bruen*, *e.g.*, Pl.'s Opp'n at 38, the D.C. Circuit's application of *Bruen* is binding, *see Save Jobs USA v. DHS*, 111 F.4th 76, 80 (D.C. Cir. 2024), *cert. denied*, 146 S. Ct. 319 (2025).

Even if factual allegations that silencers facilitate self-defense were sufficient, the Amended Complaint does not contain any. *See* Am. Compl. ¶ 34. The United States attempts to make these allegations in its brief, Pl.'s Opp'n at 37, but a plaintiff cannot overcome pleading deficiencies by making allegations in its opposition brief, *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994). Rather, "[i]t is the plaintiff's responsibility to ensure that the *complaint* 'contain[s] sufficient factual matter.'" *Doe v. District of Columbia*, 151 F.4th 435, 451 (D.C. Cir. 2025) (emphasis added) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Resisting that responsibility, the United States argues that to require allegations beyond its conclusory allegation that silencers facilitate self-defense is to require a "detailed demonstration" in violation of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Pl.'s Opp'n at 37. But the Amended Complaint is not deficient because it lacks details; it is deficient because it lacks *any* factual allegations about how silencers facilitate self-defense. That is what *Twombly* requires: "[f]actual allegations" that go beyond "conclusions." 550 U.S. at 555. Contrary to its request for a chance to develop a record, Pl.'s Opp'n at 38, the United States cannot "unlock the doors of discovery . . . with nothing more than conclusions," *Iqbal*, 556 U.S. at 678–79.

> **2.    The Amended Complaint Must, but Does Not, Plausibly Allege That Silencers and AR-15s Are In Common Use for Self-Defense.**

The United States must also plausibly allege that silencers and AR-15s are "in common use for a lawful purpose, such as self-defense." Defs.' Mot. at 33 (quoting *Hanson*, 140 F.4th at

232); *see United States v. Price*, 111 F.4th 392, 398–402 (4th Cir. 2024) (en banc) (explaining why common use is a *Bruen* step one issue), *cert. denied*, 145 S. Ct. 1891 (2025).  The District walked through the Amended Complaint's factual allegations and explained why they failed to show common use.  Defs.' Mot. at 36–43.  The United States does not engage with that discussion but simply says in a footnote that it pleaded facts to satisfy *Hanson*.  Pl.'s Opp'n at 38 n.33.  Such a cursory, conclusory footnote does not preserve a response.  *Georgia v. DOJ*, 148 F.4th 724, 739–40 (D.C. Cir. 2025).  The United States thus concedes that its Amended Complaint does not plausibly allege common use.  *See Texas*, 798 F.3d at 1114–16.

Rather than try to satisfy *Hanson*, the United States fights it, arguing that the Supreme Court's decision in *Wolford v. Lopez*, 146 S. Ct. 2032 (2026), abrogated *Hanson* and only requires the United States to plead that silencers and AR-15s are arms, and common use is an issue that belongs at *Bruen*'s step two.  Pl.'s Opp'n at 8, 33–35, 38–39.  *Wolford* was a challenge to a law prohibiting the carrying of guns onto private property without the owner's consent.  146 S. Ct. at 2045–46.  In giving a general overview of *Bruen*, the Court stated that step one asks, among other questions, "does [the challenged law] concern any form of 'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes?"  *Id.* at 2043.  This one line does not change the test.  The scope of the Second Amendment's protection for instruments was not at issue in *Wolford* because the challenged law did not concern a type of alleged "arm."  As such, the parties did not address how common use fits into the *Bruen* framework.  Consequently, the Court had no discussion of these issues.  As the Court has explained, its opinions do not create precedent on issues "not there raised in briefs or argument nor discussed in the opinion of the Court."  *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38 (1952).  Indeed, contradicting its position in this case, the United States has explained elsewhere that *Wolford*

23

does *not* support moving the common-use inquiry into *Bruen*'s step two.  Defs.' 2d Suppl. Br. [91] at 3, *Brown v. ATF*, No. 25-cv-1162 (E.D. Mo. July 27, 2026) ("U.S. *Brown* Br.").

Moreover, for *Wolford* to abrogate *Hanson*, it "must *clearly* dictate a departure from circuit law."  *Bahlul v. United States*, 77 F.4th 918, 926 (D.C. Cir. 2023) (emphasis added) (citation omitted).  This is a high bar—*Wolford* must "eviscerate" *Hanson*.  *Id.* at 925 (citation modified).  But *Wolford* was addressing a different issue and had no occasion to opine on common use, so it could not have eviscerated *Hanson*.  *See Refugee*, 174 F.4th at 115 (circuit precedent still binding when a Supreme Court case "did not address, and thus hardly eviscerated . . . this circuit's . . . rule" (citation modified)); U.S. *Brown* Br. at 3–4 (arguing that *Wolford* does not abrogate circuit-level precedent placing common use at step one).[2]

Because *Wolford* does not clearly eviscerate *Hanson*, the United States gains nothing by resorting to two out-of-circuit cases.  *See United States v. Torres*, 115 F.3d 1033, 1035–36 (D.C. Cir. 1997) (district courts must follow D.C. Circuit precedent even if called into question by other circuits' precedent).  The United States says that the Seventh Circuit's decision upholding an assault weapons ban abandoned its prior precedent placing common use at step one.  Pl.'s Opp'n at 34 (citing *Barnett v. Raoul*, 180 F.4th 1035 (7th Cir. 2026)).  But the court merely "assume[d] for purposes of today's ruling that the regulated items are 'Arms.'"  180 F.4th at 1046.  The United States also points to a recent, outlier, fractured opinion from the Third Circuit.  Pl.'s Notice of Suppl. Auth. [37] (citing *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, --- F.4th ----, Nos. 24-2415, 24-2450, 24-2506, 2026 WL 2075513 (3d Cir. July 17, 2026) (en banc)).  The majority placed common use at step two based on its reading of *Heller*, *Bruen*,

---

[2]    Even if *Wolford* did abrogate *Hanson* (and it does not), the United States' challenge to the silencer prohibition would still fail because a silencer is not a "*weapon*" as defined by *Wolford*.  146 S. Ct. at 2043 (emphasis added); *see* Pl.'s Opp'n at 37.

24

and *Wolford*—over strong dissents.  2026 WL 2075513, at \*11–13; *id.* at \*50–51 (Shwartz, J., dissenting); *id.* at \*59–62 (Krause, J., dissenting).  The D.C. Circuit read *Heller* and *Bruen* differently in *Hanson*, and *Wolford* does not clearly abrogate *Hanson*, so the Third Circuit's contrary opinion is inconsequential for this Court.

**B.      The Amended Complaint Fails to Plausibly Allege a Pattern or Practice of Conduct by Law Enforcement Officers.**

The District explained that the Amended Complaint made only two factual allegations concerning whether the alleged pattern or practice was actually occurring; both suffered from several flaws; and neither sufficed to state a claim.  Defs.' Mot. at 43–45.  In response, the United States repeats its allegations, cites a case about standing, and says the allegations suffice.  Pl.'s Opp'n at 6–7, 39.  That conclusory response does not address any of the specific deficiencies identified by the District, such as that the United States cannot plead on information and belief.  The United States concedes those points.  *See Texas*, 798 F.3d at 1114–16.

The United States cannot stave off dismissal by citing a case about pre-enforcement standing for the proposition that "enforcement of the statute is presumed."  Pl.'s Opp'n at 7 (citing *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)).  The statute here requires more: that MPD is "*engag[ing]* in a pattern or practice of conduct."  34 U.S.C. § 12601(a) (emphasis added); *see* Defs.' Mot. at 11–12 (defining these terms).  The United States cannot presume enforcement; it must plausibly allege that MPD is in fact *engaging* in enforcement in ways that deny constitutional rights—and frequently enough to constitute a "pattern or practice."  *See* Defs.' Mot. at 45.  The United States fails to do so.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Amended Complaint.

25

Date: August 4, 2026.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
Special Counsel for Firearm Safety
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
(202) 735-7474
adam.tuetken@dc.gov

*Counsel for Defendants*

26